UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

*CR 16-246 JRT/BRT*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
| | ) | |
| Plaintiff, | ) | 18 U.S.C. § 1349 |
| | ) | 18 U.S.C. § 1341 |
| v. | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1956(h) |
| 1. JEROME C. RUZICKA, | ) | 18 U.S.C. § 1957 |
| 2. SCOTT A. NELSON, | ) | 18 U.S.C. § 2 |
| 3. W. JEFFREY TAYLOR, | ) | |
| 4. LAWRENCE W. MILLER, and | ) | |
| 5. LAWRENCE T. HAGEN, | ) | |
| | ) | |
| Defendants. | ) | |

THE UNITED STATES GRAND JURY CHARGES:

## <u>OVERVIEW OF SCHEME TO DEFRAUD</u>

1.      Beginning no later than 2006 and continuing until September 2015, Jerry RUZICKA, Scott NELSON, Larry MILLER, Jeff TAYLOR, and Larry HAGEN stole more than $20,000,000 from Starkey Laboratories, a hearing aid manufacturer located in Eden Prairie, Minnesota.  RUZICKA, NELSON, and MILLER were high-level executives of Starkey, and as such were entrusted to oversee the day-to-day operations and to act in the best interests of the company.  Instead, they betrayed that trust by conspiring with each other, and at times with TAYLOR and HAGEN, to, among other things: (a) use a sham consulting company and phony invoices to embezzle millions of dollars from Starkey; (b) exploit pricing discounts from a Starkey supplier to obtain illicit payments from other hearing-aid manufacturers; (c) fraudulently award themselves shares of stock in a company owned by Starkey and, later, pay themselves $15,000,000 for the same shares

SCANNED
SEP 2 2 2016
U.S. DISTRICT COURT MPLS

<u>U.S. v. Jerome C. Ruzicka, et al.</u>

of stock; (d) enrich themselves through millions of dollars in exorbitant bonuses, fake loans, and hidden personal purchases; and (e) conceal these thefts from Starkey's owner, William Austin.   The conspirators' massive fraud against Starkey was halted only when the scheme came to light in September 2015, and RUZICKA, NELSON, and MILLER were fired by Starkey.

## INTRODUCTION

At times relevant to this Indictment:

2.      Starkey Laboratories Inc. (hereafter referred to as "Starkey") was a Minnesota corporation that, along with its subsidiaries and affiliates, developed, manufactured, and distributed hearing aids.   Starkey was the largest manufacturer of hearing aids in the United States, and one of the largest such manufacturers in the world. Starkey's headquarters, along with many of its approximately 5,000 employees, were located in Eden Prairie, Minnesota.

3.      Starkey was privately owned by William F. Austin—at times through trusts established by Austin—and by Starkey employees through an employee stock option plan. The stock held by the employee stock option plan constituted less than 7% of the total shares of the company.   Austin served as the chief executive officer of Starkey.   Austin was also the chairman and sole member of the board of directors of Starkey.

4.      Northland Hearing Centers, Inc. ("Northland Hearing") d/b/a All American Hearing was a Starkey subsidiary that acquired and operated retail hearing-aid stores.

<u>U.S. v. Jerome C. Ruzicka, et al.</u>

5.     The Starkey Hearing Foundation (hereafter the "Starkey Foundation") was a separate non-profit entity founded by Austin in about 1984 that was dedicated to providing hearing aids and other hearing services to underprivileged people throughout the world.

6.     Sonion A.S. (hereafter "Sonion"), headquartered in Denmark, manufactured and sold miniature hearing-aid components. Starkey was Sonion's primary U.S.-based customer.

<b><u>The Defendants</u></b>

7.     Jerome ("Jerry") RUZICKA was employed as president of Starkey. RUZICKA began working at Starkey in approximately 1979 and worked in various roles in Starkey's manufacturing department until he was promoted by Austin to president in 1998. RUZICKA abused his authority as President of Starkey, as well as the trust Austin placed in him, to orchestrate a multi-faceted scheme to steal more than $20 million from Starkey, as described in more detail below. When certain details of the scheme were discovered in September 2015, Starkey terminated RUZICKA's employment.

8.     Scott NELSON was employed as chief financial officer of Starkey. NELSON was originally hired by Starkey in approximately 1997, and previously served as Starkey's corporate controller and vice president of finance. NELSON exploited his management of Starkey's finances to embezzle millions of dollars from Starkey, including funds for a condominium he caused Starkey to secretly purchase for his own use, as

U.S. v. Jerome C. Ruzicka, et al.

described in more detail below.    Starkey terminated NELSON's employment in September 2015 after certain details of the scheme came to light.

9.    Lawrence ("Larry") MILLER was employed as senior vice president of human resources for Starkey.    MILLER was initially hired by Starkey in approximately 1987, and worked in Starkey's personnel/human resources department throughout his employment.    As set forth below, MILLER repeatedly falsified payroll reports in order to conceal the conspirators' embezzlement from Austin, including the exorbitant bonuses received by MILLER each year.    Starkey terminated MILLER's employment in September 2015 after certain details of the scheme came to light.

10.    William Jeffrey ("Jeff") TAYLOR was employed as the president of Sonion U.S., the U.S. subsidiary of Sonion.    TAYLOR was a personal friend of RUZICKA. TAYLOR and RUZICKA used multiple sham entities to steal millions of dollars from their employers, Starkey and Sonion, as described below.    In approximately November 2015, when Sonion discovered TAYLOR's fraudulent conduct, Sonion terminated TAYLOR's employment.

