## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**The United States of America,**

     **Plaintiff,**


**v.**                                   **Case No. CR 16-246 JRT/FLN**


**Jerome Ruzicka,**

     **Defendant.**

---

## DEFENDANT JEROME RUZICKA'S MOTION FOR A NEW TRIAL DUE TO THE GOVERNMENT'S *NAPUE* VIOLATIONS AND FOR A HEARING REGARDING WILLIAM AUSTIN'S TAX RETURN TESTIMONY

---

Defendant Jerome Ruzicka hereby moves this Court to grant a new trial because the government failed to comply with this Court's order on the defendants' *Napue* motion and violated his constitutional rights as guaranteed by *Napue v. Illinois*. There are two grounds for the present motion. First, in its rebuttal, the government affirmatively argued that William Austin did not commit perjury, thereby bolstering his testimony and directly disobeying this Court's mandate that it correct his perjured testimony. Second, the government

1

did not correct false testimony upon which the verdict was likely based, its

constitutional obligation to do so and this Court's specific order that it do so.

## APPLICABLE LAW

Rule 33 of the Federal Rules of Criminal Procedure allows this Court to

vacate the guilty verdicts and grant a new trial "if the interest of justice so

requires." Fed. R. Crim. P. 33(a).

"[I]t is established that a conviction obtained through use of false evidence,

known to be such by representatives of the State," violates the defendant's right

to due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This includes false

testimony that goes only to a witness' credibility:

> The principle that a State may not knowingly use false evidence,
> including false testimony, to obtain a tainted conviction, implicit in
> any concept of ordered liberty, does not cease to apply merely
> because the false testimony goes only to the credibility of the
> witness. **The jury's estimate of the truthfulness and reliability of a
> given witness may well be determinative of guilt or innocence**,
> and it is upon such subtle factors as the possible interest of the
> witness in testifying falsely that a defendant's life or liberty may
> depend.

*Id.* (emphasis added).

To prove a *Napue* violation, a defendant must show "(1) the prosecution

used perjured testimony; (2) the prosecution should have known or actually

knew of the perjury; and (3) there was a reasonable likelihood that the perjured

testimony could have affected the jury's verdict." *United States v. West*, 612 F.3d

2

993, 996 (8th Cir. 2010) (quoting *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007)). The second element is established if "the government knowingly, recklessly or negligently used the false testimony." *United States v. Tierney*, 947 F.2d 854, 860-61 (8th Cir. 1991).

When false testimony arises during the course of trial, "[t]he duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears." *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988). Where the government allows false testimony to stand, "[a] new trial is required if 'the false testimony . . . could in any reasonable likelihood have affected the judgment of the jury.'" *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271). The Court must find such a reasonable likelihood unless the "failure to disclose [the fact that the testimony is perjured] would be harmless beyond a reasonable doubt." *United States v. Duke*, 50 F.3d 571, 577 (8th Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

## FACTUAL BACKGROUND

As part of its case against Mr. Ruzicka, the government relied heavily upon testimony from William Austin ("Austin"), Starkey's CEO. Among other topics, Austin testified that he was unaware of the existence of Northland Hearing Centers, Inc. ("NHC"), he was unaware that Mr. Ruzicka was issued restricted stock in NHC, and he was unaware that Mr. Ruzicka redeemed that

restricted stock. The existence of NHC and the issuance of restricted stock in NHC were detailed in voluminous Starkey documents, many of which Austin was legally required to read. Nevertheless, Austin testified that he refused to read any Starkey financial documents beyond a yearly payroll report, and thus remained wholly ignorant of NHC's existence and of Mr. Ruzicka's restricted stock in NHC. The jury ultimately convicted Mr. Ruzicka of multiple counts of fraud relating to the issuance and redemption of that NHC stock.

Portions of Austin's testimony directly conflicted with numerous other government witnesses, including Jeffrey Longtain (NHC's President), Scott Nelson (Starkey's Chief Financial Officer), FBI Agent Brian Kinney, and FBI Agent Matt Snell.[1] For that reason, on February 25, 2018, Mr. Ruzicka and his co-defendant Lawrence Miller filed a motion asking the Court to require the government to correct Austin's false testimony. Dkt. 366.

