# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**The United States of America,**

    **Plaintiff,**

**v.**                              **Case No. CR 16-246 JRT/FLN**

**Jerome Ruzicka,**

    **Defendant.**

---

## DEFENDANT JEROME RUZICKA'S MOTION FOR A
## NEW TRIAL AS A RESULT OF PROSECUTORIAL MISCONDUCT

---

Defendant Jerome Ruzicka hereby moves that this Court grant him a new trial because of specific and cumulative prosecutorial misconduct. Throughout the trial, the government used false and misleading questioning, argument, and testimony to paint a picture for the jury that was contradicted by facts in the prosecutors' possession.

This strategy came to a head during the government's rebuttal, when the prosecutor committed multiple flagrant acts of misconduct. In order to discredit exculpatory documents authored by Susan Mussell, Starkey's former general

1

counsel, the prosecutor claimed for the first time in her rebuttal that Susan Mussell was "a target of the federal investigation." This claim was unsupported by evidence. In that same rebuttal, the prosecutor intentionally misled the jury as to the testimony of one of the government's key witnesses and misled the jury about the meaning and effect of the Court's *Napue* order.

Each of these actions by itself justifies a new trial. When these acts are taken in combination, along with the other acts of prosecutorial misconduct described below, they establish a clear pattern by which the government intentionally deprived Mr. Ruzicka of his right to a fair trial. He is therefore entitled to a new one.

## APPLICABLE LAW

Rule 33 of the Federal Rules of Criminal Procedure allows this Court to vacate a guilty verdict and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a).

To obtain a new trial based on prosecutorial misconduct, Defendant "must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced [his] rights in obtaining a fair trial." *United States v. King,* 36 F.3d 728, 733 (8th Cir. 1994). If a prosecutor's remarks are improper, then the Court considers: 1) the cumulative effect of misconduct; 2) the strength of the properly

admitted evidence of the defendant's guilt; and 3) any curative actions taken by the trial court. *United States v. Beckman,* 222 F.3d 512, 526 (8th Cir. 2000).

The Eighth Circuit has made clear that a prosecutor is not permitted to argue unadmitted evidence in closing argument:

> The role of the attorney in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence. It is not for the purpose of permitting counsel to 'testify' as an 'expert witness.' …[t]o the extent an attorney's closing argument ranges beyond these boundaries it is improper…[f]urthermore, [counsel] may not suggest that evidence which was not presented at trial provides additional grounds for finding [the] defendant guilty.

*United States v. Segal,* 649 F.2d 599, 604 (8th Cir. 1981).

## ARGUMENT

**I.     The government committed misconduct by arguing that Susan Mussell was a target of the federal investigation in its rebuttal.**

One of the critical issues during this trial was the extent to which Mr. Ruzicka's ownership of restricted stock in Northland Hearing Centers, Inc. ("NHC") was fully disclosed to others within the company, including Starkey's CEO, William Austin. The government argued that Mr. Ruzicka's interest in NHC was not adequately disclosed in corporate records. The government further argued that Mr. Austin was unaware both of Mr. Ruzicka's ownership in NHC and, indeed, in the very existence of NHC.

One of the critical documents introduced by Mr. Ruzicka to rebut these allegations was Ruzicka Trial Exhibit 23—a memorandum drafted by Susan

Mussell shortly after Mr. Ruzicka was fired from Starkey.[1] At the time the

memorandum was authored, Ms. Mussell was the general counsel of Starkey.

Ms. Mussell drafted the memorandum in her capacity as Starkey's general

counsel, and it was later endorsed by Brandon Sawalich, Starkey's current

president and Austin's step-son. *See* Ruzicka Tr. Ex. 20. Ms. Mussell's

memorandum states, in part:

> As I understand the current allegations, Mr. Austin claims that he
> had no knowledge about the early termination of the restricted
> stock options by Northland directors. **Several other employees**
> **who reported to at least two of the directors, one of whom was**
> **the President of Starkey (Jerry Ruzicka), the other being the CFO**
> **(Scott Nelson), knew about the payout, and company records**
> **disclosed the payout, e.g., Audit Report, payroll records**. Few, if
> any, employees knew about Mr. Ruzicka's purported ownership
> in outside companies, at least to the extent it caused concern in
> light of the culture (See below). Employees who knew about New
> Co may have reported to him (I have no specific information on
> this topic).

Ex. 1. (emphasis added).

