IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

**The United States of America,**

    Plaintiff,

v.                                       Case No. CR 16-246 JRT/FLN

**Jerome Ruzicka,**

    Defendant.

---

**DEFENDANT JEROME RUZICKA'S MOTION FOR A NEW TRIAL BECAUSE THE IMPROPER JOINDER OF MR. HAGEN AND MR. MILLER DEPRIVED HIM OF EXCULPATORY TESTIMONY**

---

Defendant Jerome Ruzicka hereby moves this Court to grant a new trial because the joinder of Mr. Hagen and Mr. Miller deprived him of exculpatory testimony they would otherwise have offered.

## APPLICABLE LAW

Rule 33 of the Federal Rules of Criminal Procedure allows this Court to vacate guilty verdicts and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).

The joinder rules "are designed to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial," *Zafiro v. United States*, 506 U.S. 534, 540 (1993); *see also United States v. Crumley*, 528 F.3d 1053, 1063-64 (8th Cir. 2008). Severance may be required if joinder impairs a defendant's right to call a co-defendant who could provide exculpatory evidence but declines to waive his right to remain silent in his own case. *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004); *United States v. Oakie*, 12 F.3d 1436, 1441 (8th Cir. 1993). Where the defendant can show that "it is likely his co-defendant actually would have testified and that this testimony would have been exculpatory," joinder is improper. *Mickelson*, 378 F.3d at 818 (citing *United States v. Delpit*, 94 F.3d 1134, 1143-44 (8th Cir. 1996)).

## ARGUMENT

Here, joinder of Mr. Hagen, and Mr. Miller eliminated the opportunity for Ruzicka to present their exculpatory testimony to the jury. Both have lengthy experience with Starkey and with William Austin, and both had direct knowledge of the facts at issue in this case. The evidence against them was so thin as to suggest that the sole reason they were charged and joined was to move them off the playing table. Their improper joinder with Mr. Ruzicka's case prejudiced his defense and should result in a new trial.

**I.   Had he not been tried with Mr. Ruzicka, Mr. Hagen would have offered exculpatory testimony in Mr. Ruzicka's defense.**

As was pointed out numerous times by Mr. Hagen's counsel during the trial, Mr. Hagen was more of a spectator at Mr. Ruzicka's trial than a co-defendant in his own right. Out of the month-and-a-half of testimony and evidence offered by the government against the defendants, perhaps an hour of testimony related to Mr. Hagen. Had Mr. Hagen been tried separately, the government could have started in the morning and rested by the afternoon. After this paucity of evidence was presented to the jury, it acquitted Mr. Hagen of all charges, including charges of which Mr. Ruzicka and Mr. Taylor were convicted.

The reason for the government's meager case against Mr. Hagen had nothing to do with justice, and everything to do with strategy. As is made clear by the Declaration of Lawrence T. Hagen, attached to this motion as Exhibit 1, Mr. Hagen could have offered numerous pieces of exculpatory evidence on Mr. Ruzicka's (and Mr. Taylor's) behalf. He would have testified that:

- Contrary to William Austin's testimony at trial and statements to government investigators, Austin was fully aware of Mr. Ruzicka's involvement with and ownership interest in SoundPoint (Ex. 1 at ¶¶ 5-9);

- Far from capitalizing on SoundPoint at Starkey's expense, Mr. Ruzicka insisted that SoundPoint be sold to Starkey at below market value to protect Starkey's interests (Ex. 1 at ¶¶ 12-13);

- Mr. Ruzicka and Mr. Taylor's involvement in Archer Acoustics was well-known to Archer Acoustics' customers and throughout the hearing aid industry (Ex. 1 at ¶¶ 14-16)

3

- Sonion was well aware of both Mr. Ruzicka and Mr. Taylor's involvement with Archer Acoustics (Ex. 1 at ¶¶ 18-21); and

- It was common practice at Starkey to transfer ownership of company-owned cars to employees after they had been fully depreciated, and in fact Austin himself told Hagen that he could do so (Ex. 1 at ¶ 22).

This is just a portion of the exculpatory testimony that Mr. Hagen could have offered. Each of the items above is exculpatory and relates to a critical issue in the government's case against Mr. Ruzicka.

In the end, however, the government's strategic gambit paid off. Mr. Hagen was put in a position where he could not offer this testimony without relinquishing his Fifth Amendment right, which he chose not to do. By offering an hour of testimony relating to Mr. Hagen over the course of a month and a half, the government removed a critical piece from Mr. Ruzicka's chessboard, wrongfully diminishing his chance at an acquittal.

### II.     Had he not been tried with Mr. Ruzicka, Mr. Miller would have offered exculpatory testimony in Mr. Ruzicka's defense.

The government used the same tactic with respect to another of Mr. Ruzicka's co-defendants, Larry Miller, and was equally successful. If the government's case against Mr. Hagen was transparent, then its case against Mr. Miller was practically invisible. The government's own witnesses admitted that there was no evidence whatsoever that Mr. Miller was involved in—or even

knew about—any conceivable scheme relating to Northland Hearing Centers, Inc., Archer Consulting, Claris Investments, or Archer Acoustics.

Instead, his alleged crime was that he was paid money he was owed under a contract. That contract was signed by his superior at Starkey—Mr. Ruzicka—who had both actual and apparent authority to bind the company to employment contracts. And for this, the government charged him as part of a wide-ranging conspiracy to defraud Starkey and Sonion. It was this fictitious conspiracy that the government relied upon to join Mr. Miller to the case. And it was this fictitious conspiracy that the jury soundly rejected, along with all other charges against Mr. Miller.

