# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**The United States of America,**

     **Plaintiff,**

**v.**                                          **Case No. CR 16-246 JRT/FLN**

**Jerome Ruzicka,**

     **Defendant.**

---

## DEFENDANT JEROME RUZICKA'S MOTION FOR A NEW TRIAL TO AVOID A MISCARRIAGE OF JUSTICE

---

Defendant Jerome Ruzicka hereby moves this Court to grant him a new trial to avoid a miscarriage of justice. The government charged Mr. Ruzicka with perpetrating a scheme to defraud Starkey by issuing and redeeming restricted stock in Northland Hearing Centers, Inc. ("NHC"), a Starkey subsidiary, without the knowledge or approval of William Austin ("Austin"), Starkey's CEO. Mr. Ruzicka provided voluminous evidence that both the issuance and the redemption of that stock was widely to Starkey employees, to accountants and auditors, and within Starkey financial records. In the face of this evidence, the

1

government rested its case almost entirely on Austin's testimony that he never read any of the dozens of documents addressed to him that fully disclosed the issuance and redemption of the restricted stock.

Austin's testimony at trial was fundamentally incredible. Mr. Ruzicka demonstrated that during the course of the government's investigation, Austin lied to law enforcement about critical facts numerous times and changed his story repeatedly. Mr. Ruzicka introduced evidence that Austin had a $100 million motive to lie about his knowledge of NHC and its restricted stock. When Austin finally did take the stand, his testimony directly conflicted with every government agent who took the stand on material issues. His testimony also conflicted with the testimony of both government cooperators on dozens of critical facts and contained claims that were proven to be impossible by Starkey's own documents. The Court even made a judicial finding before the end of trial that Austin had committed at least two instances of perjury known to the government.

In the face of these substantial credibility issues, a conviction based primarily on Austin's testimony cannot be allowed to stand. To do so would be to ignore a real and substantial risk than an innocent man has been convicted. Mr. Ruzicka therefore requests that this Court grant him a new trial.

## APPLICABLE LAW

A trial court has broad power to grant a motion for new trial for any reason if required in "the interest of justice." Fed. R. Crim. P. 33(a); *see also United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980). In contrast to a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, a trial court has broad discretion in deciding a motion for a new trial and will not be reversed unless it abuses that discretion. *United States v. Amaya*, 731 F.3d 761, 764 (8th Cir. 2013). Where the weight of the evidence is such that "a miscarriage of justice may have occurred," the Court must grant the defendant's motion. *United States v. Starr*, 533 F.3d 985, 999 (8th Cir. 2008). "There must be a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

Unlike with a motion for judgment of acquittal, a court deciding a Rule 33 Motion for new trial "need not view the evidence in the light most favorable to the verdict and it is permitted to weigh the evidence and evaluate the credibility of the witnesses." *United States v. Hassan*, 844 F.3d 723, 725-26 (8th Cir. 2016) (citing *United States v. Knight*, 800 F.3d 491, 504-05 (8th Cir. 2015)). Where a verdict rests primarily on the testimony of an unreliable or incredible witness, it is appropriate for the Court to set the verdict aside and grant the defendant a new trial. *See, e.g., United States v. Hilliard*, 392 F.3d 981, 987 (8th Cir. 2004)

3

(granting of new trial was appropriate where conviction was based on testimony of two witnesses with "serious credibility problems, exemplified by their equivocal testimony and lapses in memory"); *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999) (motion for new trial granted where conviction rested primarily on testimony of "incredible" witness whose testimony "was not clear, not convincing and, therefore, is not being considered by the Court in either the finding of guilt or the sentencing of [the defendant]"); *United States v. Lewis*, 521 Fed. App'x. 530, 541 (6th Cir. 2013) (upholding trial court's order granting new trial where trial court properly determined that government witnesses were not credible).

## ARGUMENT

### I.    The government's case against Mr. Ruzicka on the Northland charges rested almost entirely on the testimony of Austin.

From the beginning of this case, the government chose to make Austin's knowledge or ignorance of NHC and its restricted stock the central question in its case. This decision was by necessity. As the government was aware, and as was demonstrated by the testimony of its witnesses at trial, it had no other possible path to a conviction on the Northland counts.