11.    Lawrence ("Larry") HAGEN was employed by Starkey between the following approximate timeframes: 1982 through 1986, and 1999 through 2005.    HAGEN was also a personal friend of RUZICKA.    As set forth below, HAGEN controlled a dummy entity that he, RUZICKA, and TAYLOR used to fraudulently convert Starkey's pricing discounts from Sonion into illicit profits for themselves.

4

## Austin's Oversight of Starkey (2006-2015)

12.     Beginning no later than in or about 2006 and continuing through September 2015, Austin focused primarily on the Starkey Foundation, including extensive travel for mission trips that caused Austin to be absent from Minnesota on average about twenty-five days per month.   During this time, Austin entrusted the management of Starkey's operations to RUZICKA and the other Starkey executives.   Austin regularly conferred with RUZICKA and NELSON to discuss matters related to Starkey, and also monitored information about Starkey's operations, including the following:

a.     Descending Gross Payroll Report.   At least once per year Austin requested from Larry MILLER a payroll report that listed the total compensation for each employee of Starkey in descending order by compensation.   MILLER consistently represented to Austin that the descending gross report included all forms of compensation.

b.     Line of Credit Balance.   Starkey maintained a multi-million-dollar line of credit with a consortium of banks, led by Wells Fargo, that Starkey could draw upon for business purposes.   On multiple occasions every year, Austin questioned Scott NELSON regarding the outstanding balance on Starkey's line of credit.

c.     Unit Production Reports.   Austin also reviewed unit production reports that showed the total number of hearing-aid units produced and sold in geographic regions.

## RUZICKA's Employment Agreement
## and Austin's Plan for RUZICKA's Successor

13.     In or about late 2005, RUZICKA informed Austin that he (RUZICKA) planned to work at Starkey for another ten years, until 2016, and then retire at about age 60.  RUZICKA asked Austin for an employment agreement covering the next ten years.

14.     As a result, in or about January 2006, Austin signed an employment agreement with RUZICKA in which he agreed to employ RUZICKA through January 2016—the year in which RUZICKA told Austin he wanted to retire.   Pursuant to the employment agreement, Austin agreed that Starkey would pay RUZICKA a minimum base salary of approximately $600,000 (with yearly increases of at least 5%), as well as a performance bonus of up to $250,000 if Starkey met certain financial benchmarks.   In addition, Austin agreed that Starkey would pay RUZICKA a "pension" following RUZICKA's retirement equal to his total salary in the previous ten years (2006-2015) paid over the succeeding ten years (2016-2025).

15.     Believing that RUZICKA intended to retire in 2016, Austin planned to promote his step-son, Brandon Sawalich, to president when RUZICKA retired.   Sawalich had worked at Starkey since approximately 1994, primarily in Starkey's sales department. In approximately 2006, Sawalich was promoted to vice president of sales and marketing. On multiple occasions between 2006 and 2015, Austin discussed with RUZICKA his plan to appoint Sawalich as president when RUZICKA's contract expired in 2016.

U.S. v. Jerome C. Ruzicka, et al.

16.     In late 2007, RUZICKA approached Austin and expressed concern about whether his pension would be paid if Austin were to die.  As a result, and in order to provide RUZICKA with an incentive to maximize the value of the company in the event of Austin's death, in December 2007, Austin signed an amendment to RUZICKA's 2006 employment agreement.  According to the amendment, upon Austin's death or a change in control of Starkey, RUZICKA would obtain a 10% ownership stake in Starkey. RUZICKA's potential ownership stake was worth at least approximately $50,000,000 based on Starkey's valuation at the end of 2007.  Despite this lucrative employment agreement, RUZICKA orchestrated a scheme to defraud Starkey in order to obtain additional funds for himself and his co-conspirators.

## COUNT 1
(Conspiracy to Commit Mail Fraud and Wire Fraud)
18 U.S.C. § 1349

17.     The allegations contained in paragraphs 1 through 16 of this Indictment are re-alleged as if stated in full herein.

18.     Beginning no later than in or about 2006 and continuing at least until in or about September 2015, in the State and District of Minnesota and elsewhere, the defendants,

**JEROME C. RUZICKA,
SCOTT A. NELSON,
W. JEFFREY TAYLOR,
LAWRENCE W. MILLER, and
LAWRENCE T. HAGEN,**

did knowingly conspire with each other and with others to devise and participate in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions, and for the purpose of executing such scheme and artifice, and attempting to do so: (a) caused the sending, delivering, and receipt of various matters and things by United States Postal Service and private and commercial interstate carrier; and (b) caused the transmission in interstate commerce, by means of wire communications, of certain writings, signs, signals, pictures, and sounds.

19.     More specifically, beginning at least as early as 2006, and continuing until his termination in September 2015, RUZICKA conspired with NELSON, MILLER, TAYLOR, HAGEN, and others to embezzle and misappropriate money and business opportunities belonging to Starkey and Sonion and to conceal the scheme from Austin and others by, including but not limited to, the following:

a.     RUZICKA and TAYLOR formed and controlled a sham company (Archer Consulting) that falsely claimed to provide services to Starkey, and then submitted phony invoices to Starkey for those purported services in order to enrich themselves at Starkey's expense;

b.     RUZICKA, TAYLOR, and HAGEN fraudulently represented to Sonion that dummy entities they controlled (Claris Investments and Archer Acoustics)

U.S. v. Jerome C. Ruzicka, et al.

were Starkey affiliates such that Sonion allowed them to purchase hearing-aid components at Starkey's discounted prices.   They then resold that product to, or otherwise shared the discounted pricing with, other hearing-aid manufacturers in exchange for commissions and rebates.   In so doing, RUZICKA, TAYLOR, and HAGEN thereby fraudulently deprived Sonion and Starkey of money and business opportunities;

c.   RUZICKA and NELSON surreptitiously and without Austin's knowledge or approval awarded themselves restricted stock in Starkey's retail affiliate (Northland Hearing) and then paid themselves and another individual (referred to herein as "J.L.") approximately $15 million in exchange for terminating the restricted stock grants; and

d.   RUZICKA, NELSON, and MILLER embezzled money and other benefits for themselves that were concealed from Austin.