On February 27, 2018, the Court issued an order on Mr. Ruzicka's motion. The Court found that where Austin's testimony conflicted with Nelson and Longtain, Mr. Ruzicka had not shown that the government had actual knowledge of which witness was being untruthful. Dkt. 377 at 5. However, where Austin's testimony conflicted with that of Agent Kinney and Agent Snell,

---

[1]     As explained further below, Mr. Ruzicka's testimony also directly conflicted with that of IRS Agent Shannon Korpela, though Agent Korpela had not yet testified at the time Mr. Ruzicka brought his initial *Napue* motion.

the Court found that the government did know which witness was testifying untruthfully. *Id.* at 6-15. The Court ultimately made a judicial finding that "the Government knows that Austin perjured himself" on at least two occasions. *Id.* at 15. The Court therefore held that the government had "a duty to correct the false testimony." *Id.*

In crafting this remedy, the Court made clear that the ultimate goal must be to fully inform the jury of Austin's perjury so that it could properly evaluate his credibility. As the Court stated:

> Because a conviction cannot be obtained through the use of false testimony, the Government must ensure – as its constitutional duty – that all false testimony is removed from the record. It is not enough for the Government to call back Austin, Kinney, or Snell, and have them testify to the accuracy of the perjured statements. Such a solution would leave the perjured testimony on the record and would not provide the jury with the information necessary to weigh the credibility of the affected witnesses.

*Id.* at 16. After issuing its order, the Court also also crafted Jury Instruction No. 41, which read in part:

> At the end of trial, the Court struck two portions of William Austin's testimony because the Court concluded that these statements were false:
>
> 1.     William Austin's testimony that he never shredded any descending gross income reports.
>
> 2.     William Austin's testimony that he believed Defendant Ruzicka had drafted the amendment to his employment contract and that he had drafted that amendment the same day it was signed.

Dkt. 396 at 57.

The Court also did not limit the scope of its order to the two portions of Austin's testimony described above. As part of its order, the Court specifically required the government to "identify **all** instances – including, but not limited to, the two identified by the Court – in which it knows that a Government witness perjured himself or herself." Dkt. 377 at 16 (emphasis in original). Subsequently, the Court accepted "the Government's good-faith representations that it is not aware of any other false testimony implicating *Napue*," and held that "the Government has complied with its obligation to correct false testimony." Dkt. 391 at 2.

## ARGUMENT

## I.   The government failed to correct Austin's perjured testimony, and actively undermined the Court from informing the jury about that perjury.

This Court did its level best to mitigate the damage done by the government's knowing use of false testimony by Austin. The Court provided a clear and reasoned analysis showing why it was beyond doubt that Austin had committed at least two instances of perjury. It crafted an order that required the the government to correct the false testimony so that the jury could properly evaluate Austin's credibility. And when the government's half-hearted "correction" of Austin's testimony failed to properly inform the jury of the issues

with Austin's testimony, the Court gave a jury instruction that put the jury on notice of the falsity of Austin's testimony.

Unfortunately, the prosecution then spent its rebuttal argument undoing all of the work that the Court had done so that the government could bolster Austin's false testimony and use it to obtain a conviction. The government's deliberate disregard for both its *Napue* obligations and this Court's order require a new trial.

### A. The government deliberately misrepresented the Court's findings in an effort to mislead the jury.

First, the government deliberately misled the jury regarding the meaning and effect of the Court's Jury Instruction No. 41 and the Court's judicial findings. In her rebuttal, the prosecutor told the jury in no uncertain terms that the Court had not determined that Austin lied:

> Now the defense attorneys have repeatedly told you that there is a judicial finding that Mr. Austin lied. I want you to look at this instruction. There is one word you don't see there, right? You don't see the word "lied." You don't see the word "knowingly" false.