This paragraph was critical evidence for Mr. Ruzicka at trial. It was a

contemporaneous statement from one of Starkey's corporate officers that the

stock redemption and related payout was properly reported in company records.

It also established that while Austin weighed in on the NHC transaction and

---

[1]      A true and correct copy of Ruzicka Trial Exhibit 23 is attached to this
motion as Exhibit 1.

disclaimed knowledge of the redemption of the restricted stock, he <u>did not deny</u> knowing that the stock was issued or that NHC existed.

Because this memorandum was a contemporaneous recording by the corporate secretary and general counsel, it amounts to an official statement by Starkey that the transactions were properly recorded. Since the fraud, if any, victimized Starkey, this memorandum could not be more important. Indeed, the memorandum was featured prominently in the closing argument on behalf of Mr. Ruzicka.

Because this was critical evidence for Mr. Ruzicka, the government sought to discredit it in its rebuttal argument. That is when the prosecutor decided to tell the jury, for the first time and without any evidence in the record to support her claim, that Susan Mussell was a co-conspirator and target of the government's investigation:

> Now Mr. Conard has brought up the memo drafted by Susan Mussell several times, and you have this in evidence. It's drafted after Mr. Ruzicka was terminated, and as you have heard from the agents, Susan Mussell was both the subject of the internal investigation, and she was a target of the federal investigation as well.

Trial Tr. vol. 35, 59:7-12, Mar. 2, 2018.

The government's argument regarding Ms. Mussell was unsupported by any evidence. Three government agents testified in this matter. FBI Agent Brian Kinney did not testify that Susan Mussell was a target of the federal

investigation. IRS Agent Shannon Korpela did not testify that Susan Mussell was a target of the investigation. And while a prosecutor tried to elicit testimony from FBI Agent Matt Snell that Susan Mussell was a target of Starkey's internal "investigation," that evidence was excluded as irrelevant hearsay. Trial Tr. vol. 16, 157:17-20, Feb. 16, 2018.

The government therefore argued new evidence not in the record for the first time in its rebuttal, when Mr. Ruzicka had no opportunity to respond. This violation alone is sufficient to merit a new trial. A prosecutor is not permitted to argue facts not in evidence to obtain a conviction. *Segal,* 649 F.2d at 604. Here, the government improperly argued evidence that was not in the record to invalidate key evidence introduced by Mr. Ruzicka. Mr. Ruzicka's evidence, had the jury accepted it, likely would have resulted in an acquittal. The government's misconduct prejudiced Mr. Ruzicka's right to a fair trial, and the only way to correct this misconduct is by granting Mr. Ruzicka a new trial.

## II.      The prosecutors committed numerous cumulative acts of misconduct regarding the documents surrounding the NHC transactions.

Unfortunately, the prosecutor's fabrication of evidence in rebuttal was not an isolated incident. Throughout the trial, the prosecutors repeatedly attempted to mislead the jury and the Court regarding the documents surrounding the NHC transactions in order to obtain a conviction. The government's most egregious misstatements are summarized below.

6

## A.   The prosecutors falsely argued that Scott Nelson signed the ESOP trustee verification forms "every year."

Another of the critical issues at trial was whether William Austin had actual knowledge of the facts that were allegedly concealed from him. These allegedly concealed facts included the existence of NHC, Mr. Ruzicka's ownership of restricted stock in NHC, and Mr. Ruzicka's eventual redemption of that stock in 2013. If Austin had actual knowledge of these facts, the government's case would be over before it began.

In the early 2000s, Starkey implemented an Employee Stock Ownership Plan ("ESOP").[2] As part of the ESOP, an outside auditor (Chartwell) was required to assess Starkey's financial status once each year and prepare a report outlining its findings and setting a valuation for the company. That report was then required to be provided to the ESOP's trustees—Mr. Ruzicka and Mr. Austin. Every year from 2005 to 2013, the ESOP valuation report prepared by Chartwell described in detail the existence of NHC and the ownership of restricted stock in NHC by Starkey's executives. In 2013, the report contained a clear disclosure of the redemption of that restricted stock.