Just as with Mr. Hagen, the government's real aim in shoehorning Mr. Miller into a conspiracy with the other defendants was not efficiency or justice—it was to remove a valuable witness with exculpatory information from Mr. Ruzicka's witness list. Mr. Ruzicka has consulted with Mr. Miller concerning the testimony he would have been prepared to offer had Mr. Ruzicka been able to call him. That testimony includes the following facts:

1. Lawrence Miller was employed in human resources at Starkey Laboratories since 1987.
2. He dealt with Bill Austin and Jerry Ruzicka regularly over that time.
3. At all times, compensation decisions were made by Jerry Ruzicka.

4. Mr. Miller never observed, never heard, never received instruction and was never aware of anyone receiving instruction from Bill Austin regarding compensation.

5. Bill Austin always referred those questions and decisions to Jerry Ruzicka.

6. Mr. Miller was involved in management of the ESOP from the beginning.

7. He was involved in updating the ESOP structure with the help of outside counsel in roughly 2011.

8. During that process he dealt thoroughly with the issue of the restricted stock in Northland Hearing Centers, as a material issue regarding the ESOP.

9. The trustees of the ESOP at that time included both Jerry Ruzicka and Bill Austin.

10. No one instructed Mr. Miller, nor Susan Mussell to his knowledge, nor outside counsel to hide or conceal the existence of the restricted stock in Northland.

11. Mr. Miller believed then and does believe now that Bill Austin knew about the stock.

12. He knows that Bill Austin did in fact review documents related to the ESOP, including the valuation report, because Austin would ask Mr. Miller questions about the report that could only come from the report.

13. At all times that Jeff Longtain was involved in the management of Northland, he was an employee of Northland Hearing Centers Inc.

14. His supervisor was at all those times Jerry Ruzicka.

15. Hisg performance reviews and compensation were always handled by Jerry Ruzicka.

16. Every time the Northland staff came to Minneapolis for an annual meeting, Jerry Ruzicka delivered the annual review and strategic presentation.

17. The fact that stores were held in Northland Hearing Centers Inc. was widely and openly discussed at all times.

18. Mr. Miller believes that Bill Austin knew about Northland Hearing Centers, Inc.

19. Bill Austin directed the change of Starkey from a "C" corporation to an "S" corporation in or about the year 2000. It was widely understood among the executive ranks to be a structural change meant to benefit Austin personally.

20. Austin regularly involved himself in tax issues, and regularly offered tax advice, expertise, and schemes to anyone who would listen.

21. Mr. Miller was regularly involved in Starkey's acquisition of other businesses.

22. Acquisitions regularly involved significant financial discussions that included discussions about the retention of employees, and the financial issues regarding those decisions.

23. Many of the acquisitions Starkey undertook were more difficult because of Starkey's S-Corp status.

24. He was aware that Bill Austin repeatedly and frequently refused to allow a change back to a "C" corporation structure.

25. Bill Austin was at all times aware that Starkey had a corporate tax return, and that Austin had his own tax return.

26. Bill Austin regularly talked about different tax schemes for Starkey and himself.

27. Bill Austin lied when he said he only recently came to know that he and Starkey had separate returns.

This testimony would have been exculpatory. It directly contradicts the testimony of Austin, the government's key witness, in numerous respects. It also

would have established that Austin had direct knowledge of Northland Hearing Centers, Inc., the restricted stock in that company, and the redemption of that restricted stock through his review of Starkey's ESOP valuation reports.

But just like Mr. Hagen, Mr. Miller was placed in a position where he could not offer this exculpatory testimony on Mr. Ruzicka's behalf without waiving his Fifth Amendment rights. Had the government tried Mr. Miller separately, as it should have, then he would have been able to offer this exculpatory testimony on Mr. Ruzicka's behalf. Instead the government knowingly accused Mr. Miller of participating in a conspiracy that its own witnesses knew he could not have been a part of, all to take another valuable piece off of Mr. Ruzicka's chessboard.

But criminal justice is not a game. It is supposed to be an even-handed and fair pursuit of the truth. Had the government treated it that way, then both Mr. Hagen and Mr. Miller would have been available to Mr. Ruzicka to offer testimony that would have gotten him acquitted. Instead, the government hurled bogus charges it knew it would lose at Mr. Hagen and Mr. Miller so that it could bag a bigger prize—joining them to Mr. Ruzicka at the defendant's table and denying him their testimony. That injustice should not be allowed to stand.

## CONCLUSION

Austin committed perjury during this trial, comfortable in the knowledge that false accusations against Mr. Hagen and Mr. Miller, however thinly supported, would keep them from taking the witness stand and exposing that perjury. The result is a rank injustice that this Court has the opportunity to remedy. Because the government's improper joinder of Mr. Miller and Mr. Hagen denied Mr. Ruzicka exculpatory testimony, he should be granted a new trial.

Respectfully submitted this 12th day of April, 2018.

    /s/ John C. Conard
John C. Conard (MN No. 386618)
Alexander C. Kopplin (MN No. 393197)
Daniel R. Burgess (MN No. 389976)
WARD | KOPPLIN PLLC
227 Colfax Avenue North
Suite 200
Minneapolis, MN 55405
(952) 653-2620
john@jurytrialmn.com
akopplin@wklawfirm.com
burgess@dburgesslaw.com