The unrebutted evidence at trial established that the existence of NHC and Mr. Ruzicka's ownership of restricted stock in NHC was widely disseminated and openly known. This information was included in countless internal Starkey

4

financial documents. It was included in Starkey's audited financial records. It was included in the ESOP valuation reports prepared by Chartwell—which Austin was required to read by virtue of his status as an ESOP trustee. And both the existence of NHC and Mr. Ruzicka's position as a director of NHC were contained in publicly available filings with the secretaries of state of more than 40 states.

This information was also freely provided to countless individuals both inside and outside Starkey, each of whom was free to tell Austin about it whenever they wished. It was disclosed to Chartwell, who owed Starkey a fiduciary duty. It was disclosed to Ernst & Young, who did Austin's personal taxes in the early 2000s and owed him a fiduciary duty. It was disclosed to RSM McGladrey, who did Austin's personal taxes in the late 2000s and 2010s and also owed him a fiduciary duty. It was disclosed to the law firms of Briggs & Morgan and Bowman & Brooke, each of whom owed Starkey a fiduciary duty. It was disclosed to Starkey's tax department, Starkey's general counsel and secretary, and Starkey's entire executive leadership team.

In the face of this widespread disclosure, the only possible way that the government could hope to prove that the existence of NHC and Mr. Ruzicka's restricted stock in it were the result of fraud was to claim that Austin, Starkey's CEO, somehow did not know about it. And so that's precisely what the

government did. It rested its case completely on the shoulders of Austin, who

testified that he did not read a single one of the documents listed above and did

not speak with a single one of the people above about NHC.

In short, Austin's testimony was critical to the government, which could

not have obtained a conviction on the Northland counts without it.

Unfortunately for the government, as described below, Austin's testimony was

fundamentally incredible for a plethora of reasons.

## II. Austin repeatedly lied under oath and provided facially implausible testimony.

The government built its case on Northland upon a foundation of Austin's

testimony (and credibility). That case cannot stand if Austin's testimony was not

credible. Unfortunately for the government, Austin's pre-trial statements to the

government and his testimony at trial were replete with outright lies and facially

implausible claims that destroyed any credibility he may have had.

### A. This Court has already determined that Austin perjured himself at least twice.

As a threshold matter, this Court has already determined that portions of

Austin's testimony were not credible—and were in fact the result of perjury. On

February 27, 2018, this Court issued an order (the "*Napue* Order") on Mr.

Ruzicka's motion under *Napue v. Illinois*, 360, U.S. 264 (1959) and its progeny. In

that order, the Court found that Austin committed at least two demonstrable acts

of perjury that were known to the government and ordered the government to correct Austin's testimony.[1] Dkt. 377 at 15-16.

This finding alone is enough to justify a new trial. The Court found that Austin committed unambiguous perjury, and that this perjury "was material for a number of reasons." *Id.* at 15. The Court further found that "the fact that Austin perjured himself goes to his credibility as a witness" and that this was particularly important because "Austin's knowledge about Ruzicka's conduct is central to this case." *Id.* Where a witness has committed perjury with respect to two material matters, there is no way that the Court can have confidence that he testified truthfully to the other material matters encompassed by his testimony. Consequently, this Court must order a new trial.

**B.      Austin repeatedly lied to the government about critical facts during the government's investigation.**

The issues with Austin's credibility were not limited to his testimony at trial. During cross-examination, the government's own investigating agent was forced to admit that Austin had repeatedly changed his story about critical facts in pre-trial interviews with the government and had simply lied about others. This pattern of demonstrable lies further demonstrates the fundamental unreliability of Austin's trial testimony.

---

[1]      Mr. Ruzicka has filed a separate Motion for New Trial based on the government's failure to comply with this obligation.

1.    <u>Austin changed his story about the people authorized to sign
his name to documents at least four times</u>.

As part of his effort to fabricate a case against Mr. Ruzicka, Austin claimed that Mr. Ruzicka was not authorized to sign his name to documents. The issue of who had Austin's authority to sign his name, and under what circumstances, was therefore crucial to the government's case. The government relied upon Austin's representations regarding his signature to argue that the fact that Mr. Ruzicka signed Austin's name to documents was evidence of his participation in a scheme to defraud Starkey.