## Archer Consulting

20.   Beginning in or about 2006, and continuing until in or about September 2015, RUZICKA and TAYLOR embezzled approximately $7,650,000 from Starkey by issuing false invoices to Starkey from a sham company named Archer Consulting.

21.   Archer Consulting, Inc., was at all times owned and controlled by TAYLOR and/or RUZICKA.

22.   Beginning in about 2006, RUZICKA caused Starkey to begin paying Archer Consulting a purported "commission" on sales of hearing aid components from Sonion

U.S. v. Jerome C. Ruzicka, et al.

(TAYLOR's employer) to Starkey (RUZICKA's employer).   Austin—Starkey's

C.E.O.—was entirely unaware that RUZICKA was making secret payments to himself and

TAYLOR via fraudulent commissions paid to a sham vendor.   As RUZICKA and

TAYLOR well knew, neither of them was entitled to receive commissions from Starkey

on sales from Sonion to Starkey.   In fact, TAYLOR was already receiving a separate

commission from Sonion based on Starkey's purchases from Sonion.

    23.    On or about March 10, 2006, TAYLOR wrote the following email to

RUZICKA:

> Hi Jerry...I am in the midst of catching up on some Archer
> invoices, and want to seek your input/advice.   I've been
> struggling to find some creative way to determine/base the
> Archer commission, but now think that the simplest approach
> is just a straight % of sales invoiced for the month.

Thereafter, TAYLOR submitted invoices for commission payments to RUZICKA on

behalf of Archer Consulting, which RUZICKA caused Starkey to pay.   TAYLOR

controlled the Archer Consulting bank account into which the payments from Starkey were

deposited.   After receiving payment from Starkey on the sham invoices, TAYLOR kicked

back approximately half of the payment to RUZICKA.

    24.    In about 2010, RUZICKA and TAYLOR changed the description of the

fraudulent payments from "commissions" to "consulting fees."   RUZICKA and TAYLOR

signed and back-dated a Consulting Services Agreement whereby Starkey purportedly

hired Archer Consulting to provide "consulting services for the purchase of transducers,"

including opinions on "technology, price, and delivery." Transducers are hearing-aid components that Starkey purchased from Sonion. The Consulting Services Agreement set forth a payment schedule of $75,000 per month, and directed that the "Consultant shall report exclusively to Starkey's President in connection with the performance and delivery of the Services."

25.     Beginning in about 2010, and continuing through 2015, RUZICKA and TAYLOR issued monthly invoices from Archer Consulting for "consulting" fees, and RUZICKA caused Starkey to pay the invoices. RUZICKA and TAYLOR then split the proceeds, including the funding of a fraudulent 401(k) plan for RUZICKA and TAYLOR through Archer Consulting.

26.     In total, between 2006 and 2015, RUZICKA and TAYLOR stole approximately $7,650,000 from Starkey through fraudulent "commission" and "consulting fee" invoices from Archer Consulting.

## Claris Investments and Archer Acoustics

27.     Beginning no later than in or about 2004 and continuing until in or about 2015, RUZICKA, TAYLOR, and HAGEN obtained discounted pricing for hearing-aid components from Sonion by falsely representing to Sonion that dummy entities they owned and controlled were Starkey affiliates. RUZICKA, TAYLOR, and HAGEN, then re-sold the discounted components to hearing-aid manufacturers or otherwise shared the

discounted pricing with the hearing-aid manufacturers in exchange for fraudulent payments the defendants characterized as "commissions" or "rebates."

### Claris Investments

28.     In or about 2002, RUZICKA and HAGEN formed Claris Investments LLC ("Claris").   TAYLOR later joined the company as an equal member.

29.     Beginning no later than in or about 2005, TAYLOR fraudulently represented to Sonion that Claris was affiliated with Starkey and thereby caused Sonion to allow Claris to purchase hearing-aid components at Starkey's discounted price.

30.     Beginning in about 2005, Claris agreed to provide the same discounted pricing on Sonion products to a German hearing aid manufacturer, Auric Horsysteme ("Auric").   In exchange for the discounted pricing, Claris submitted invoices to Auric for "commissions" based on the sales from Sonion to Auric, resulting in payments from Auric to Claris of approximately $350,000 between 2004 and 2012, thereby fraudulently depriving Sonion and Starkey of money and business opportunities.   RUZICKA, TAYLOR, and HAGEN, each received a share of the fraudulent proceeds via payments from Claris to them personally or to other entities on their behalf.

31.     The invoices from Claris to Auric identified the Claris sales representative as "Geronimo Rose."   Geronimo Rose was a pseudonym used by TAYLOR so that Auric and, more importantly, his employer Sonion, did not find out TAYLOR was involved with Claris.

12

U.S. v. Jerome C. Ruzicka, et al.

### *Archer Acoustics*

32.     In about 2009, TAYLOR and RUZICKA set up another company, Archer Acoustics, that was used in the same fashion as Claris to fraudulently leverage Starkey's pricing discount with Sonion into illicit profits for RUZICKA, TAYLOR, and HAGEN.

33.     Beginning no later than in or about 2009, TAYLOR fraudulently represented to Sonion that Archer Acoustics was affiliated with Starkey and thereby caused Sonion to give Starkey's discounted pricing to Archer Acoustics.