Trial Tr. vol. 35, 53:1-12, Mar. 2, 2018.

But as the prosecutor was fully aware, there **was** "a judicial finding that Mr. Austin lied." As the Court stated numerous times in its *Napue* Order, it made a judicial finding that Austin committed perjury. Indeed, the Court could not have been clearer:

> This is not a mere failure to recall who drafted the amendment to the
> contract and when. Austin testified at length and in great detail
> about the creation of this amended contract. Documentary evidence
> – as testified to by Snell, establishes that it is **impossible** for Austin's
> story to be true. Accordingly, the Court finds that Austin perjured
> himself with respect to the statements that (1) the amended contract
> was drafted and signed in one day and (2) Ruzicka drafted the
> contract.

Dkt. 377 at 14 (bold emphasis in original). The prosecutor's argument was

therefore a deliberate and flagrant misrepresentation of the Court's findings.

The effect of the government's rebuttal was to render the Court's *Napue*

Order a nullity. In that order, the Court plainly found that "the fact that Austin

perjured himself goes to his credibility as a witness." *Id.* at 15. For this reason, the

Court ordered the prosecution to correct Austin's perjured testimony in front of

the jury so that the jury would be "provide[d] with the information necessary to

weigh the credibility of the affected witnesses." *Id.* at 16. Mr. Ruzicka's

constitutional rights therefore required that the jury be fully informed *by the*

*government* that Austin had perjured himself.

The government did the exact opposite. At no point did it inform the jury

of Austin's perjury—instead couching the falsity of his testimony as something

"the Court [] determine[d]." And in the face of a judicial finding that Austin had

perjured himself, the prosecutor affirmatively argued to the jury that he had not.

Thus, the jury was left without what the Court had found was necessary to

preserve Mr. Ruzicka's rights—"the information necessary to weigh [Austin's]

credibility." The government's statements in rebuttal amounted to a new *Napue* violation which denied Mr. Ruzicka a fair trial. Accordingly, this Court must grant Mr. Ruzicka a new trial.

**B.    The government capitalized on Austin's falsehoods to bolster the rest of his testimony.**

The government also undermined the Court's *Napue* Order by commandeering it as a weapon to bolster Austin's testimony and to attack Mr. Ruzicka. After misrepresenting the Court's finding that Austin had committed perjury, the government went on to argue that the reference to only two of Austin's statements in Jury Instruction No. 41 meant that the rest were credible:

> There are two things that the Court did determine were false, and you will look at those two things and those facts, and you have to ask yourselves how do they chalk up in terms of the four days of testimony that you heard from Bill Austin.

> He testified for four days, and there are two things that are the subject of this instruction . . . .

Trial Tr. vol. 35, 53:1-12, Mar. 2, 2018.

This is, again, a flagrant misrepresentation of the Court's order and Jury Instruction No. 41. At no point did the Court find or even suggest that these two statements were the only examples of Austin's false testimony. Instead, the Court found that these were the two instances that the government *knew for certain* were false. Dkt. 377 at 6, 14. The Court specifically ordered the government to conduct a review and determine if any other testimony by a government witness

was false. Using the Court's jury instruction to bolster the remainder of Austin's testimony, as the government did here, was intentionally misleading.

This mischaracterization is exacerbated by the fact that, as discussed further below, the government—and indeed, the individual prosecutor who gave the rebuttal—was personally aware that multiple other portions of Austin's testimony were false. The sole purpose of this misleading argument was, once again, to deprive the jury of "the information necessary to weigh [Austin's] credibility." For this reason, the Court must grant Mr. Ruzicka a new trial.

## II.     The government chose not to correct additional testimony from Austin that it knew to be false.

The government's violations under *Napue* extend further than the two statements identified above. In fact, despite its assurances to the Court to the contrary, the government was aware of at least four additional false statements made by Austin under oath. The government allowed each of these false statements to stand uncorrected, despite its obligations under both this Court's order and the Constitution.

### A.     The government was aware that William Austin testified falsely about his January 31, 2018 interview with the government.