Nevertheless, Austin maintained that he had no knowledge of these facts because he never read a single ESOP valuation report in his time as CEO. To

---

[2]     A true and correct copy of relevant excerpts from the ESOP, introduced into evidence as Ruzicka Trial Exhibit 8.01, is attached to this motion as Exhibit 2.

rebut this assertion, Mr. Ruzicka introduced multiple yearly certifications relating to the ESOP. Each of these documents certified that "the Plan's trustee (the 'Trustee') has received, reviewed and accepted" the valuation report.[3] Scott Nelson signed the first two of these certifications in 2004 and 2005. *See* Ruzicka Ex. 3, 4.[4] Each one after 2005 was signed by Susan Mussell, Starkey's general counsel. *See* Ex. 5, 6, 7.[5]

The importance of the certifications was clear. They served as a contemporaneous statement by Susan Mussell that, in each year after 2005, William Austin reviewed and accepted a document that fully disclosed the existence of NHC and the existence of restricted stock in NHC. In her rebuttal, the prosecutor attempted to discredit this evidence:

> So, for example, remember all of the questions about these trustee certifications relating to the ESOP. **Every year Scott Nelson certified**

---

[3]     The use of the quoted term "Trustee" is critical—the ESOP itself makes clear that the word "Trustee" is not a singular term, but means "the person, *persons*, or entity named as trustee herein." Ex. 2 at 16 (emphasis added). Both Mr. Austin and Mr. Ruzicka were trustees of the ESOP, and collectively constituted "the 'Trustee'" as used in that document.

[4]     A true and correct copy of the 2004 ESOP certification, admitted into evidence as Ruzicka Trial Exhibit 6.02, is attached to this motion as Exhibit 3. A true and correct copy of the 2005 ESOP certification, admitted into evidence as Ruzicka Trial Exhibit 343, is attached to this motion as Exhibit 4.

[5]     A true and correct copy of the 2006 ESOP certification, admitted into evidence as Ruzicka Trial Exhibit 344, is attached to this motion as Exhibit 5. A true and correct copy of the 2007 ESOP certification, admitted into evidence as Ruzicka Trial Exhibit 346, is attached to this motion as Exhibit 6. A true and correct copy of the 2010 ESOP certification, admitted into evidence as Ruzicka Trial Exhibit 349, is attached to this motion as Exhibit 7.

**that he had reviewed the valuations with the trustee**, and the
questioning was designed to suggest that because of these
certifications Mr. Austin must have known about the Northland
stock transaction. When Scott Nelson ultimately testified, though, he
acknowledged the fact that there were two trustees for the ESOP,
Jerry Ruzicka and Bill Austin, and he acknowledged that when he
signed that record, he was affirming the fact that he had reviewed
the valuation with Jerry Ruzicka.

Trial Tr. vol. 35, 60:22-61:10, Mar. 2, 2018 (emphasis added). This argument was

directly contradicted by evidence in the record.

The government introduced no evidence contradicting the plain inference

that Mr. Austin, as a trustee, was provided with these ESOP reports by Ms.

Mussell in each year after 2005. Instead of owning up to this failure of proof, the

government chose to mislead the jury by arguing that only Scott Nelson had

signed the certifications. The government made this argument knowing that the

record directly contradicted it. This knowing misrepresentation on the part of the

government was designed to mislead the jury regarding critical evidence, and

prejudiced Mr. Ruzicka's right to a fair trial.

> **B.    The prosecutors intentionally mischaracterized testimony by
> concealing relevant portions of the transcript from the jury.**

In its rebuttal, the government also intentionally mischaracterized the

testimony of one of its witnesses—Scott Nelson—in order to mislead the jury

regarding exculpatory facts. During his testimony, Scott Nelson testified that he

had told William Austin about the existence of NHC and the restricted stock long

before Mr. Ruzicka redeemed that stock. This evidence was critical to Mr.

Ruzicka's case and was featured prominently in the defense's closing argument.

In rebuttal, the prosecutor claimed that Scott Nelson's conversation with

William Austin regarding the restricted stock did not occur until 2015—after the

restricted stock had been redeemed—and that the move into NHC was never

discussed:

> Now, I mentioned to you a moment ago about the fact that Mr.
> Conard during his closing argument showed you some of the
> transcripts, some of the things that people said during their
> testimony but not all, including some portions of the testimony of
> Scott Nelson, and you'll recall that Mr. Conard showed you some
> language where Scott Nelson was talking about a conversation with
> Bill Austin about restricted stock. What you need to be clear about is
> the fact that when Mr. Conard asked this question, he asked about
> the conversation at the Beach Road house, and as Mr. Nelson
> clarified on redirect examination, the conversation at the Beach Road
> house happened in September of 2015. The only other conversation
> that Scott Nelson acknowledged ever having with Bill Austin about
> the ownership of Northland was the conversation wherein Scott
> Nelson said he talked to Bill Austin about moving Northland LLC
> into Starkey, moving the assets that Bill Austin owned into another
> company that Bill Austin owned.