At trial, however, it became clear that during the government's investigation, Austin had changed his story about who was authorized to sign his name at least four times. Agent Kinney confirmed this in his testimony:

> Q.    Okay. Moving on to the next representation. In the search warrant application, Bill Austin told you, and you repeated, that he never gave permission to anyone to sign his name, isn't that right?
> A.    That's what he stated, yes.
> Q.    And you repeated it?
> A.    Yes, at the time. Yes.
> Q.    And you repeated it under oath?
> A.    Yes.
> Q.    And it wasn't true?
> A.    In furtherance of the investigation, that is correct. Yes.
> Q.    The next version of the story you were told is that only Jeff Papineau got to sign a real estate document, right?
> A.    That would have been the next one in line, yes.
> Q.    And the next version of the story that you were told was that Jeff Papineau and Brandon Sawalich on one occasion, right?
> A.    According to Mr. Austin, yes.

> Q.     Then the next version you were told is Jeff Papineau and
>        Brandon Sawalich on multiple occasions?
> A.     I believe so. I would have to look at it, but I believe so.

Trial Tr. vol. 5, 99:6-100:3, Jan. 23, 2018. Austin went on to repeat this fourth

version of the story in his trial testimony. Trial Tr. vol. 12, 131:22-24, Feb. 12,

2018.

Agent Kinney's own testimony confirmed that Austin told four separate

stories to the government about who had authority to sign his name—and

necessarily lied in at least three the first three of those stories.[2]

2.     Austin lied to the government about whether Starkey used
       consultants.

Austin also lied to the government about whether Starkey used

consultants. At trial, the government attempted to prove that Mr. Ruzicka was

guilty of fraud by virtue of his participation in a consulting company called

Archer Consulting. Mr. Ruzicka was ultimately acquitted of all but one charge

related to that entity. In an initial effort to bolster the case against Mr. Ruzicka

with respect to Archer Consulting, Austin claimed that Mr. Ruzicka's

participation in that company was improper because Starkey never used

consultants.

---

[2]     The fourth of these stories was also demonstrated to be a lie by the
testimony of Scott Nelson, who confirmed that he was personally asked by
Austin to sign Austin's name to documents on numerous occasions. Trial Tr. vol.
16, 29:23-230:11, Feb. 16, 2018; vol. 17, 245:14-246:9, 250:11-25, Feb. 19, 2018.

Again, Agent Kinney testified that Austin's claim that Starkey never hired

consultants was untrue:

> Q. Thank you. So I would like to talk about something new. You were informed by Bill Austin that Starkey didn't use any consultants, is that right?
>
> A. By Mr. Austin? Yes.
>
> Q. Okay. And it wasn't true?
>
> A. It later on became to be not true that we became aware of.
>
> Q. Later on you became aware that it was untrue, but it was untrue all along, right?
>
> A. I don't know "all along." We learned during the course of there were consultants that were hired.
>
> . . .
>
> Q. Okay. And in any event, the claim way, way back at the beginning that none of these consultants existed at Starkey was a false claim, wasn't it?
>
> A. The claim by Mr. Austin? I think it was inaccurate, yes.

Trial Tr. vol. 5, 124:4-14, 128:11-15, Feb. 12, 2018. Mr. Ruzicka further proved

through numerous Starkey documents and the testimony of Starkey employees

like Chris McCormick that Starkey regularly used consultants, including at the

specific direction of Austin's wife and his step-son.

> 3.    <u>Austin lied to the government about his knowledge of the procedure for obtaining his signature</u>.

Austin also lied to the government about the procedure at Starkey for

obtaining his signature. In his initial interview with the government, Austin

described in detail the "green folder" system, whereby all documents requiring

Austin's signature were placed in a folder on Mr. Ruzicka's desk. But in later

interviews with the government, Austin claimed to have no idea what the "green folder" system even was.

Agent Kinney confirmed this in his testimony:

Q.    Okay. Austin told you in your initial interview October 28th that he was aware of a green folder and that it was instituted for obtaining his signature. Did he tell you that?

A.    That's correct. Yes.

Q.    But then later – if I can have i60a please – later, while being interviewed by you and other federal agents, he claimed he had never seen a green folder?