34.     Initially, Archer Acoustics purchased hearing aid products from Sonion and resold the products to other hearing aid manufacturers at a marked up price.   Beginning in approximately 2011, the defendants directed their "customers" to order products directly from Sonion, and then caused Sonion to pay "product rebates" to Archer Acoustics based on the sales.   RUZICKA, TAYLOR, and HAGEN received their individual shares of these fraud proceeds via payments from Archer Acoustics to them personally or to other entities on their behalf.

35.     In total, RUZICKA, TAYLOR, and HAGEN obtained at least approximately $600,000 in profits, commissions, and rebates by fraudulently leveraging Starkey's purchasing power for their own benefit.

## Northland

### *2006 – Fraudulent Transfer of Assets and Grant of Restricted Stock*

36.     Northland US, LLC (hereafter "Northland LLC"), was created in approximately 2002, and was wholly-owned by Austin. In about 2005, Northland LLC began acquiring and operating retail hearing aid establishments.

37.     In or about 2006, without Austin's knowledge or approval, RUZICKA and NELSON created a new entity, Northland Hearing Centers, Inc. (hereafter "Northland Hearing"), and then transferred Northland LLC's assets into Northland Hearing. In misappropriating Northland LLC's assets to an entity they controlled, RUZICKA and NELSON caused Austin's signature to be forged on certain of the necessary closing and formation documents.

38.     RUZICKA and NELSON also caused Northland Hearing to issue 100,000 shares of stock, including—again without Austin's knowledge—51,000 shares to themselves and J.L. as restricted stock. This stock was "restricted" in that the shareholders would lose their shares if their employment with Northland Hearing and/or Starkey was terminated during the vesting period. However, the restricted shares were scheduled to fully vest in 2016, thereby eliminating any restrictions on ownership at that time. Despite awarding themselves more than half of the stock in Starkey's retail subsidiary, RUZICKA

and NELSON did not obtain Austin's approval for—or even notify Austin about—the stock grants.

### *2013 Payments for Restricted Stock*

39.   In or about 2013, as the expiration of RUZICKA's employment agreement approached, RUZICKA and NELSON caused Northland Hearing to pay them for their unvested restricted stock—again without Austin's knowledge or approval—by terminating the stock in exchange for approximately $15,000,000.

40.   Specifically, at NELSON's direction, between June and August 2013, Starkey made payments to RUZICKA, NELSON, and J.L. totaling approximately $8,200,000. RUZICKA, NELSON, and J.L. received these payments via the purchase of whole-life insurance policies with Lincoln Financial Group and through deposits made into investment accounts at Edward Jones. Later, in December 2013, NELSON caused the payments to RUZICKA, NELSON, and J.L. to be "grossed up" for taxes, and an additional approximately $7,000,000 was sent to the Internal Revenue Service ("IRS") on behalf of RUZICKA, NELSON, and J.L. to cover the income taxes that would accrue to RUZICKA, NELSON, and J.L. as a result of the millions of dollars they received from the early termination of the restricted stock.

41.   RUZICKA and NELSON took various steps to conceal the Northland transactions from Austin, including lying to and misleading Starkey and Northland Hearing employees and others.

U.S. v. Jerome C. Ruzicka, et al.

42.    In total, RUZICKA and NELSON abused their positions as president and chief financial officer of Starkey to steal approximately $15,000,000 from Starkey through the fraudulent issuance and early termination of restricted stock in Northland Hearing.

## Further Embezzlement and Concealment of Benefits

43.    From 2006 to 2015, RUZICKA, NELSON, and MILLER abused their positions and authority as Starkey executives to embezzle money and fraudulently obtain other benefits from Starkey.   In order to evade detection by Austin and avoid any challenge to their ability to enrich themselves, they took various steps to conceal from Austin their receipt of these benefits.

### Miller "Loyalty" Bonus and
### Falsification of Descending Gross Salary Reports

44.    In or about July 2006 (the same year that RUZICKA and NELSON fraudulently obtained restricted stock in Northland Hearing), RUZICKA—as president of Starkey—signed an employment agreement with Larry MILLER that guaranteed MILLER a "long-term services and loyalty bonus" of $50,000 (net) each year from 2006 through 2015.   This "loyalty bonus" was in addition to MILLER's salary and performance bonus. No other Starkey employee received such a "loyalty" bonus.   Thereafter, from 2006 through MILLER's termination in 2015, RUZICKA and MILLER caused Starkey to pay MILLER approximately $88,250 per year (consisting of the $50,000 bonus, grossed up for

U.S. v. Jerome C. Ruzicka, et al.

taxes) on top of his salary and a performance-based bonus.   In total, MILLER received approximately $882,500 in "loyalty" bonuses between 2006 and 2015.

45.      Between 2006 and 2015, at least once per year, Austin requested and received from MILLER a descending gross payroll report.   Prior to Austin receiving the report, however, MILLER, RUZICKA, and/or NELSON manipulated the descending payroll report to conceal from Austin certain bonus payments and other benefits they paid to themselves and other Starkey employees.

46.      For example, in 2011, Larry MILLER received from Starkey total gross earnings of approximately $624,000, including a salary of $300,000 and bonuses totaling approximately $307,000.   MILLER's 2011 bonuses included "loyalty" payments of $176,500 (MILLER received an additional $88,250 to "catch-up" for partial payments in 2008 and 2009).   In or about December 2011, Starkey's director of payroll emailed to MILLER a copy of the Starkey descending gross report reflecting MILLER's total compensation of approximately $624,000, which rendered him the third highest paid employee at Starkey after RUZICKA and Austin.   MILLER then doctored the report to hide his compensation before providing a copy to Austin.   Specifically, MILLER reduced his bonus by approximately $240,000—from about $307,000 to $67,000—thereby concealing from Austin a significant portion of the excessive bonuses he received in 2011.