The first false testimony from Austin that the government chose not to correct is similar in type to the two identified by the Court in its initial *Napue* order. It, too, was directly contradicted by the testimony of a government agent.

10

At trial, multiple witnesses testified that Austin had engaged in business dealings with Larry Hixson ("Hixson"). Specifically, both Jeffrey Longtain and Scott Nelson testified that Austin entered into an oral contract with Hixson. Trial Tr. vol. 7, 101:5-102:17, Jan. 26, 2018; vol. 17, 282:12-283:18, Feb. 19, 2018. They also testified that when the oral contract was reduced to writing, Austin instructed Nelson to alter its terms to benefit Austin without informing Hixson that he had done so, in the hopes that Hixson would sign the contract without noticing the changes. *Id.*

This testimony was obviously critical to the issues of Austin's credibility and his business practices. During cross-examination, counsel for Mr. Ruzicka asked Austin if he had been questioned by the government about his interactions with Hixson. Austin flatly denied ever being asked about Hixson:

> Q.   Did the government recently ask you about a man named Jim Hixson?
> A.   No.
> Q.   The government did not ask you about a man named Jim Hixson?
> A.   No.
> Q.   Or Larry Hixson, rather? Did the government ask you about a man named Larry Hixson?
> A.   No.
> Q.   Didn't ask you about a deal you did with Larry Hixson?
> A.   No.
> Q.   Didn't ask you about a contract you signed with him?
> A.   No.

Trial Tr. vol. 12, 31:1-16, Feb. 12, 2018.

This was a lie. Moreover, the government knew that this testimony was false at the time that Austin gave it. On January 29 and 31, 2018, FBI Agent Brian Kinney interviewed Austin in the presence of both Assistant United States Attorney Lola Velazquez-Aguilu—the prosecutor who performed the direct examination of Austin and gave the government's rebuttal argument—and IRS Agent Shannon Korpela.[2] At this interview, Austin was specifically asked about his interactions with Larry Hixson, with Kinney memorializing Austin's response as follows:

> Bill Austin stated that he did negotiate a contract with Larry Hixson and believed Hixson understood the contract. Austin stated that he was not aware that Hixson was ill and that Hixson is still alive.

 Ex. 1 at 2. Austin was asked about his contract with Hixson *in the presence of the prosecutor who directed him* less than two weeks before he took the stand. He then claimed under oath, in front of that same prosecutor, that this questioning never occurred. Ms. Velazquez-Aguilu then made a conscious decision not to correct Austin's false testimony when he offered it.

After Austin testified, the government called Agent Korpela to testify. Again, the prosecutor performing this direct examination was Ms. Velazquez-Aguilu. During cross-examination, counsel for Mr. Ruzicka questioned Agent

---

[2]     A true and correct copy of FBI Agent Brian Kinney's summary of Austin's January 29 and 31, 2018 interview is attached to this motion as Exhibit 1.

Korpela about Austin's statements at his January 31, 2018 interview.[3] After being

refreshed with Agent Kinney's summary of the interview, Agent Korpela

admitted that she was personally present when the government questioned

Austin about his contract with Hixson:

> Q.  Do you recall having this meeting?
> A.  I was there during a portion of meetings. It could have been on those days. I'm sorry. I don't recall the date.
> Q.  And do you recall having a conversation about Larry Hixson with Mr. Austin?
>
> [failed objection removed]
>
> THE WITNESS:   I do recall having that conversation with him.
> BY MR. CONARD:
> Q.  Okay. So that conversation occurred on January 31st of this year?
> A.  Yes.
> Q.  Shortly before Mr. Austin took the stand and denied that it had?
> A.  I think he just probably forgot that we had discussed that, because we've discussed quite a bit with him.
> Q.  All right. So it was inaccurate is what you're agreeing?
>
> [failed objection removed]
>
> BY MR. CONARD:
> Q.  So his testimony was inaccurate?
> A.  As to that? I believe so.
> Q.  And it was under oath?
> A.  Yes.