Trial Tr. vol. 35, 56:23-57:16, Mar. 2, 2018. To support this claim, the prosecutor

showed only the bottom half of page 216 of the transcript of Nelson's testimony,

which read:

> Q.    Sure. Well, because you talked to Bill Austin about this in that
>       time frame?
> A.    Yes.
> Q.    You we want [sic] to his Beach Road house, and you talked to
>       him about the move to Northland Hearing Centers, Inc.?

A.    I did talk with him about the move, yes.

Q.    And you talked to him about the restricted stock?

A.    I recall I had a conversation with him about that.

Trial Tr. vol. 17, 216:18-25, Feb. 19, 2018. Counsel for Mr. Ruzicka objected and

pointed out that within six inches of the portion of the transcript read by the

prosecutor, the testimony was shown to be precisely opposite of the prosecutor's

claim. Trial Tr. vol. 35, 57:21-25, Mar. 2, 2018. The entire section reads:

Q.    Sure. Well, because you talked to Bill Austin about this in that
      time frame?

A.    Yes.

Q.    You we want [sic] to his Beach Road house, and you talked to
      him about the move to Northland Hearing Centers, Inc.?

A.    I did talk with him about the move, yes.

Q.    And you talked to him about the restricted stock?

A.    I recall I had a conversation with him about that.

**[PAGE BREAK]**

Q.    **You had a conversation with Bill Austin in 2006 about the
      move to Northland Hearing Centers, Inc.,** and about the
      issuance of restricted stock?

A.    I don't recall if the restricted stock was – that conversation was
      in 2006 exactly, but **I know I had the conversation about
      moving it from the LLC into the other corporation**.

Q.    **And about that time as well, you talked about the restricted
      stock with Bill Austin?**

A.    **I recall that, yes.**

Q.    Okay. So you told him?

A.    Yes.

Q.    **And this is at the very beginning?**

A.    **Yes.**

Trial Tr. vol. 17, 216:18-217:14, Feb. 19, 2018 (emphasis added).

In short, the prosecutor used a page break in the transcript to conceal the

fact that Mr. Nelson's conversation with Austin about the move to NHC and

about the issuance of restricted stock occurred around 2006, and not in 2015, as the prosecutor argued. This is not simply an advocate arguing an alternate inference from a set of facts. Here the prosecutor argued that a portion of a transcript established "X" by concealing the portion of the transcript which said "NOT X."

This deception was rendered even more egregious because multiple times outside this portion of the transcript, Mr. Nelson reaffirmed that his conversation with Mr. Austin about NHC occurred long before 2015. Later in the same cross-examination, he testified that:

> Q. And so as time went on, you and Jeff Longtain and Jerry Ruzicka openly built this retail empire for Starkey, right?
> A. Correct.
> Q. Believing that Austin knew about your involvement?
> A. Yes.
> Q. Because you had told him about your involvement?
> A. Correct.
> Q. Believing he knew about the equity compensation because you had told him about it?
> A. Correct.

Trial Tr. vol. 17, 218:12-21, Feb. 19, 2018. Shortly afterward, Mr. Nelson confirmed again that his conversation with Mr. Austin occurred long before his firing in 2015:

> Q. Okay. In fact even in your own department, there were times when Mr. Austin would talk to your assistant when you were gone to double check your work?
> A. Correct.

| Q. | So there was no hiding anything from Bill Austin at Starkey like this? |
|----|----|
| A. | I don't believe so, no. |
| Q. | Right. And he knew about the restricted stock an way [sic]? |
| A. | I believe so, yes. |
| Q. | Because you told him about it? |
| A. | Correct. |

*Id.* at 224:22-225:7.

The government was well aware that Mr. Nelson had unambiguously testified that he had informed Austin of both NHC and the restricted stock long before 2015. But the prosecutor chose to argue in her rebuttal that this conversation occurred on the day of Mr. Nelson's firing in 2015. This government's choice to deliberately mislead the jury regarding critical and exculpatory evidence prejudiced Mr. Ruzicka's right to a fair trial.