A.    That's the statement he made.

Q.    So one day he knows all about it, and three months later he denies that it exists, right?

A.    According to the document.

Q.    The official reports, right?

A.    True. And for my –

Trial Tr. vol. 5, 67:18-68:6, Feb. 12, 2018. Agent Kinney later clarified that the reason Mr. Austin changed his story was that in his first interview, despite claiming personal knowledge of the "green folder" system, Austin was actually just repeating what his investigators had told him to say. *Id.* at 196:3-197:6.

4.    <u>Austin changed his story about shredding descending gross reports</u>.

Perhaps the most important subject of all of Austin's conversations with the government was Starkey's descending gross reports. At trial, the government claimed that the removal of information relating to the NHC restricted stock payout from a descending gross report was evidence of a scheme to defraud

Starkey. Consequently, Austin's claims to investigators about descending gross

reports were critically relevant.

Austin lied about those descending gross reports, too. Agent Kinney

confirmed in his testimony that in Austin's October 28, 2015 interview with the

government, he claimed that he always shredded the descending gross reports

when he was done with them:

> Q.    Moving on. The next claim that was made in your search
>        warrant application was that Bill Austin liked to shred these
>        descending gross reports. Do you remember making that?
> A.     I believe that's what he informed us. He would destroy them.
>        . . .
> Q.    So 2013 survived. 2015 survived. Every other one was
>        shredded?
> A.     I don't know if they were shredded. We just don't have them.
> Q.    Well, you repeated the claim in your search warrant
>        application under oath. Do you or do you not believe that it's
>        true?
> A.     He told us they were shredded, so I take that as a belief, yes.

Trial Tr. vol. 5, 97:10-15, 98:4-12, Feb. 12, 2018. During his direct examination,

however, Austin claimed for the first time that not only did he not shred the

descending gross reports, but he had never shredded a document *in his entire life*:

> Q.    Now, that portion about shredding the report, is that
>        something that he had said to you previously with respect to
>        these reports?
> A.     He would typically admonish me to do that. I have never
>        shredded a document in my life.

Trial Tr. vol. 11, 65:3-15, Feb. 9, 2018. Austin later repeated this claim when being

cross-examined:

Q.   I'd like to talk about the shredding of documents, Mr. Austin.

A.   Yes.

Q.   Is it true that you told us on direct examination on Friday afternoon that you have never shredded a document in your life?

A.   In my recollection, I have never stuffed a piece of paper in one of those things.

Q.   I'm just asking if you recall that that was your testimony?

A.   I do.

Q.   And that was your testimony?

A.   It was.

Q.   Okay. However, you told Agent Kinney that you typically shredded the list after he reviewed it because of the confidential nature of the information; is that true?

A.   I have never shredded anything.

Trial Tr. vol. 12, 128:20-129:17, Feb. 12, 2018.

This contradiction was so clear and unambiguous that the Court made a judicial finding that either Agent Kinney or Austin had committed perjury. Dkt. 377 at 9-10. The Court went on to instruct the jury that Austin's testimony "that he never shredded any descending gross income reports" was false. Dkt. 396 at 57.

**C.    Austin's trial testimony was contradicted by the testimony of numerous government witnesses and the contents of Starkey documents.**

One of the clearest pieces of evidence demonstrating Austin's lack of credibility is the extent to which his testimony conflicted with the other evidence offered by the government. Austin's testimony conflicted with that of every single testifying government agent on at least one key point. He made claims that

were impossible to reconcile with documents in the government's possession.
And with respect to the government's two cooperating witnesses—Scott Nelson
and Jeffrey Longtain—Austin's testimony was diametrically opposed to theirs on
nearly every issue. These numerous contradictions demonstrate the fundamental
unreliability of Austin's testimony.

1. <u>Austin's testimony directly conflicted with the testimony of
each of the government's testifying agents</u>.

Austin's lack of credibility was demonstrated by the direct contradictions
between his testimony and that of all of the government's testifying agents. The
Court is already aware of the direct conflicts between Austin's testimony and the
testimony of FBI Agents Brian Kinney and Matt Snell. These contradictions
formed part of the basis for Mr. Ruzicka's initial *Napue* motion and resulted in
the Court's finding that Austin had committed demonstrable perjury about
material matters. *See* Dkt. 366; Dkt. 377.