<u>U.S. v. Jerome C. Ruzicka, et al.</u>

As a result, instead of being listed as the third-highest paid employee, the doctored report listed MILLER as Starkey's seventh-highest paid employee.

47. Additionally, in 2012, Starkey paid MILLER approximately $534,000 in total compensation, including salary of $315,000 and bonuses totaling approximately $216,000. In or about February 2013, MILLER received the Starkey descending payroll report. MILLER then falsified the report before providing a copy to Austin. Specifically, MILLER reduced his bonus by approximately $125,000—from about $216,000 to $91,000 —thereby concealing a significant portion of his bonuses from Austin.

48. In 2013, MILLER received from Starkey approximately $535,000 in total compensation, including salary of $335,000 and bonuses totaling approximately $200,000. Also in 2013, RUZICKA, NELSON, and J.L. received approximately $15,000,000 for their Northland Hearing restricted stock. In order to conceal these payments from Austin, MILLER and NELSON fraudulently altered the descending payroll reports. First, in about December 2013, Starkey's director of payroll sent a copy of the descending payroll reports for Starkey and Northland Hearing to NELSON and RUZICKA. NELSON entirely removed the Northland Hearing payments from the Northland descending gross report, and also falsified the Starkey descending gross report by reducing MILLER's bonus from approximately $200,000 to about $120,000. NELSON then emailed a copy of the falsified Starkey and Northland descending gross reports to MILLER. In the cover email, NELSON told MILLER, "Attached are the descending gross files for 2013 in case you are

asked to provide them.   You can check the numbers, but I think they are largely consistent with prior years reporting." After receiving the reports, MILLER further falsified the Starkey descending gross report by reducing his bonus by another approximately $50,000 before providing the report to Austin.

### RUZICKA's Fraudulent Bonus and
### Falsification of Descending Gross Report

49.   RUZICKA's 2006 employment agreement provided that RUZICKA was eligible to receive a bonus of $250,000 in any year in which Starkey "grows" by more than 10% and also increases its income before taxes ("IBT") by at least 10%.

50.   On or about January 20, 2015, RUZICKA sent an e-mail to MILLER instructing MILLER to process a bonus for RUZICKA in the amount of $250,000 because RUZICKA claimed Starkey's net revenues and IBT had grown by more than 10% in 2014. RUZICKA attached to the email a fraudulent and misleading profit and loss ("P&L") statement.   First, the attached P&L statement was not for the complete year and thus represented an inflated IBT as a result of the exclusion of significant end-of-year transactions conducted in the final financial cycle that reduced Starkey's IBT.   Second, RUZICKA and/or NELSON doctored the numbers in the P&L statement so that it appeared that Starkey's net revenues had grown by 10%.   In the e-mail to MILLER, RUZICKA wrote: "[k]eep this for your records if needed."

51.    On or about January 30, 2015, armed with RUZICKA's doctored P&L statement, MILLER approved RUZICKA's bonus and caused Starkey to pay approximately $390,000 to or on behalf of RUZICKA.   Not only was this bonus based on a falsified P&L statement, but it included approximately $140,000 to cover the additional income tax obligations created by the $250,000 bonus, even though RUZICKA's contract did not call for such "grossing up" of bonus payments.

52.    On or about August 7, 2015, Austin asked MILLER for a copy of the year-to-date descending gross report for Starkey.   MILLER sent an email to RUZICKA informing him of Austin's request for the descending gross report.   RUZICKA obtained a copy of the Starkey descending gross report from Starkey's payroll department, which reflected the $390,000 fraudulent bonus payment that RUZICKA received and MILLER approved in January 2015.   RUZICKA altered the Starkey descending gross report by removing the entire bonus payment he received.   RUZICKA and MILLER then together delivered the falsified Starkey descending payroll report to Austin, thereby concealing from Austin the fraudulent bonus payment received by RUZICKA.

### *NELSON's Fraudulent Purchase of Condominium*

53.    In 2012, NELSON used Starkey's funds to purchase a condominium for his own exclusive use, including to carry on a clandestine personal relationship with another Starkey employee.

U.S. v. Jerome C. Ruzicka, et al.

54.     Specifically, in or about May 2012, NELSON caused Starkey to purchase a condominium located at Smetana Drive, in Minnetonka, Minnesota, within the Cloud 9 development (hereafter the "Cloud 9 condo") for approximately $201,887.59.

55.     Although Starkey at times purchased residences and allowed employees and associates of Starkey to use the residences when necessary to perform work for Starkey, NELSON intended to and did in fact use the Cloud 9 condo exclusively for his own private, non-business purposes, including to carry on a clandestine personal relationship with a Starkey employee.   NELSON did not make the Cloud 9 condo known or available to other Starkey employees and associates, and neither sought approval from nor disclosed to Austin his use of Starkey's money to purchase the Cloud 9 condo for his own personal use. NELSON also did not disclose his personal use of the Cloud 9 condo to Starkey's payroll department, and failed to pay any Federal or State income taxes as a result of his personal use of the Cloud 9 condo.

### NELSON $225,000 Embezzlement in 2014

56.     In 2014, NELSON embezzled approximately $225,000 from Starkey and attempted to conceal the theft by falsifying Starkey's books and records.

57.     On or about March 25, 2014, NELSON caused Starkey's accounting department to issue a check in the amount of $225,000 to an Edward Jones account owned by NELSON.   NELSON lied to Starkey's controller, telling him that the check was payment for a life insurance premium for NELSON.   NELSON thereby caused the

21

payment to be entered on Starkey's general ledger as an "insurance" expense.   In fact, and as NELSON knew, he used the $225,000 payment from Starkey to replenish his investment account after making a payment of approximately $716,000 for a home in Prior Lake, Minnesota, two weeks earlier, on or about March 14, 2014.