---

[3]    Notably, because she knew that Agent Korpela's testimony would directly conflict with Austin's, Ms. Velazquez-Aguilu actively fought to keep prevent Mr. Ruzicka's counsel from questioning Agent Korpela about this conversation. Ms. Velazquez-Aguilu objected four separate times that any questioning about Austin's statements to the government in this interview was improper under Federal Rule of Evidence 608. *See* Trial Tr. vol. 20, 192:15-17, 193:15-20, 194:14-15, 195:5-6, Feb. 22, 2018.

Trial Tr. vol. 20, 194:9-195:12, Feb. 22, 2018.

Austin's testimony fell within the Court's order requiring the government to "identify **all** instances . . . in which it knows that a Government witness perjured himself or herself." Dkt. 377 at 16 (emphasis in original). But despite the clear conflict between Austin's testimony and both Agent Kinney's interview summary and Agent Korpela's testimony, the government never informed the Court that Austin had testified falsely on this matter.[4] Nor did it strike Austin's testimony or take any action to correct it on the record in the presence of the jury. Instead it made a strategic decision to let Austin's perjury lie so that it could rely on his testimony in closing argument. This choice violated the Court's order and the Constitution, and deprived Mr. Ruzicka of his right to a fair trial.

### B.  The government was aware that William Austin testified falsely about his July 22, 2016 interview with the government.

Austin lied about his interviews with the government on at least one other occasion as well. During cross-examination, counsel for Mr. Ruzicka asked Austin if he had taken steps to untangle his personal assets from his business

---

[4]     The government may argue that Austin's testimony on this matter did not constitute a knowing falsehood, but instead a failure of memory. Even if that were the case, the government's failure to correct the testimony would still have resulted in the jury not having the information necessary to gauge Austin's credibility. If Austin truly could not remember *being questioned by federal agents and Assistant United States Attorneys* less than two weeks before he testified, how could the jury possibly believe he had perfect recollection of offhand conversations regarding Northland that took place more than a decade before?

assets—or to use the phrase Austin had used with the government, to "separate

church and state." Austin replied that he had never made any such statement:

> Q.    Okay. Would you agree that, aside from this, in 2006 you were
>        working with an attorney from California to change your
>        estate to, in your words, separate church and state? Is that
>        right?
>
> A.    I don't recall that being my words. I certainly wasn't working
>        with that attorney in California at the time of this document.
>
> Q.    And when you said that, you meant separating your business
>        and personal assets?
>
> A.    **I never said that.**
>        . . .
> Q.    You don't recall telling the government that in 2006 you were
>        working with an attorney in California on a new rule to
>        separate the church and state, meaning its personal assets and
>        business assets?
>
> A.    I don't recall telling the government any such thing. In fact,
>        those are not my normal words. **I would not say church and
>        state. That sounds like someone else's words.** I don't usually
>        say things like that.

Trial Tr. vol. 12, 125:25-127:1, Feb. 12, 2018.

The government knew that this, too, was a lie. On July 22, 2016, Ms.

Velazquez-Aguilu, along with Assistant United States Attorney Benjamin Langer

and United States Postal Inspector Rachel Williams, interviewed Austin.[5]

Inspector Williams prepared a memorandum of interview summarizing the

---

[5]    A true and correct copy of Inspector Williams' summary of Austin July 22,
2016 government interview is attached to this motion as Exhibit 2.

government's conversation with Austin.[6] Inspector Williams summarized

Austin's statement as follows:

> Sometime in 2006, Ruzicka brought up the idea of acting as Austin's executor upon his death. At the time, Austin was working with an attorney in California on a new will **to separate the "church and state," meaning his personal assets and business assets**. Austin entertained the idea but never finalized any plans or gave Ruzicka an answer.

Ex. 2 at 6 (emphasis added). Inspector Williams' interview summary leaves no

doubt as to whether Austin made the comment he later denied making—she

went so far as to put his language in quotation marks and explain what he meant

by it.