**C.    The prosecutors used leading questions to elicit false testimony that Ruzicka's ownership in NHC was not publicly disclosed when the prosecutors knew it was disclosed.**

Another important issue in the case was the extent to which Mr. Ruzicka's ownership in NHC was disclosed in publicly available documents. Mr. Ruzicka introduced publicly-available Secretary of State filings from 43 states, each of which prominently listed both the existence of NHC and Mr. Ruzicka's association with that entity. The government stipulated to the admission of all the secretary of state filings after review, because they are certified public

records. One of these documents was Ruzicka Trial Exhibit 1.14, NHC's

Application for Authority to Transact Business in Arizona.[6]

During her redirect examination of Jeff Longtain, the prosecutor elicited

testimony from Mr. Longtain about Ruzicka Trial Exhibit 1.14. Trial Tr. vol. 7,

117:15-119:10, Jan. 26, 2018. The testimony was designed to suggest that the

disclosures in this document were incomplete because it did not identify Mr.

Ruzicka's ownership in NHC. This questioning was misleading and improper.

First, this questioning was misleading because it implied that Ruzicka Trial

Exhibit 1.14 should have listed NHC's ownership, when the document that the

prosecutor was referencing had no provision for such a reference. *See* Ex. 8. This

questioning was doubly misleading because Arizona's public records relating to

NHC absolutely do list Ruzicka, Nelson, and Longtain as owners of NHC stock

in other documents that the prosecutor knew of and simply ignored. The very

next exhibit on Mr. Ruzicka's exhibit list, Ruzicka Trial Exhibit 1.15, listed Mr.

Ruzicka as an owner of stock in NHC no fewer than six times.[7] *See* Ex. 9 at 17, 24,

28, 32, 36, and 43. Ruzicka Trial Exhibit 1.15 established that Ruzicka, Nelson,

and Longtain's ownership of stock in NHC was appropriately registered and

---

[6]    A true and correct copy of Ruzicka Trial Exhibit 1.14 is attached to this
motion as Exhibit 8.

[7]    A true and correct copy of Ruzicka Trial Exhibit 1.15 is attached to this
motion as Exhibit 9.

publicly disclosed every year until 2013 when the shares were redeemed. In short, the records establish exactly the opposite of the misleading claim made by the prosecutor with misleading records, leading questions, and a cooperating government witness.

### D. The prosecutors used leading questions to elicit deliberately misleading testimony that public documents showing Mr. Ruzicka's ownership in NHC may not be publicly available.

Another prosecutor, taking the testimony of FBI Special Agent Matthew Snell, used leading questions to falsely claim that these same annual reports may not be public and may not have been publicly available. The relevant portion of Agent Snell's testimony reads:

> Q. And I think Mr. Conard also asked you some questions about that Arizona document that Northland had to file. I think it was called an annual report. Do you remember that?
> A. I recall a document, yes.
> Q. I'm not going to put it up, but do you know whether that document was publicly available?
> A. As I discussed speaking with Mr. Conard, I don't know. He explained that it was available upon request for a certified copy, but whether it was publicly available and viewable on the website, I do not know.
> Q. Okay. So Mr. Conard obtained it in some fashion, although he could have used a subpoena to get that; is that true?
> A. I presume so, yes.
> Q. But you don't know whether that is something you can look up on computer?
> A. Correct.

Trial Tr. vol. 16, 165:16-166:8, Feb. 16, 2018.

The document at issue was once again Ruzicka Trial Exhibit 1.15, the comprehensive collection of annual reports for NHC in Arizona. At the time of this questioning on February 16, 2018, Ruzicka Trial Exhibit 1.15 had been in the prosecutor's possession for almost a month. The government knew that Ruzicka Trial Exhibit 1.15 was a publicly available, certified record. It also knew that no subpoenas had been issued by the defense in November of 2016, the certification date on the front of the reports.

It should not need to be said, but a government lawyer who started at Kirkland and Ellis, has practiced law for 15 years, and has been a key member of the white-collar squad for more than half a decade, knows that secretary of state filings are public records and certainly knew that these were. It should also not need to be said that an FBI agent of over 14 years' experience, who has worked on "several dozen" white collar cases, knows that secretary of state filings are public records and certainly knew that these were.

This was a knowing bit of deceptive trial theater. It was shown to be so when counsel was able to locate and download the report in a little over a minute during a demonstration on re-cross examination. The fact that the government was caught trying to deceive the jury does not excuse that they set out to mislead it in a way that must have been by design. There is also no guarantee that cross examination fully cured the deception for all jurors.