Austin's testimony also directly conflicted with the testimony of IRS Agent
Shannon Korpela. As described in further detail in Mr. Ruzicka's Motion for
New Trial under *Napue*, which Mr. Ruzicka herein incorporates by reference,
Austin testified at trial that he had never been questioned by the government
regarding his contract with Larry Hixson. But Agent Korpela confirmed in her
testimony that she had been present during an interview less than two weeks
before Austin's testimony in which he was questioned about precisely that topic.

14

Austin's testimony even conflicted with the likely testimony of agents that the government chose not to call. As explained in further detail in Mr. Ruzicka's Motion for New Trial under *Napue*, Austin claimed never to have discussed "separating church and state" with the government in any interview. But United States Postal Inspector Rachel Williams—who was part of the investigating team but did not testify at trial—directly quoted him as saying precisely that in her summary of Austin's July 22, 2016 government interview.

2. <u>Austin's testimony directly conflicted with Starkey's own documents.</u>

On at least two occasions, Austin offered testimony that was rendered impossible by Starkey documents in the government's possession. The first of these examples related to the amendment to Mr. Ruzicka's employment contract. Austin testified that (1) he had a conversation with Mr. Ruzicka where he proposed giving him a payout equal to ten percent of the company; (2) Mr. Ruzicka went back to his building and drafted the contract; and (3) Austin signed the contract later the same day. Trial Tr. vol. 11, 93:6-94:2, Feb. 9, 2018.

Mr. Ruzicka entered evidence that proved that Austin's account of these events was a lie. E-mails kept by Susan Mussell, Starkey's corporate counsel, conclusively proved that the contract was drafted not by Mr. Ruzicka in one day, but by multiple attorneys over the course of weeks. These drafts, each of which contained Austin's proposed ten percent payout, also demonstrated that it was

impossible that he signed the contract amendment containing that provision on

the same day that he proposed it. These exhibits led the Court to conclude in its

*Napue* Order that:

> Austin testified at length and in great detail about the creation of
> this amended contract. Documentary evidence – as testified to by
> Snell – establishes that it is **impossible** for Austin's story to be true.
> Accordingly, the Court finds that Austin perjured himself with
> respect to the statements that (1) the amended contract was drafted
> and signed in one day and (2) Ruzicka drafted the contract.

Dkt. 377 at 14 (emphasis in original).

Austin also directly contradicted Starkey's documents when testifying

about the documents he allegedly signed. Austin testified at trial that every year

he signed "probably hundreds" of written actions for Starkey. Trial Tr. vol. 12,

144:8-25, Feb. 12, 2018. But as explained further in Mr. Ruzicka's Motion for New

Trial under *Napue*, the documents produced by Starkey under subpoena

conclusively demonstrated that Austin had signed only a handful of written

actions in the decade between 2006 and 2015.

> 3.   <u>Austin's testimony directly conflicted with the testimony of
>      the government's cooperating witnesses on dozens of key
>      facts</u>.

Many of the topics covered by Austin in his testimony were also testified

to by Scott Nelson and Jeffrey Longtain. And in almost every relevant detail, the

testimony of Mr. Nelson and Mr. Longtain directly conflicted with Austin. As the

Court noted in its *Napue* Order, "many of these inconsistencies are egregious,

particularly because all of the inconsistencies stem from **only** the Government's

case-in-chief." Dkt. 377 at 5 (emphasis in original).

Mr. Ruzicka has summarized some of the most important inconsistencies

below:

- Mr. Austin told the jury no one was authorized to sign his name, save Brandon Sawalich. Trial Tr. Vol. 12, 131:22-24, Feb. 12, 2018. Mr. Nelson said he and Mr. Ruzicka both had signing authority and signed critical documents with Mr. Austin's implied permission, often at Mr. Austin's specific instruction. Trial Tr. Vol. 16, 229:23-230:11, Feb. 16, 2018; Vol. 17, 245:14-246:9; 250:11-25, Feb. 19, 2018.

- Mr. Austin announced the employment contracts were not authorized without his signature, particularly certain bonuses, the lack of non-compete clauses, and Starkey's obligation to pay benefits into the future. Trial Tr. Vol. 11, 125:15-128:5, Feb. 9, 2018. Mr. Nelson, and others, testified that Mr. Ruzicka was well within his authority to do so. Trial Tr. Vol. 17, 312:22; 317:22-318:15, Feb. 19, 2018.