58.   At an unknown date between March 2014 and October 2015, in order to further conceal his theft, NELSON prepared a phony "promissory note" that disguised the $225,000 payment as a loan from Starkey to NELSON that supposedly accrued interest at 5% per year until its expiration in 2020.   NELSON never included the purported "loan" he received from Starkey on Starkey's loan register, where all other loans issued by Starkey to employees were tracked, nor has he made any payments on the loan.

### RUZICKA $200,000 Embezzlement in 2014

59.   On or about April 8, 2014, NELSON caused Starkey's accounting department to issue a check in the amount of $200,000 to an Edward Jones account owned by RUZICKA.   NELSON lied to Starkey's controller, telling him that the check related to "officers insurance" for RUZICKA.   NELSON thereby caused the payment to be entered on Starkey's general ledger as an "insurance" expense.   In fact, RUZICKA used the $200,000 payment from Starkey to make payments on RUZICKA's state and federal personal income taxes.

60.     NELSON and RUZICKA did not record the $200,000 payment to RUZICKA as compensation, and therefore Starkey's payroll department did not include the $200,000 payment as a taxable benefit to RUZICKA.

### *RUZICKA's Theft of Jaguar Vehicle from Starkey*

61.     In 2015, RUZICKA misappropriated his Starkey-owned company car, a 2011 Jaguar.

62.     On or about August 30, 2010, RUZICKA caused Starkey to purchase a 2011 Jaguar vehicle for approximately $119,188.77 for RUZICKA's use.   Thereafter, from 2010 to 2015, Starkey paid the fees, insurance premiums, and other costs associated with the Jaguar.

63.     On or about July 1, 2015, approximately six months before his employment contract expired, RUZICKA transferred ownership of the Jaguar from Starkey to himself. RUZICKA acquired the title to the vehicle from Starkey, and then signed a title transfer document as both the representative of the seller, Starkey, and as the vehicle buyer.   At the time of transfer, the vehicle's mileage was approximately 31,800 and the vehicle's value was at least approximately $44,075.   RUZICKA did not pay or otherwise reimburse Starkey for the Jaguar.   RUZICKA also did not notify Starkey's payroll department of the transfer so that Starkey could include the value of the vehicle as a taxable benefit to RUZICKA.

U.S. v. Jerome C. Ruzicka, et al.

## Total Losses

64.    Through the means set forth above, RUZICKA, NELSON, MILLER, TAYLOR, and HAGEN conspired to embezzle and misappropriate money and business opportunities worth at least approximately $20,000,000 from Starkey and Sonion.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-7
(Mail Fraud)
18 U.S.C. § 1341

65.    The allegations contained in paragraphs 1 through 64 of this Indictment are re-alleged as if stated in full herein.

66.    On or about the following dates, in the State and District of Minnesota and elsewhere, the below-named defendants, having devised and intending to devise the scheme and artifice described above, aiding and abetting, and being aided and abetted by each other, caused to be sent, delivered, and moved by the United States Postal Service and private and commercial interstate carrier various mailings, items, and things for the purpose of executing and attempting to execute such scheme and artifice:

U.S. v. Jerome C. Ruzicka, et al.

| COUNT | DEFENDANT(S) | DATE (on or about) | MAILING DETAILS |
|---|---|---|---|
| 2 | Jerome RUZICKA Scott NELSON | June 26, 2013 | Envelope containing check # 297920, in the amount of $230,000.00, representing proceeds of the Northland restricted stock transaction, sent from Edward Jones to Lincoln Financial Group |
| 3 | Jerome RUZICKA Scott NELSON | July 11, 2013 | Envelope containing check # 298193, in the amount of $725,000.00, representing proceeds of the Northland restricted stock transaction, sent from Edward Jones to Lincoln Financial Group |
| 4 | Jerome RUZICKA W. Jeffrey TAYLOR | February 8, 2014 | Envelope containing IRS Form W-2 related to funds received through Archer Consulting, sent from Paychex to Jerome Ruzicka |
| 5 | Jerome RUZICKA W. Jeffrey TAYLOR | January 27, 2015 | Envelope containing IRS Form W-2 related to funds received through Archer Consulting, sent from Paychex to Jerome Ruzicka |
| 6 | Jerome RUZICKA W. Jeffrey TAYLOR | February 3, 2015 | Envelope containing check #113 in the amount of $60,000.00 sent from Archer Consulting, Inc., to Paychex Retirement Services |
| 7 | Jerome RUZICKA | July 1, 2015 | Envelope containing official title to Jaguar vehicle in the name of Jerome Ruzicka, sent from the Minnesota Department of Motor Vehicles to Jerome Ruzicka |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 8-23
### (Wire Fraud)
### 18 U.S.C. § 1343

67.    The allegations contained in paragraphs 1 through 64 of this Indictment are re-alleged as if stated in full herein.