Both Ms. Velazquez-Aguilu and Mr. Langner were present for the

interview and knew that Austin's testimony that he had never discussed

"separating church and state" with the government was false. But once again,

they remained silent when he offered that testimony. And even when the Court

ordered the government "to correct any testimony that it knows is false,

consistent with its constitutional duty under *Napue* and its progeny," Dkt. 377 at

5, the prosecutors chose to do nothing to correct Austin's false testimony.

---

[6]     While the government included Inspector Williams on its witness list, it ultimately did not call her to testify at the trial. Consequently, the best evidence available to Mr. Ruzicka regarding Austin's statements at that interview is Inspector Williams' interview summary, as Inspector Williams chose not to otherwise record the interview.

**C.      The government chose not to correct Austin's false testimony regarding his signature.**

Another critical issue at trial involved Austin's signature. The government presented evidence that Mr. Ruzicka signed Austin's name to various written actions between 2006 and 2015, and argued that this showed Mr. Ruzicka's intent to defraud Starkey. Mr. Ruzicka argued that Austin had delegated his signing authority to Mr. Ruzicka and other executives at Starkey, and in fact actively refused to sign documents like written actions. To support this argument, Mr. Ruzicka introduced evidence that Austin had signed less than a dozen official Starkey documents in the past decade.

At trial, counsel for Mr. Ruzicka cross-examined Austin regarding the number of documents bearing his signature. Austin testified that he signed hundreds of written actions every year:

Q.      Do you recall signing any written actions between 2006 and 2015?

A.      Yeah, I do.

Q.      About how many?

A.      Every year probably hundreds. And what they were –

Q.      Well, hold on. I understand that answer.
So you're saying that at Starkey right now there are hundreds of written actions between those two years that bear your signature?

A.      I would think so. They'd line them on the counter –

Q.      Thank you.

A.      -- for actions around the world, and I would typically sign any time I was required. It would be signed right away.

Trial Tr. vol. 12, 144:12-25, Feb. 12, 2018.

Austin's testimony that he signed "hundreds of written actions" between 2006 and 2015 was false, and the government knew that it was false. On November 27, 2017, Mr. Ruzicka served a subpoena on Starkey seeking, among other things, Starkey's corporate books containing all written actions of its Board of Directors. Starkey objected. On December 13, 2017, Magistrate Judge Franklin L. Noel ordered Starkey to produce "Corporate Books for Starkey limited to two or three binders of corporate articles, bylaws, records of action." Dkt. 229 at 9-10. Starkey subsequently produced these documents to Mr. Ruzicka, along with other categories ordered by Magistrate Judge Noel. At the same time, Starkey produced these documents to the government for its use. Starkey's production included Starkey's written actions going back to the 1970s.

Contrary to Austin's testimony, there were not "hundreds" of written actions bearing Austin's signature. In fact, for the ten-year period from 2006 to 2015, there were only a handful.[7] The rest were signed by other people using their version of Austin's signature, which looks nothing like his authentic signature. Because it was in possession of these documents at the time Austin testified, the government was aware that Austin's testimony on this point was

---

[7]     Given the voluminous nature of the set of Starkey written actions for the years 2006 to 2015, Mr. Ruzicka has not attached those actions as an exhibit to this motion. Mr. Ruzicka is happy to provide those documents as an exhibit should the Court so request, or can otherwise make them available for inspection.

false. And again, the government chose to let this testimony stand uncorrected, even after being ordered by the Court to correct testimony it knew to be false.

Moreover, this testimony was critical to the government's case. The government argued that the fact that Mr. Ruzicka had signed Austin's name to documents was evidence of his fraudulent intent. Austin's false testimony that he was willing to sign documents like the ones signed by Mr. Ruzicka, and had in fact signed hundreds of similar documents, went to the very heart of the government's case. The government's purposeful refusal to correct that testimony deprived Mr. Ruzicka of his right to a fair trial.