**E.      The prosecutors elicited false testimony from an IRS agent that Mr. Ruzicka directed the purchase of SoundPoint's accounts receivable balance at an inflated price for personal gain.**

At trial, the government argued that Mr. Ruzicka's interest in SoundPoint—a company purchased by Starkey—was evidence of his fraudulent intent. In order to make this claim, the government deliberately misled the jury about the nature of Starkey's purchase of SoundPoint in 2010. Specifically, the prosecutor elicited from IRS Agent Shannon Korpela testimony that NHC bought $500,000 of accounts receivable from SoundPoint for $850,000. This was done to suggest that the transaction was a vehicle of embezzlement by Ruzicka who owned a little more than 25% of the stock in SoundPoint:

> Q.      And then what does Mr. Ruzicka say about the suggestion of $500,000 -- let me ask you a question. Was $500,000 below the price that All American paid for the accounts receivables?
> A.      Yes, they paid 850,000.
> Q.      Okay. So what did Mr. Ruzicka say to the suggestion of purchasing the accounts receivables for $500,000?
> A.      He says, We can agree on a number and not look back. If they have reserved it properly, I don't want to try and recover any lost amount. This will add a complication between him and his shareholders that will get in the way of completing a deal, and if they can't support the business, cash flow, and we don't fund them, we could damage the business for us.

Trial Tr. vol. 20, 48:8-21, Feb. 22, 2018.

Ruzicka's counsel objected that this characterization was misleading because the $850,000 purchase was for the business as a whole, and not its accounts receivable. *Id.* at 49:1-8. The prosecutor responded by confirming that in

17

fact she did mean to suggest that Ruzicka directed the purchase of $500,000 of accounts receivable for $850,000. *Id.* at 49:9-50:10. Ruzicka's counsel challenged the prosecutor's good faith basis and the Court indicated that the prosecutor could forward unless the witness' characterization of the purchase was not "blatantly wrong." *Id.* at 49:22-24. The prosecutor assured the Court that it was not. *Id.* at 49:25-50:1.

Agent Korpela's characterization was blatantly wrong, as the prosecutor knew. The binding deal document for the sale—*which was one of the government's own exhibits*—established that the $850,000 purchase price was not for SoundPoint's accounts receivable, but was in fact for all the units (shares) in the LLC. *See* Ex. 10.[8] An excerpt of Government Trial Exhibit 587 is quoted below:

> "*Units*" -- 100% of the issued and outstanding Units of the Company, divided between the Members identified in Schedule 3.3.
>
> **2.      SALE AND TRANSFER OF UNITS; CLOSING; CLOSING DATE.**
>
> **2.1     *Units*.** Subject to the terms and conditions of this Agreement, at the Closing, Sellers will sell and transfer the Units to Buyer, and Buyer will purchase the Units from Sellers.
>
> **2.2     *Purchase Price*.** The purchase price (the "**Purchase Price**") for the Units will be **$850,000.00** to be paid in full on the Closing Date by wire transfer to an account specified by Sellers.

Ex. 10 at 9. This is precisely what Ruzicka's counsel told the Court, and precisely what counsel for the government assured the Court was not the case, so she could continue eliciting false testimony from the IRS agent.

---

[8]      A true and correct copy of Government Trial Exhibit 587 is attached to this motion as Exhibit 10.

Cross examination on this topic did not occur until Monday February 26, 2018. The original false testimony was entered on Thursday February 22, 2018. There is no guarantee that cross examination undid the falsehood for all jurors, or that the lingering claim from the last week did not survive in the notes of a leader. That the government was caught misrepresenting the nature of the SoundPoint sale is not an excuse for its misrepresentation.

The prosecutor put false evidence of a direct fraud against NHC before the jury, without a good faith basis to do so, after assuring the Court that she had such a basis, to defeat precisely the objection that her own evidence established as justified. These actions were improper and constituted misconduct.

**F.     The prosecutors misled the Court about the evidence regarding the government's false claim that Mr. Ruzicka owned Hearing Fusion in order to admit the false claim that Mr. Ruzicka owned Hearing Fusion.**

Another part of the government's case against Mr. Ruzicka concerned a company called Hearing Fusion, Inc. ("Hearing Fusion"). The government claimed that Mr. Ruzicka was an owner of—rather than merely a consultant for—Hearing Fusion at the same time that Hearing Fusion was collecting money from Starkey for providing software services. The government claimed that Mr. Ruzicka's purported ownership of Hearing Fusion was evidence of how he "leveraged his position at Starkey to enrich himself," and was therefore relevant to his intent. Dkt. 244 at 18. Hearing Fusion, and the fact that it paid fees to

Ruzicka, was the subject of significant testimony, including from government witnesses Agent Kinney, Jeff Longtain, William Austin, and Mark Dorner.