- While Mr. Austin said he did not know Northland Hearing Centers Inc. even existed prior to 2015, Trial Tr. Vol. 11, 96:6-19, Feb. 9,2018, and that he knew nothing of the restricted stock agreement, Trial Tr. Vol. 11, 96:20-97:6, Feb. 9, 2018, Mr. Nelson said that he did. Trial Tr. Vol. 17, 216:11-217:14; 218:12-21; 225:1-7, Feb. 19, 2018.

- Mr. Nelson testified that Austin told him to keep two versions of each critical transaction at Starkey: one for the desk drawer and one for the IRS. Trial Tr. Vol. 17, 243:3-16, Feb. 19, 2018. Mr. Austin denied this. Trial Tr. Vol. 14, 30:22-31:7, Feb. 14, 2018.

- Mr. Austin's rendition of the Larry Hixson contract was that he did not tell Mr. Nelson to insert language into it that would prevent Mr. Hixson's family from a continued benefit upon his death. Trial Tr. Vol. 12, 31:17-32:10, Feb. 12, 2018. Mr. Nelson said he acted on Mr. Austin's actual instruction to write in language to the contract that would bar such a benefit, and that this was only changed, albeit reluctantly, almost one year

after the initial contract was signed. Trial Tr. Vol. 17, 282:12-285:5, Feb. 19, 2018. Indeed, Mr. Austin said he never talked to Mr. Nelson about Mr. Hixson's contract. Trial Tr. Vol. 12, 32:11-22, Feb. 12, 2018. Mr. Nelson recalled the conversation in detail. Trial Tr. Vol. 17, 282:12-285:5, Feb. 19, 2018. Note, too, that Mr. Nelson's testimony regarding the Larry Hixson contract was corroborated by the testimony of Jeffrey Longtain, another of the government's key witnesses. Trial Tr. Vol. 7, 101:5-102:17, Jan. 26, 2018.

- Mr. Austin indicated an unfamiliarity and lack of recognition of Jake Jacobson, Starkey's controller. Trial Tr. Vol. 12, 77:11-78:1, Feb. 12, 2018. Mr. Nelson testified that Mr. Austin knew Mr. Jacobson quite well, and Mr. Austin year by year secured hundreds of the thousands of dollars in hard cold cash from a safe located in Mr. Jacobson's office no less. Trial Tr. Vol. 17, 241:21-242:18, Feb. 19,2018.

- Mr. Austin denied ever calling Susan Mussell "that lady lawyer." Trial Tr. Vol. 14, 32:20-33:12, Feb. 14, 2018. Yet Mr. Nelson said this was a common (albeit condescending) salutation. Trial Tr. Vol. 18, 217:5-10, Feb. 20, 2018.

- Mr. Austin testified that he had no knowledge regarding tax matters, and that, until recently, he was unaware that Starkey even had a corporate tax return. Trial Tr. Vol. 11, 75:6-12; 78:7-18, Feb. 9, 2018. But Mr. Nelson confirmed that not only was Mr. Austin aware of Starkey's tax return, he was directly involved in Starkey's transition from a C-corp to an S-corp, and frequently gave sophisticated tax advice to Mr. Nelson and Starkey's customers. Trial Tr. Vol. 17, 266:9-269:16, Feb 19, 2018.

- Mr. Austin claimed he never directed that anyone, including Jeff Taylor, be reimbursed for any donation to The Celebrity Apprentice. Trial Tr. Vol. 13, 177:20-178:23, Feb. 13, 2018. Mr. Nelson confirmed that Mr. Austin directed him to reimburse Mr. Taylor and others. Trial Tr. Vol. 18, 87:12-90:18.

When deciding Mr. Ruzicka's initial *Napue* motion, the Court indicated that its hands were tied with respect to these inconsistencies. The Court could not determine which witness was testifying truthfully without making a credibility determination, which it was not permitted to do at that time. Dkt. 377

18

at 5. But that is no longer the case. Under Federal Rule of Criminal Procedure 33, this Court is now permitted—and is arguably legally obligated—to "evaluate the credibility of the witnesses." *Hassan*, 844 F.3d at 725-26 (8th Cir. 2016) (citing *Knight*, 800 F.3d at 504-05).