68.    On or about the following dates, in the State and District of Minnesota, the below-named defendants, having devised and intending to devise the scheme and artifice described above, aiding and abetting, and being aided and abetted by each other, caused to be transmitted by means of wire communication in interstate commerce the following writings, signs, signals, pictures, and sounds for the purpose of executing and attempting to execute such scheme and artifice:

| COUNT | DEFENDANT(S) | DATE (on or about) | WIRE DETAILS |
|---|---|---|---|
| 8 | Jerome RUZICKA Larry MILLER | October 7, 2011 | Electronic payment in the amount of approximately $63,054.92 sent from Starkey's bank account at Wells Fargo to Miller's bank account at Wells Fargo |
| 9 | Jerome RUZICKA W. Jeffrey TAYLOR Lawrence HAGEN | February 15, 2012 | Wire transfer in the amount of approximately $27,869.82 from Auric Horsysteme's bank account to Claris Investments' bank account at Alliance Bank |
| 10 | Jerome RUZICKA W. Jeffrey TAYLOR Lawrence HAGEN | March 19, 2012 | Wire transfer in the amount of approximately $54,836.95 from Sonion's bank account at Danske Bank to Archer Acoustics' bank account at US Bank |

U.S. v. Jerome C. Ruzicka, et al.

| COUNT | DEFENDANT(S) | DATE (on or about) | WIRE DETAILS |
|---|---|---|---|
| 11 | Jerome RUZICKA W. Jeffrey TAYLOR | November 30, 2012 | Electronic payment in the amount of approximately $450,000.00 from Starkey's bank account at Wells Fargo to Archer Consulting's bank account at US Bank |
| 12 | Jerome RUZICKA Larry MILLER | December 14, 2012 | Electronic payment in the amount of approximately $63,230.16 sent from Starkey's bank account at Wells Fargo to Miller's bank account at Wells Fargo |
| 13 | Jerome RUZICKA Scott NELSON | August 8, 2013 | Processing of check #298848 in the amount of $2,070,000.00 from Starkey's bank account at Wells Fargo to Nelson's investment account at Edward Jones |
| 14 | Jerome RUZICKA Scott NELSON | August 8, 2013 | Processing of check #298849 in the amount of $2,900,000.00 from Starkey's bank account at Wells Fargo to Ruzicka's investment account at Edward Jones |
| 15 | Jerome RUZICKA Larry MILLER | September 27, 2013 | Electronic payment in the amount of approximately $62,126.80 sent from Starkey's bank account at Wells Fargo to Miller's bank account at Wells Fargo |
| 16 | Jerome RUZICKA Larry MILLER | July 25, 2014 | Electronic payment in the amount of approximately $57,749.16 sent from Starkey's bank account at Wells Fargo to Miller's bank account at Wells Fargo |
| 17 | Jerome RUZICKA W. Jeffrey TAYLOR | September 26, 2014 | Electronic payment in the amount of approximately $75,000.00 from Starkey's bank account at Wells Fargo to Archer Consulting's bank account at US Bank |
| 18 | Jerome RUZICKA W. Jeffrey TAYLOR | October 24, 2014 | Electronic payment in the amount of approximately $75,000.00 from Starkey's bank account at Wells Fargo to Archer Consulting's bank account at US Bank |

U.S. v. Jerome C. Ruzicka, et al.

| COUNT | DEFENDANT(S) | DATE (on or about) | WIRE DETAILS |
|---|---|---|---|
| 19 | Jerome RUZICKA<br>W. Jeffrey TAYLOR | October 31, 2014 | Electronic payment in the amount of approximately $6,374.92 from Paychex on behalf of Archer Consulting to Ruzicka's bank account at US Bank |
| 20 | Jerome RUZICKA<br>W. Jeffrey TAYLOR | October 31, 2014 | Electronic payment in the amount of approximately $7,090.88 from Paychex on behalf of Archer Consulting to Taylor's bank account at US Bank |
| 21 | Jerome RUZICKA<br>W. Jeffrey TAYLOR | November 13, 2014 | Processing of check #1132 in the amount of approximately $100,000.00 from Archer Consulting's bank account at US Bank to Ruzicka's bank account at US Bank |
| 22 | Jerome RUZICKA<br>W. Jeffrey TAYLOR | November 13, 2014 | Processing of check #1133 in the amount of approximately $100,000.00 from Archer Consulting's bank account at US Bank to Taylor's bank account at US Bank |
| 23 | Jerome RUZICKA<br>W. Jeffrey TAYLOR<br>Lawrence HAGEN | July 7, 2015 | Wire transfer in the amount of approximately $46,776.80 from ExSilent's bank account at ABN Amro Bank to Archer Acoustics' bank account at US Bank |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 24
(Conspiracy to Commit Money Laundering)
18 U.S.C. § 1956(h)

69.     The allegations contained in paragraphs 1 through 68 of this Indictment are re-alleged as if stated in full herein.

70.     From in or about 2006 through in or about September 2015, in the State and District of Minnesota and elsewhere, the defendants,

28

## JEROME C. RUZICKA and
## W. JEFFREY TAYLOR,

did knowingly and willfully combine, conspire, and agree to conduct and attempt to conduct financial transactions affecting interstate commerce, namely, transfers of the proceeds of specified unlawful activity related to Archer Consulting to themselves or for their benefit, knowing that the property involved in the financial transactions involved proceeds of a specified unlawful activity, that is, conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, and knowing that the transactions were designed in whole or in part to conceal or disguise the nature, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

### COUNT 25
(Conspiracy to Commit Money Laundering)
18 U.S.C. § 1956(h)

71.     The allegations contained in paragraphs 1 through 68 of this Indictment are re-alleged as if stated in full herein.

72.     From in or about 2006 through in or about September 2015, in the State and District of Minnesota and elsewhere, the defendants,

CASE 0:16-cr-00246-JRT-SER   Document 1   Filed 09/21/16   Page 30 of 34

U.S. v. Jerome C. Ruzicka, et al.