**D.    The government knew that Austin's testimony regarding his tax returns was false and chose not to correct it.**

Another critical issue in the government's case was Austin's knowledge of his tax returns. At trial, Mr. Ruzicka presented evidence that the payment he received in exchange for his NHC restricted stock was contained within Starkey's corporate tax returns. This was strong circumstantial evidence that Austin— Starkey's CEO—knew of the payout, despite his testimony to the contrary.

To combat this evidence, the government elicited testimony from Austin using leading questions. The government had Austin testify that despite serving as Starkey's CEO for more than 30 years, not only was he unaware of what was in Starkey's corporate tax return, until recently *he didn't even know Starkey had a corporate tax return*:

Q.     Mr. Austin, just before the break, I was starting to change topics slightly, and I was going to start asking you some questions about tax returns. Okay?
Recently, did you come to understand that there was a separate return for Starkey, the company, and for you personally?
A.     Yes.
Q.     Previously, was it your understanding that there was just one consolidated return?
A.     Yes.

Trial Tr. vol. 11, 75:6-12, Feb. 9, 2018. Austin followed this incredible claim up with another—that he never played a part in preparing any tax return:

Q.     Okay. Mr. Austin, do you participate in the preparation of Starkey's corporate return?
A.     Actually, I don't participate in the preparation of any return.
Q.     Okay. So is that true for both your personal return and the foundation's return as well?
A.     That's true.

*Id.* at 78:7-11.

The government knew this testimony was false for numerous reasons.

First, it is facially implausible for the CEO of a billion-dollar corporation *with its own dedicated tax department* to claim he is unaware that the corporation files a tax return. Second, the government had spoken with Scott Nelson, who told them (and later testified at trial) that Austin was intimately involved with Starkey's tax strategy and would frequently give sophisticated tax advice to others. Trial Tr. vol. 17, 266:9-269:16, Feb. 19, 2018. But third and most importantly, the government team, which included IRS Agent Shannon Korpela, had access to and had reviewed Austin's tax records, which showed that he knew Starkey had

20

a separate tax return. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (prosecutor's duty to disclose extends to "others acting on the government's behalf in the case, including the police").

Unfortunately, Mr. Ruzicka's ability to demonstrate the falsity of Austin's claim at trial was severely compromised. The government disclosed only Austin's personal and Starkey's corporate tax return for the year 2015 and for no other years. And as discussed further below, Mr. Ruzicka's attempts to subpoena tax returns from Starkey and Austin were unsuccessful.

However, the few tax returns Mr. Ruzicka has managed to obtain demonstrate the falsity of Austin's claims.[8] For both his 2004 and 2005 personal tax returns, Austin personally signed an extension of time to file, showing his involvement in the returns' preparation. Ex. 3 at 3; Ex. 4 at 3. He included in those tax returns rental and depreciation income for properties held by Northland US, LLC—such as his property at 6641 Beach Road—showing his knowledge of that entity. Ex. 3 at 6-7, 9-11; Ex. 4 at 5, 7-9. And each tax return shows that Austin was aware of the existence of Starkey's separate taxable

---

[8]     A true and correct copy of relevant excerpts from Austin's 2003 personal income tax return (with identifying and specific financial information redacted) is attached to this motion as Exhibit 3. A true and correct copy of Austin's 2004 personal income tax return (with identifying and specific financial information redacted) is attached to this motion as Exhibit 4.

status—at a minimum, because the returns reported the results of K-1 forms that Austin received from Starkey. Ex. 3 at 15; Ex. 4 at 18.

The government purposefully elicited false testimony from Austin to avoid the damning effects of Starkey's 2015 tax return. And the government continued to allow that testimony to stand uncorrected so it could obtain a conviction. This is a clear violation of Mr. Ruzicka's rights under *Napue.*

III.   **The government's failure to correct Austin's testimony deprived Mr. Ruzicka of his right to a fair trial.**

The government's case against Mr. Ruzicka on the Northland counts hinged largely on the credibility of Austin. Mr. Ruzicka introduced voluminous evidence that the existence of NHC and the issuance of restricted stock was widely disseminated. In the face of this evidence, the government relied heavily on Austin's testimony that he did not know that NHC existed or that Mr. Ruzicka had restricted stock in NHC. Consequently, any evidence that would have affected Austin's credibility was critical to Mr. Ruzicka's defense.