This evidence was only conditionally relevant, based on the factual representation by the government that Ruzicka was an owner of the company. In the government's initial disclosure of trial exhibits, the only documents relevant to Mr. Ruzicka's purported ownership Hearing were contained in Government Trial Exhibit 102. These included numerous unsigned and legally ineffective drafts of Hearing Fusion corporate documents. After repeated disputes, counsel for Ruzicka brought a motion to compel disclosure of any evidence beyond Government Trial Exhibit 102 regarding Ruzicka's ownership. Dkt. 322.

As a result of that motion, the Court heard arguments from counsel. The prosecutor represented to the court that there was documentary evidence showing Mr. Ruzicka's alleged ownership of Hearing Fusion beyond the inchoate documents in Government Trial Exhibit 102.

> You know, Mr. Ruzicka states that because [Government Exhibit 102] was unsigned that it's not probative of anything, but we're not going to prove this through just one document. We're going to prove it through several different documents and the testimony of Mr. Dorner and others . . .

Trial Tr. vol. 4, 85:18-25, Jan. 22, 2018. After a further exchange, the Court asked the prosecutor directly if there were documents that demonstrated completed ownership, and was assured by the prosecutor that such documents did exist:

| | |
|---|---|
| THE COURT: | But there are no documents which demonstrate that? |
| MR. SAXENA: | There are documents which demonstrate it, Your Honor. And they have been disclosed. |

*Id.* at 86:12-15.

The problem is that as the prosecutor was aware, there were no such documents, only Government Exhibit 102. The testimony of government witness Dorner established that while there was talk that someday Ruzicka might own part of Hearing Fusion, and initial planning about how to accomplish that, it was never completed and Ruzicka never owned any of Hearing Fusion:

> Q.    Are you aware that there was some talk at this point about Mr. Ruzicka coming to own shares in Hearing Fusion?
>
> [failed objection removed]
>
> THE WITNESS:    Yes.
>
> BY MR. CONARD:
>
> Q.    And that would have been in February of 2012?
>
> A.    I don't recall the exact date, but it sounds like it was around that period.
>
> Q.    So February 2012 was about four months before all payments to Jerry from Hearing Fusion stopped?
>
> A.    Yes.
>
> Q.    And it was about six months before they got a lawyer involved to try to make it official, right?
>
> A.    Yes.
>
> Q.    And it never got fully executed, right?
>
> A.    Yes.
>
> Q.    So it looks like they talked about it and then thought about it and then prepared to do it but didn't do it, isn't that fair?
>
> A.    Yes.
>
> Q.    And that's what the documents support?
>
> [failed objection removed]
>
> Q.    And that's what the documents support?
>
> A.    Yes.

Had the prosecutor been forthright about the evidence relating to Hearing

Fusion, that evidence would have been struck as irrelevant and unfairly

prejudicial. Instead, the government made representations to the Court about

evidence that did not exist and subjected the jury to a trial within a trial designed

to improperly attack Mr. Ruzicka's character.

### G.     The prosecutors made false and misleading statements about the Court's order to remedy the prosecutors' prior wrongful presentation of false testimony in violation of *Napue v. Illinois*.

The Court entered an order on February 27, 2018 regarding false testimony

by government witness William Austin. That order made a judicial finding that

Austin had committed perjury:

> Accordingly, the Court finds that Austin perjured himself with
> respect to the statements that (1) the amended contract was drafted
> and signed in one day and (2) Ruzicka drafted the contract.

Dkt. 377 at 14. The Court further held that to remedy this perjury, the jury must

be provided "with the information necessary to weigh the credibility of the

affected witnesses." *Id.* at 16. The Court therefore ordered the government to

correct Austin's perjured statements.

After further proceedings, the Court crafted Jury Instruction No. 41, which

was designed to provide the jury with the information necessary to weigh

Austin's credibility. That instruction, which was delivered to the Jury on

Monday March 5, 2018 at the beginning of deliberations, read in part:

At the end of trial, the Court struck two portions of William Austin's testimony because the Court concluded that these statements were false:

1.      William Austin's testimony that he never shredded any descending gross income reports.

2.      William Austin's testimony that he believed Defendant Ruzicka had drafted the amendment to his employment contract and that he had drafted that amendment the same day it was signed.

Dkt. 396 at 57.