Mr. Nelson and Mr. Longtain had no reason to lie about any of the matters identified above. Each of the testimony excerpts identified above was damaging to the government's case. Because both Mr. Nelson and Mr. Longtain were seeking a 5K cooperation letter from the government to justify a reduced prison sentence, they had every reason to tell the government only what it wanted to hear. Instead, they offered truthful testimony adverse to the government's interests because they were under oath and were required to do so.

This is a direct contrast to Austin's obvious motive to testify falsely. As described in further detail in Section II.E, *infra*, Austin had both a personal and financial motive to lie to implicate Mr. Ruzicka in this criminal case. By doing so he could both get revenge for Mr. Ruzicka's decision to pass Austin's step-son over for the position of President of Starkey and save more than $100 million he would otherwise owe under Mr. Ruzicka's employment agreement. Under these circumstances, it is clear which witnesses offered truthful testimony and which one did not.

**D.** **Austin's testimony contained numerous patently incredible claims.**

Finally, in addition to the numerous portions of his testimony that were contradicted by other witnesses and by Starkey documents, Austin also made multiple claims that were simply too implausible and bizarre to be believed by a rational juror.

For example, Austin claimed that despite serving as the CEO and sole owner of Starkey for more than three decades, he was entirely unaware that Starkey had to file a corporate tax return separate from Austin's personal tax return. Trial Tr. vol. 11, 75:6-12, Feb. 9, 2018. This claim was facially implausible. Indeed, the incredible nature of Austin's claim was emphasized when, later during the same direct examination, Austin testified with certainty about the effect that donated parts had on Starkey's corporate tax liability:

> Q.    Okay. Do you have any knowledge regarding how the
>        donation of these parts impacted Starkey's tax return?
> A.    Should've impacted our tax return not at all.
> Q.    Well, do you have any knowledge about how it actually did
>        impact the return, Mr. Austin?
> A.    It impacted our tax return not at all.

Trial Tr. vol. 11, 108:19-24, Feb. 9, 2018. As described above, Austin's claim to know nothing about taxes was also contradicted at length by both Mr. Longtain and Mr. Nelson.

Austin also testified that during a Starkey Foundation trip to Mexico, he met and was possessed by the Archangel Michael. Trial Tr. vol. 13, 110:14-112:21, Feb. 13, 2018. Austin testified that while in Mexico, he met a boy who saw angels who told Austin to close his eyes. *Id.* Austin testified that the Archangel Michael spoke through him using a deep voice that was not his own, and instructed him "you know what to do, do it." *Id.* Austin further testified that when he opened his eyes to see "eyes like my father, these burning, bright blue eyes." *Id.*

There is a difference between a sincerely held religious belief and mania. Austin's claim that he was possessed by an angel who commanded him to do things is the latter. Nor was Austin's testimony the only evidence presented to the jury on this issue. Scott Nelson offered unrebutted testimony that at company meetings, Austin would proudly and at great length relate his conversations with dead animals. Trial Tr. vol. 17, 261:8-11. Mr. Nelson also testified that Austin told stories at fundraising events about conversations with angels who predicted the precise moment of his death: November 11, 2011 at 11:11 p.m. *Id.* at 261:12-23. And when Austin inevitably did not die on that date, he told people that the Archangel Michael had given him a reprieve while he was in Mexico. *Id.* at 261:25-262:5.

Austin did not restrict his bizarre claims to religious matters, either. At several points during cross-examination he accused his ex-wife, Cynthia

Dawson-Austin, of trying to murder him. Trial Tr. vol. 12, 236:11-25, Feb. 12,

2018; vol. 13, 109:19-110:1. Austin was also cross-examined regarding the fact

that he fit patients with hearing aids without being licensed to do so. As part of

this cross-examination, Austin was asked about his attempt to pass the hearing

aid dispenser's exam, and his failure of that exam. Austin testified that the

Minnesota Department of Health intentionally sabotaged his test as part of a

nefarious plot against Starkey:

> Q.    And you've actually sat for that test, haven't you?
> A.    I did.
> Q.    And you walked out in the middle of it; isn't that true?
> A.    Well, the test was administered by a person selling hearing aids that didn't want Starkey selling hearing aids because we were a manufacturer locally.
>
> So while I was trying to trying to [sic] test a bone conduction test, the guy slipped the bone conductor off one side secretly and then pretended that that was normal. He tried to fail me when I was doing the procedure correctly, so I figured forget it.
>
>  . . .
>
> Q.    And it's your testimony that whoever the State of Minnesota had had it in for you, right?
> A.    Absolutely.
> Q.    And, without you knowing it, sabotaged your efforts as an applicant?
> A.    Well, that's what I think happened so –
> Q.    And they did that to sabotage Starkey?
> A.    No. They were not wanting us to sell hearing aids.
> Q.    You don't claim that?
> A.    Well, they purposely created a situation to cause it. Call it a mistake.