## JEROME C. RUZICKA,
## W. JEFFREY TAYLOR, and
## LAWRENCE T. HAGEN,

did knowingly and willfully combine, conspire, and agree to conduct and attempt to conduct financial transactions affecting interstate commerce, namely, transfers of the proceeds of specified unlawful activity related to Claris Investments and Archer Acoustics to themselves or for their benefit, knowing that the property involved in the financial transactions involved proceeds of a specified unlawful activity, that is, conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, and knowing that the transactions were designed in whole or in part to conceal or disguise the nature, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

### COUNTS 26-30
(Transactions Involving Fraud Proceeds)
18 U.S.C. § 1957

73.     The allegations contained in paragraphs 1 through 68 of this Indictment are re-alleged as if stated in full herein.

74.     On or about the following dates, in the State and District of Minnesota and elsewhere, the below-named defendants knowingly engaged and attempted to engage in a

U.S. v. Jerome C. Ruzicka, et al.

monetary transaction by, through, or to a financial institution, affecting interstate or foreign

commerce, in criminally derived property of a value greater than $10,000, such property

having been derived from specified unlawful activities, that is, conspiracy to commit mail

fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, mail fraud

in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of

Title 18, United States Code, Section 1343:

| COUNT | DEFENDANT(S) | DATE (on or about) | TRANSACTION |
|---|---|---|---|
| 26 | Jerome RUZICKA W. Jeffrey TAYLOR | February 26, 2014 | Negotiation of check in the amount of $60,000.00 from Archer Consulting to Paychex 401k Retirement Services for the benefit of Ruzicka and Taylor |
| 27 | Jerome RUZICKA W. Jeffrey TAYLOR | February 28, 2014 | Negotiation of check in the amount of approximately $100,000.00 from Archer Consulting to Jeff Taylor |
| 28 | Jerome RUZICKA W. Jeffrey TAYLOR | February 28, 2014 | Negotiation of check in the amount of approximately $100,000.00 from Archer Consulting to Jerry Ruzicka |
| 29 | Scott NELSON | March 11, 2014 | Negotiation of cashier's check in the amount of approximately $716,217.00 related to purchase of residence in Prior Lake, MN |
| 30 | Jerome RUZICKA W. Jeffrey TAYLOR | February 9, 2015 | Negotiation of check in the amount of $60,000.00 from Archer Consulting to Paychex 401k Retirement Services for the benefit of Ruzicka and Taylor |

All in violation of Title 18, United States Code, Sections 1957 and 2.

U.S. v. Jerome C. Ruzicka, et al.

## FORFEITURE ALLEGATIONS

75.     Counts 1-30 of this Indictment are hereby realleged and incorporated as if

fully set forth herein by reference, for the purpose of alleging forfeitures pursuant to Title

18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States

Code, Section 2461(c).

76.     As the result of the offenses alleged in Counts 1-23 of this Indictment, the

defendants,

**JEROME C. RUZICKA,**
**SCOTT A. NELSON,**
**W. JEFFREY TAYLOR,**
**LAWRENCE W. MILLER, and**
**LAWRENCE T. HAGEN,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C) in conjunction with Title 28, United States Code, Section 2461(c), any

property, real or personal, which constitutes or is derived from proceeds traceable to such

violations.   The property subject to forfeiture includes, but is not limited to:

   a.     All funds and holdings in Edward Jones Account No. 808-09541-1-1,
          in the approximate amount of $1,315,150.02;

   b.     All funds and holdings in Edward Jones Account No. 808-14970-1-1,
          in the approximate amount of $1,079,233.66;

   c.     All funds and holdings in Edward Jones Account No. 808-14977-1-4,
          in the approximate amount of $261,281.72;

   d.     All funds and holdings in Edward Jones Account No. 808-16006-1-4,
          in the approximate amount of $375,328.30;

U.S. v. Jerome C. Ruzicka, et al.

e.   All funds and holdings in Edward Jones Account No. 808-16007-1-3, in the approximate amount of 375,328.18;

f.   Lincoln National Life Insurance Company Policy No. 4877260, held by Jerome C. Ruzicka;

g.   Lincoln National Life Insurance Company Policy No. 4876981, held by J. L.;

h.   Lincoln National Life Insurance Company Policy No. 4876947, held by Scott A. Nelson;

i.   All funds and holdings held in the 401(k) Profit Sharing Plan and Trust, Plan Number 153205, at Paychex Retirement Services, in the name of Archer Consulting Inc.;

j.   $310,860 in funds or other holdings held in Edward Jones Individual Retirement Account No. 808-81410;

k.   Sun Life Assurance Co. Policy No. B73700009, held by Jerome C. Ruzicka;

l.   Sun Life Assurance Co. Policy No. B73700008, held by Scott A. Nelson;

m.   Sun Life Assurance Co. Policy No. B73700006, held by Lawrence W. Miller;

n.   Sun Life Assurance Co. Policy No. B73700005, held by J. M.;

o.   the real property, including the land and any buildings and structures located at 14907 Wildwood Court, Prior Lake, Minnesota;

p.   a 2011 Jaguar, VIN: SAJWA2JC5BMV07033.

77.   As a result of the offenses alleged in Counts 24-30 of this Indictment, defendants,

U.S. v. Jerome C. Ruzicka, et al.

### JEROME C. RUZICKA,
### SCOTT A. NELSON, and
### W. JEFFREY TAYLOR,

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in the such violations, and any property traceable to such property. The property subject to forfeiture includes, but is not limited to:

a. All funds and holdings held in the 401(k) Profit Sharing Plan and Trust, Plan Number 153205, at Paychex Retirement Services, in the name of Archer Consulting Inc.;

b. $310,860 in funds or other holdings held in Edward Jones Individual Retirement Account No. 808-81410;

c. the real property, including the land and any buildings and structures located at 14907 Wildwood Court, Prior Lake, Minnesota.

78.   If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                              FOREPERSON

34