The fact that Austin repeatedly lied on the stand regarding his interviews with the government would certainly have diminished Austin's credibility. But instead of providing the jury with this information, as it was required by the Court and the Constitution to do, the government fought to hide Austin's perjury. Had the jury not believed Austin's testimony regarding NHC, it would have been impossible for it to convict Mr. Ruzicka on the Northland counts. But

because the government hid Austin's perjury from the jury, it did believe Austin, and convicted Mr. Ruzicka.

The government's behavior is rendered even more egregious because not only did Ms. Velazquez-Aguilu fail to correct testimony from Austin that she personally knew to be false, but she capitalized on that failure to correct Austin's testimony in rebuttal. As described above, she sought to undercut both the Court's order and Jury Instruction No. 41 by arguing to the jury that the Court's instruction meant that Austin had only testified falsely on two occasions, while simultaneously implying that Austin's falsehoods were an unknowing accident. She made this argument despite knowing for a fact that he had testified falsely on at least four other occasions as well. Her refusal to correct Austin's testimony is a violation of the Supreme Court's mandate in *Napue* and this Court's order. That refusal requires this Court to grant Mr. Ruzicka a new trial.

## IV.  Mr. Ruzicka should be granted a hearing with subpoena power so that he can present evidence regarding Austin's knowledge of Starkey's taxes.

Finally, this Court should grant Mr. Ruzicka a hearing with subpoena power so that he can obtain the evidence necessary to conclusively prove the falsity of Austin's testimony that he was unaware of Starkey's tax return. On November 27, 2017, Mr. Ruzicka served a subpoena on Starkey seeking, among other categories of documents, the tax returns for Starkey and Austin for the

years 2002 to the present. Starkey objected. On December 7 and December 12, 2017, Magistrate Judge Franklin L. Noel held two hearings on Mr. Ruzicka's subpoena. Assistant United States Attorney Ben Langner attended both hearings. In the presence of Mr. Langner, counsel for Starkey argued that these tax returns were irrelevant and too voluminous to produce. Magistrate Judge Noel accepted this reasoning and denied Mr. Ruzicka's subpoena for those documents. Dkt. 229 at 11.

Afterward, secure in the knowledge that Mr. Ruzicka had been denied the documents necessary to prove otherwise, the government elicited false testimony from Austin that he had no idea what was in Starkey's tax returns. Thus, Starkey's tax returns—at least some of which, upon Mr. Ruzicka's information and belief, were personally signed by Austin—became critically relevant.

The government is not allowed to elicit false testimony simply because the defendant lacks access to the documents necessary to prove the testimony false. Mr. Ruzicka therefore requests that the Court grant him a hearing with subpoena power so that he may obtain Starkey's corporate tax returns. Such a hearing is necessary so that Mr. Ruzicka may demonstrate that Austin's testimony regarding his knowledge of Starkey's corporate tax returns was false, and that the government knew it was false.

## CONCLUSION

This Court granted the government ample opportunity to correct the false testimony of Austin. At each opportunity, the government willingly chose not to do so. It disregarded and mooted the Court's order finding that Austin had committed perjury through its rebuttal argument, and allowed numerous other false statements by Austin to remain on the record, despite knowing full well their falsity. Because the government failed to uphold its constitutional responsibility under *Napue*, this Court should grant Mr. Ruzicka a new trial.

Respectfully submitted this 12th day of April, 2018.

 */s/ John C. Conard*
John C. Conard (MN No. 386618)
Alexander C. Kopplin (MN No. 393197)
Daniel R. Burgess (MN No. 389976)
WARD | KOPPLIN PLLC
227 Colfax Avenue North
Suite 200
Minneapolis, MN 55405
(952) 653-2620
john@jurytrialmn.com
akopplin@wklawfirm.com
burgess@dburgesslaw.com