Incredibly, despite the existence of a judicial finding that Austin had committed perjury, the government argued in its rebuttal that no such judicial finding had been made:

Now the defense attorneys have repeatedly told you that there is a judicial finding that Mr. Austin lied. I want you to look at this instruction. There is one word you don't see there, right? You don't see the word "lied." You don't see the word "knowingly" false.

There are two things that the Court did determine were false, and you will look at those two things and those facts, and you have to ask yourselves how do they chalk up in terms of the four days of testimony that you heard from Bill Austin. He testified for four days, and there are two things that are the subject of this instruction . . .

Trial Tr. vol. 35, 53:1-12, Mar. 2, 2018. The prosecutor made this argument *knowing that the Court had made a judicial finding that Austin had committed perjury*. The prosecutor, knowing there would be no opportunity to correct her claim, falsely led the jury to believe there was no judicial finding of a knowing falsehood by Austin. This misconduct on the part of the prosecutor was

specifically designed to deprive the jury of just what the Court had found was necessary: "the information necessary to weigh the credibility" of Austin.

The other component of the prosecutor's argument suggested that the Court's order found that *only* these two statements were incorrect. In fact, the Court had ordered the government to uncover other false testimony by Austin and, as detailed further in Mr. Ruzicka's Motion for New Trial under *Napue*, the prosecutor herself was aware of other false testimony by Austin at the time she made this claim. Dkt. 377 at 16. Jury Instruction No. 41 itself could at best partially correct this false impression by informing the Jury that they could evaluate the rest of Austin's testimony by reference to the two falsehoods. However, this correction would not come until the jury had sat in the prosecutor's falsehood for a weekend.

## III.   The government's case regarding NHC was otherwise weak.

The numerous instances of prosecutorial misconduct identified above are particularly important in this case because the government likely would not have obtained conviction on the Northland counts without them. The indictment outlines a scheme to defraud based on omission in the face of an obligation to disclose. The Government rested without admitting any evidence of a fiduciary or statutory duty. In addition, documents entered into evidence showed that the initial restructuring of NHC, the issuance of restricted stock, and the redemption

of the stock were all fully disclosed in Starkey's tax returns, its audited financials,

management reports to the Board of Directors, and ESOP valuation reports.

These facts were also freely disclosed to two different "big six" accounting firms,

three different white-shoe law firms, the finance and tax departments of Starkey,

and the office of Starkey's General Counsel and Secretary.

The sole salient claim to support the Northland charges was Austin's claim

that he lacked personal knowledge. In light of the evidence showing that the

NHC transactions were fully disclosed and open, the numerous acts of

misconduct by the government likely had a dispositive effect in leading the jury

to conclude that Mr. Ruzicka was guilty of the Northland counts. This is

particularly likely here, where the jury remained deeply divided after more than

three full days of deliberations, and it specifically asked the Court if a "hung jury

[is] an option." Dkt. 415. Given the relative weakness of the government's case, it

is clear that the prosecutor's actions likely affected the outcome.

## IV.    The Court's curative actions were rendered moot by the misconduct.

The Court took corrective action by ordering the government to correct

Austin's testimony and the inclusion of Jury Instruction No. 41. But that remedy

was immediately undercut by the government's mischaracterization of the

Court's findings in its *Napue* order, as described above. Given the government's

intentional sabotage of the Court's remedy, combined with the extensive misconduct and the weakness of the government's case, a new trial is necessary.

## CONCLUSION

Because of prosecutorial misconduct in closing argument and elsewhere, the government substantially interfered with Ruzicka's right to a fair trial. The repeated misleading and artful representations by the Government diminished the strength of exculpatory evidence by falsely implying that Susan Mussell was a criminal without evidentiary support. At the same time the Government falsely bolstered the testimony of government witness Austin, in the face of an unprecedented order by the Court. At every turn, the government attempted to mislead the jury and deny Ruzicka a fair trial. The only remedy that can correct the government's misconduct is to grant Mr. Ruzicka a new trial.

Respectfully submitted this 12th day of April, 2018.

*/s/ John C. Conard*
John C. Conard (MN No. 386618)
Alexander C. Kopplin (MN No. 393197)
Daniel R. Burgess (MN No. 389976)
WARD | KOPPLIN PLLC
227 Colfax Avenue North
Suite 200
Minneapolis, MN 55405
(952) 653-2620
john@jurytrialmn.com
akopplin@wklawfirm.com
burgess@dburgesslaw.com