Trial Tr. vol. 12, 200:1-201:12, Feb. 12, 2018. Austin's bizarre and paranoid claims were facially unbelievable and should give this Court real concern about accepting his testimony on any matter.

E. **Mr. Ruzicka established that Austin had a motive to lie**.

Austin's numerous outright lies, omissions, contradictions, and facially implausible claims detailed above are rendered even more suspect by his clear motive to testify against Mr. Ruzicka. In 2006, Austin signed an employment contract with Mr. Ruzicka that guaranteed him approximately $10 million in deferred compensation upon Mr. Ruzicka's retirement. In 2007, Austin signed an amendment to that employment agreement that guaranteed Mr. Ruzicka a payout equal to ten percent of Starkey's value—estimated to be north of $1 billion at the time of Mr. Ruzicka's firing—at the date of Austin's death, his incapacity, or the sale of the company. Both the original employment contract and its amendment were entered into evidence as Government Trial Exhibit 88. Neither the employment contract nor the amendment contained any provision invalidating those guarantees if Mr. Ruzicka's employment were terminated.

Consequently, the only way for Austin to escape Starkey's obligation to pay Mr. Ruzicka $100 million under his employment contract was to claim it was obtained via fraud. *See* Restatement (Second) of Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material

misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient"). Austin had more than 100 million reasons to falsely accuse Mr. Ruzicka of fraud—a fact which this Court must consider when evaluating his credibility.

Austin also had a personal reason to testify against Mr. Ruzicka. Numerous witnesses, including Austin himself, testified that Austin wanted to promote his step-son, Brandon Sawalich, to the position of President of Starkey. Mr. Ruzicka refused to let that happen because he believed that Sawalich was not qualified or capable of running Starkey. Mr. Ruzicka's decision provided Austin with an obvious bias against him, which in turn substantially reduced the credibility of his testimony.

## III.   If the Court allows Mr. Ruzicka's conviction on the Northland courts to stand, a miscarriage of justice will occur.

Mr. Ruzicka does not make his request that the Court set aside the jury's verdict on the Northland charges lightly. A district court should not overrule a jury's verdict except under exceptional circumstances. But if ever there were a case where exceptional circumstances were present, this is it.

For the reasons listed above, this Court knows that Austin's testimony was fundamentally incredible. And this is an unusual case because the government's conduct resulted in *only* this Court being aware of the extent of the full extent of Austin's lack of credibility. As detailed further in Mr. Ruzicka's Motion for a

New Trial under *Napue*, in its rebuttal the government actively misled the jury about the nature of the Court's findings on Austin's credibility. This means that this Court is actually in a significantly better position to evaluate Austin's lack of credibility than the jury was.

Austin told dozens of lies about material matters, both during the investigation and his trial testimony. In light of these lies, and Austin's clear personal and financial motives to lie about the NHC transactions, there is simply no way that the Court can conclude with certainty that Austin was telling the truth about that transaction. There is a real chance that Austin's incredible testimony and wholesale perjury resulted in the conviction of an innocent man. In the interest of justice, this Court must set that conviction aside and grant Mr. Ruzicka a new trial.

## CONCLUSION

For the foregoing reasons, Mr. Ruzicka respectfully requests that the Court grant him a new trial under Federal Rule of Criminal Procedure 33.

Respectfully submitted this 12th day of April, 2018.


 */s/ John C. Conard*
John C. Conard (MN No. 386618)
Alexander C. Kopplin (MN No. 393197)
Daniel R. Burgess (MN No. 389976)
WARD | KOPPLIN PLLC
227 Colfax Avenue North

Suite 200
Minneapolis, MN 55405
(952) 653-2620
john@jurytrialmn.com
akopplin@wklawfirm.com
burgess@dburgesslaw.com