# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

                                    Criminal No. 16-246 (JRT/SER)

                  Plaintiff,

v.                                   **ORDER**

JEROME C. RUZICKA and W.
JEFFREY TAYLOR,

                    Defendants.

---

Dulce J. Foster, **FREDRIKSON & BYRON, P.A.**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for William F. Austin.

Erica MacDonald, United States Attorney, and Benjamin F. Langner, Lola Velazquez-Aguilu, and Surya Saxena, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

John C. Conard, **JOHN C. CONARD PLLC**, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415, for defendant Jerome C. Ruzicka.

Casey T. Rundquist and William J. Mauzy, **MAUZY LAW PA**, 800 Hennepin Avenue, Suite 800, Minneapolis, MN 55403, for defendant W. Jeffrey Taylor.

On April 6, 2018, William F. Austin requested permission to file a motion under the Crime Victims' Rights Act ("CVRA"). The Court ordered Austin to show cause and submit a brief as to why Austin is a "crime victim" within the meaning of the Act. Now, Austin and Starkey Laboratories, Inc. ("Starkey"), have filed a joint brief regarding their statuses as crime victims.

The only issue before the Court in this motion is the question of whether Austin and/or Starkey are "crime victims" under the CVRA. The Court will conclude that Starkey is a victim and may file a motion under the CVRA. However, the Court will conclude that Austin is not a victim entitled to file a motion under the CVRA because any harm he suffered was not caused by the alleged criminal conduct.

## BACKGROUND

### I.     FACTUAL BACKGROUND

Starkey is a Minnesota S Corporation that develops, manufactures, and distributes hearing aids. (3d Superseding Indictment ("Indictment") ¶ 2, Jan. 8, 2018, Docket No. 298.) Starkey is privately owned by Austin and Starkey employees. (*Id.* ¶ 3.) Starkey employees hold shares under an Employee Stock Option Program ("ESOP"), which is managed by a trust. (Austin Ex. List, Ex. H ("Chartwell Report 2013") at 5, May. 3, 2018, Docket No. 458-8.) On December 31, 2013, Austin held 93.6% of Starkey's outstanding shares and the ESOP held the remaining 6.4%. (*Id.*) During the relevant time period, Austin served as Starkey's CEO and Chairman of the Board of Directors. (Indictment ¶ 3.)

From about 2005 until 2006, Northland US, LLC ("Northland US"), acquired and operated hearing-aid retailers.[1] (Indictment ¶ 35.) Northland US was wholly owned by Austin. (Austin Ex. List, Ex. A ("Grimes Memo") at 2, May 3, 2018, Docket No. 458-1.)

------

[1] It is a matter of dispute as to when Northland US was created. (*See* Trial Tr. Vol. XVII at 4158:7-23, July 13, 2018, Docket No. 511.) These facts are not at issue for the current motion.

On August 31, 2006, Northland US's assets and liabilities were transferred to Northland Hearing Centers, Inc. ("Northland Hearing"), and Starkey paid $5.3 million for 49% of Northland Hearing's shares in the form of loan forgiveness. (Indictment ¶ 36; Ruzicka Ex. 1 ("Chartwell Report 2008") at 2, June 1, 2018, Docket No. 479-1; *see* Grimes Memo at 2.) At the same time, Northland Hearing issued the remaining 51% of shares in the form of restricted stock to Jerry Ruzicka, Scott Nelson, and Jeffrey Longtain, which was scheduled to vest in 2016. (Indictment ¶ 37.) It is disputed whether Austin knew about (1) the transfer of assets from Northland US to Northland Hearing and (2) the issuance of restricted stock to Ruzicka, Nelson, and Longtain.

In 2013, Ruzicka allegedly caused Northland Hearing to terminate the unvested restricted stock for approximately $8,200,000 without Austin's knowledge or approval. (Indictment ¶¶ 38-39.) Ruzicka later "grossed up" the payments by an additional $7,000,000 to cover to income taxes. (*Id.* ¶¶ 40, 42.) These payments were booked to Northland Hearing rather than Starkey. (*Id.* ¶ 41.)

Ruzicka was indicted – along with four co-conspirators – in connection with the alleged embezzlement of funds from Starkey. Count 1 alleges, in part, that Ruzicka engaged in a conspiracy to commit mail fraud and wire fraud by (1) issuing restricted stock in Northland Hearing without Austin's knowledge in 2006 and (2) redeeming that restricted stock without Austin's knowledge in 2013. (*Id.* ¶¶ 35-43.) Counts 2 and 3 allege that Ruzicka committed mail fraud by sending checks "representing [the] proceeds of the Northland restricted transaction" through the mail. (*Id.* ¶ 58.) Count 10 alleges that Ruzicka committed wire fraud by processing a check of $2,900,000 from Starkey's bank

account to Ruzicka's investment account in August 2013. (*Id.* ¶ 60.) The jury returned a not-guilty verdict for Ruzicka with respect to the conspiracy count and a guilty verdict for Ruzicka with respect to the counts of mail and wire fraud stemming from the Northland transaction. (Ruzicka Verdict ("Verdict") at 1-2, Mar. 8, 2018, Docket No. 417.)

## II. PROCEDURAL BACKGROUND

On February 27, 2018, the Court concluded that the United States had knowledge about two instances of false testimony – (1) whether Austin told FBI agents in an interview that he shreds documents and (2) whether, in a single day, Ruzicka drafted an amended employment contract that was signed. (*Napue* Order at 6-15, Feb. 27, 2018, Docket No. 377.) The Court concluded that the United States' failure to correct these false statements would result in a constitutional violation. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). To avoid the violation, the Government called back two FBI agents for further testimony. In light of this testimony, the Court found that Austin had provided false testimony and struck his false statements. (*Napue* Remedy Order at 2, Mar. 5, 2018, Docket No. 391.) On March 5, the Court issued an order finding that the United States had remedied the *Napue* violation. (*Id.*)

Following trial, Austin filed a letter with the Court requesting permission to file a CVRA motion to clarify the Court's February 27 order. (Letter at 1, Apr. 6, 2018, Docket No. 431.) In particular, Austin cited the provision of the CVRA that affords crime victims "[t]he right to be treated with fairness and with respect for the victim's dignity and

privacy." 18 U.S.C. § 3771(a)(8). The Court ordered Austin to file a brief explaining why he is a "crime victim" under the CVRA. (Order, Apr. 6, 2018, Docket No. 432.)

Austin – now joined by Starkey – has filed a brief arguing that he is a victim because he was harmed as a result of the 2006 and 2013 Northland transactions. (Austin Br., May 3, 2018, Docket No. 457.) The United States and Ruzicka both filed responses, the United States in support and Ruzicka in opposition. (Ruzicka Br., June 1, 2018, Docket No. 479; U.S. Br., June 1, 2018, Docket No. 478.)

## DISCUSSION

The CVRA protects certain rights for crime victims, including "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy" and the right to restitution as provided in law. 18 U.S.C. § 3771(a). The victim may file a motion to assert his or her rights with the district court where the defendant is being prosecuted or, when no prosecution is underway, in the district where the crime occurred. *Id.* at (d)(3).

The CVRA defines "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." *Id.* at (e)(2).[2]

The Eighth Circuit has not had an opportunity to review what it means for an individual to be "directly and proximately harmed as a result of the commission of a federal

---

[2] While the CVRA does not define "person," the Dictionary Act defines "person" to include both individuals and corporations. 1 U.S.C. § 1; *see also United States v. Benedict*, 855 F.3d 880, 886-87 (8th Cir. 2017) (interpreting the definition of "crime victim" under the Mandatory Victims Restitution Act using the Dictionary Act).

offense" under the CVRA.  Other courts have examined this issue, and the Court finds the resulting cases instructive.  Additionally, the definition of "crime victim" in the CVRA was drawn from the Mandatory Victims Restitution Act ("MVRA") and the Victim Witness Protection Act ("VWPA").  *See* Paul G. Cassell, *Recognizing Victims in the Federal Rules of Criminal Procedure: Proposed Amendments in Light of the Crime Victims' Rights Act*, 2005 B.Y.U. L. Rev. 835, 857 (2005).  Courts have interpreted the CVRA in light of the MVRA and the VWPA,[3] and, therefore, the Eighth Circuit's MVRA and VWPA caselaw is relevant to the Court's interpretation of the CVRA.

The Eleventh Circuit has held that the determination of whether an individual is a victim for purposes of the CVRA is a mixed question of law and fact.  *In re Stewart*, 552 F.3d 1285, 1288 (11th Cir. 2008).  In the restitution context, judicial factfinding is appropriate to determine the scope and victims of criminal conduct.  *See United States v. Thunderhawk*, 799 F.3d 1203, 1209 (8th Cir. 2015).  Courts use a two-step process for determining whether an individual is a victim under the CVRA:  First, the Court "identif[ies] the behavior constituting 'commission of a Federal offense.'"  *Stewart*, 552 F.3d at 1288 (quoting 18 U.S.C. § 3771(e)).  Second, the Court "identif[ies] the direct and proximate effects of that behavior on parties other than the United States."  *Id.*

---

[3] *See In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010) (citing MVRA cases while interpreting the CVRA); *United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 460-62 (D.N.J. 2009) (documenting legislative history supporting interpretation of the CVRA in light of the MVRA and VWPA); *United States v. Vergez*, No. 5:15-86, 2016 WL 695709, at *5 (N.D. Ala. 2016); *United States v. Schwartz*, No. 3:6-2, 2006 WL 1662899 at *2-3 (D. Conn. May 25, 2006).

First, the Court must identify the behavior constituting commission of the offense. The "commission of the federal offense" may be broader than the conviction itself. *See United States v. Chalupnik*, 514 F.3d 748, 753-54 (8th Cir. 2008) (MVRA). Accordingly, the Court concludes that it can look to the underlying course of conduct that led to the offense to determine the scope of the "commission of the federal offense."

Second, the Court must determine whether the victims were directly and proximately harmed by the commission of the federal offense. "The CVRA . . . does not limit the class of crime victims to those whose identity constitutes an element of the offense or who happen to be identified in the charging document." *Stewart*, 552 F.3d at 1289. In other words, "a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." *Id.*; *see also Moore v. United States*, 178 F.3d 994, 1001 (8th Cir. 1999) (holding that a bystander of a bank robbery was a victim under the MVRA).

"A person is directly harmed by the commission of a federal offense where that offense is a but-for cause of the harm." *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011). To be "direct" harm, "the harm to the victim [must] be closely related to the conduct inherent to the offense, rather than merely tangentially linked"; the harm cannot be ancillary to the defendant's conduct. *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010). "A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct." *Fisher*, 640 F.3d at 648. A proximate-cause requirement "preclude[s] liability in situations where the causal link between conduct and result is so attenuated that

the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014).

## I.     COMMISSION OF A FEDERAL OFFENSE

The Court must first identify the behavior that constitutes the commission of a federal offense. Austin and Starkey limit their brief to the events surrounding Northland US and Northland Hearing: (1) the 2006 transfer of Northland US's assets to Northland Hearing, (2) the 2006 issuance of restricted stock to Ruzicka, Nelson, and Longtain, and (3) the 2013 payments for termination of the restricted stock and grossing-up of the proceeds to cover tax liabilities. The primary question for the Court is whether Austin knew about these transactions. If Austin knew of and condoned a particular transaction, the Court cannot find that the action was committed with intent to defraud Starkey. The Court will conclude that Austin knew about the 2006 transfer of Northland US's assets to Northland Hearing and the 2006 issuance of restricted stock to Ruzicka, Nelson, and Longtain. However, the Court will conclude that the 2013 restricted-stock transaction and grossing-up of the proceeds was the "commission of a federal offense."

### A.     2006 Northland US Asset Transfer

The Court must decide whether the 2006 transfer of Northland US's assets to Northland Hearing constituted behavior during the commission of a federal offense. The Court will find that Austin knew about the asset transfer and, therefore, will conclude that the 2006 asset transfer was not a fraudulent transaction constituting part of the commission of a federal offense.

The jury made no affirmative findings with respect to the 2006 Northland transactions. The jury did not need to find any facts with respect to the 2006 asset transfer or issuance of restricted stock to convict Ruzicka of mail or wire fraud for the 2013 transaction. The only count in the Indictment that necessarily involved the 2006 Northland transactions was the conspiracy count. (Indictment ¶¶ 35-37.) The jury returned a not guilty verdict with respect to conspiracy. (Ruzicka Verdict at 1.) The Court cannot ascertain whether the jury believed that the 2006 transactions were fraudulent. The Court must consider the evidence presented at trial to determine whether the commission of the federal offense includes the 2006 asset transfer and issuance of restricted stock. *Cf. Thunderhawk*, 799 F.3d at 1209.

Around 2006, it became clear to Starkey's Finance Department that the retail-location assets should be separated from Northland US. According to Nelson's trial testimony, Northland US purchased retail locations using loan funds received from Starkey. (Trial Tr. Vol. XVII at 4160:9-25, July 13, 2018, Docket No. 511.) However, this loan arrangement between Starkey and Northland US potentially ran afoul of agreements between Starkey and Wells Fargo. (*Id.* at 4161:1-15, 4162:10-21.) Starkey also had business reasons to separate the retail assets from Northland US. (Trial Tr. Vol. XVIII at 4403:1-4406:5, July 17, 2018, Docket No. 525.) To resolve this issue, Starkey created Northland Hearing. (Trial Tr. Vol. XVII at 4163:14-22.)

Nelson signed Austin's name on documents relevant to the asset transfer. (*Id.* at 4171:1-4172:9; Trial Tr. Vol. XXVIII at 4197:19-4198:13, 4199:19-4200:23) Nelson admitted that he did not seek Austin's permission to sign the documents. (Trial Tr. Vol.

XXVII at 4171:20-22.) However, Nelson testified that he believed he had authority to sign Austin's name because "Bill was aware that we were moving the stock or the company out of [Northland US] into an entity that Starkey would own." (*Id.* at 4172:23-4173:21.) Nelson testified that he had a conversation with Austin about the asset transfer. (*Id.* at 4173:4-11.) The Court finds Nelson's testimony credible.

Moreover, Austin is a trustee for Starkey's ESOP. (Trial Tr. Vol. XVIII at 4208:3-5.) The annual Appraisal Report for the ESOP disclosed at length:

> Historically, the Company's consolidated financial statements included the operations of its variable interest entity ("VIE"), Northland, US, LLC. However, on August 31, 2006, the majority of the assets and liabilities of the VIE were acquired by Northland Hearing Center, Inc. ("NHC"), for which the Company is the primary beneficiary. As a result, Starkey's financials were consolidated with NHC since 2006.

(*See* Ruzicka Br., Ex. 1 at 3, June 1, 2018, Docket No. 479-1.) The Court acknowledges that this disclosure was made after the 2006 asset transfer and that Nelson generally did not review the report with Austin. (*See* Trial Tr. Vol. XVIII at 4208:6-24.) However, the Court finds it relevant as evidence that Ruzicka did not seek to conceal the asset transfer from Austin.

The Court finds that Austin knew about the asset transfer. Accordingly, the Court concludes that the asset transfer does not constitute behavior during the commission of a federal offense.

**B.  2006 Northland Hearing Issuance of Restricted Stock**

The Court must decide whether the 2006 issuance of restricted stock constituted behavior during the commission of a federal offense.  The Court will find that Austin knew about the issuance of restricted stock and, therefore, will conclude that the issuance of restricted stock was not a fraudulent transaction constituting part of the commission of a federal offense.

Nelson testified that Ruzicka proposed giving himself, Nelson, and Longtain a "substantial portion" of the Northland Hearing's shares as a long-term incentive for their management.  (Trial Vol. XVII at 4164:19-4165:22.)  Nelson clearly testified that he and the auditors told Austin about the issuance of the restricted stock "at the very beginning":

> Q.   You . . . w[e]nt to [Austin's] Beach Road house, and you talked to him about the move to Northland Hearing Centers, Inc.?
>
> A.   I did talk with him about the move, yes.
>
> Q.   And you talked to him about the restricted stock?
>
> A.   I recall I had a conversation with him about that.
>
> Q.   You had a conversation with Bill Austin in 2006 about the move to Northland Hearing Centers, Inc., and about the issuance of restricted stock?
>
> A.   I don't recall if the restricted stock was – that conversation was in 2006 exactly, but I know I had the conversation about moving it from the LLC into the other corporation.
>
> Q.   And about that time as well, you talked about the restricted stock with Bill Austin?
>
> A.   I recall that, yes.

Q.     Okay.  So you told him?

A.     Yes.

Q.     And this is at the very beginning?

A.     Yes.

Q.     Okay.  And you know the auditor sat with him and told him, too?

A.     I was told that they did, yes.  I was not in that meeting.

Q.     Okay.  The Ernst & Young auditor sat and told Bill Austin?

       . . .

A.     I was told by them that they had that discussion with Mr. Austin.  I was not in the meetings is what I am saying.

       . . .

Q.     Okay.  So we spent a lot of time on whether or not Bill Austin would have or would not have looked at the audited financials, but as far as you know, the auditor sat with him in 2006 and told him?

A.     That's what I believe, yes.

Q.     About Northland?

A.     Correct.

Q.     About the restricted stock?

A.     Correct.

Q.     And so as time went on, you and Jeff Longtain and Jerry Ruzicka openly built this retail empire for Starkey, right?

| | |
|---|---|
| A. | Correct. |
| Q. | Believing that Austin knew about your involvement? |
| A. | Yes. |
| Q. | Because you had told him about your involvement? |
| A. | Correct. |
| Q. | Believing he knew about the equity compensation because you had told him about it? |
| A. | Correct. |

(Trial Tr. Vol. XVIII at 4406:24-4408:24.)   The Court finds this portion of Nelson's testimony credible.

On redirect examination, Nelson contradicted some of his otherwise-clear testimony.  The United States began its questioning of Nelson by reminding him of his position as a former defendant who had pleaded guilty:

| | |
|---|---|
| Q. | . . . [B]y my count, you have met with the government eight times, does that sound about right? |
| A. | Sounds about right. |
| Q. | Okay.  The first time you met with the government was when Special Agent Kinney came to your house in November of 2015.  Do you remember that? |
| A. | Correct. |
| Q. | And it was very important for you to tell the truth at that time? |
| A. | Yes. |
| Q. | And then following that, you got charged with a crime? |

A.     Yes.

Q.     And you were charged in the same indictment as the defendants that are sitting here?

A.     Correct.

Q.     Okay.  And then subsequently you pleaded guilty?

A.     Yes.

Q.     In December of 2017?

A.     Correct.

Q.     And prior to your plea, there was one meeting with some of us over here on this side; is that right?

A.     Yes.

Q.     And then you pleaded guilty?

A.     Yes.

Q.     And you entered into a plea agreement?

A.     Yes.

Q.     And it was important for you to tell the truth in that plea agreement, right?

A.     Yes.

Q.     And it was also important when you stood here in court to tell the truth related to your plea in front of the judge?

A.     Yes.

Q.     And then following that, you met with some combination of this group over here six more times, I believe?

Q.     And I was always there?

A.     Yes.

Q.     Right?  You and I were always there?

A.     Yes.

Q.     And it was very important for you to tell the truth during those meetings, right?

A.     It was.

Q.     Okay.  Now, here you are in court, and now you are testifying.  It's also important to tell the truth, right?

A.     Yes.

(Trial Tr. Vol. XIX at 4655:16-4657:11, July 17, 2018, Docket No. 526.)   After again reminding Nelson that he had taken a plea agreement and had met with the United States' attorneys numerous times, the prosecutor questioned Nelson on the substance of his testimony about the meetings he had with Austin about the restructuring of Northland US and Northland Hearing and the restricted stock:

Q.     And when you have met with the government the six or seven times since your plea, we have talked about [Northland], too; is that fair?

A.     Yes, we have.

Q.     Okay.  And in all those conversations, you recalled one face-to-face meeting that you had with Mr. Austin; isn't that correct?

A.     Correct.

Q.     One[ ] face-to-face meeting that you recall in history –

A.     Correct.

Q.     And I was always there?

A.     Yes.

Q.     Right?  You and I were always there?

A.     Yes.

Q.     And it was very important for you to tell the truth during those meetings, right?

A.     It was.

Q.     Okay.  Now, here you are in court, and now you are testifying.  It's also important to tell the truth, right?

A.     Yes.

(Trial Tr. Vol. XIX at 4655:16-4657:11, July 17, 2018, Docket No. 526.)   After again reminding Nelson that he had taken a plea agreement and had met with the United States' attorneys numerous times, the prosecutor questioned Nelson on the substance of his testimony about the meetings he had with Austin about the restructuring of Northland US and Northland Hearing and the restricted stock:

Q.     And when you have met with the government the six or seven times since your plea, we have talked about [Northland], too; is that fair?

A.     Yes, we have.

Q.     Okay.  And in all those conversations, you recalled one face-to-face meeting that you had with Mr. Austin; isn't that correct?

A.     Correct.

Q.     One[ ] face-to-face meeting that you recall in history –

A.     Yes.

Q.     – where you discussed with him that transaction.

Q.     And during that meeting that you had with Mr. Austin, you talked to him about the fact that the retail assets of Northland US, LLC were getting moved into Starkey?

A.     I did.

Q.     Now, when I asked you this question previously and all of the other times that I have met with you, you could not recall when that meeting occurred?

A.     I cannot recall when that meeting occurred.

Q.     Okay.  But I am confused because when Mr. Conard asked you those questions, it sounded like there may have been multiple meetings.

A.     Then I misspoke because it was one meeting with Bill where we talked about it.

Q.     Okay.  There was only one meeting that you recall in all of history, and I am not trying to be difficult with you, but there were a number of questions asked to you that I was confused by because I have met with you on this seven times.  So I just want to be clear with you about what your recollection is.

(Trial Tr. Vol. XIX at 4667:5-4668:10.)  Nelson subsequently recanted.  He testified that the conversation "happen[ed] at some point between 2006 and 2015," but that he could not recall whether it happened before August 2006.  (*Id.* at 4669:18-24.)  Nelson testified that, "I don't believe we had talked about the restricted stock specifically with Bill, no."  (*Id.* at 4670:12-15.)  At the time, the Court warned the prosecutor, "I think you need to be careful about vouching for him, particularly, you know, we talked seven times, didn't we?  That

kind of thing I think is getting improper.  It's improper, getting toward improper vouching for him.  That part of it is problematic."  (*Id.* at 4672:24-4673:3.)  During recross, Nelson testified that a member of the audit team had told Austin about the issuance of the restricted stock in 2006.  (*Id.* at 4735:6-25.)

The Court does not find Nelson's testimony that he never told Austin about the issuance of the restricted stock credible.  Nelson testified on cross-examination that he told Austin about the issuance of the restricted stock.  On redirect, the prosecutor zealously questioned Nelson about his plea bargain, the number of meetings he had with the prosecution and investigators, and the need to tell the truth.  The prosecutor followed this line of questioning with questions about Nelson's previous testimony.  Nelson recanted his testimony.  The Court does not find Nelson's recantation credible.

Even if Nelson never told Austin about the issuance of the restricted stock, he testified that auditors told Austin in 2006.  Moreover, the ESOP's Appraisal Report showed that Starkey only owed 49% of Northland Hearing.  (Ruzicka Br., Ex. 1, at 3.)  The Court finds that disclosure relevant as evidence that Ruzicka did not seek to conceal from Austin that Starkey did not own 100% of Northland Hearing.

Even absent Nelson's testimony that he told Austin about the issuance of the restricted stock, the Court finds that Austin knew about the issuance of the restricted stock.  Accordingly, the Court concludes that the 2006 issuance of restricted stock does not constitute behavior during the commission of a federal offense

### C. 2013 Restricted Stock Payments

The Court must decide whether the 2013 payments for termination of the restricted stock constituted behavior during the commission of a federal offense. The Indictment alleges that Ruzicka committed two counts of mail fraud by sending two checks "representing proceeds of the Northland restricted stock transaction" in June 2013 and July 2013. (Indictment ¶ 58 (counts 2 and 3).) The Indictment also alleges one count of wire fraud related to the 2013 transactions. (*Id.* ¶ 60 (count 10).) The jury returned a guilty verdict for all three counts. (Ruzicka Verdict at 1-2.) Unlike the 2006 Northland transactions, Nelson testified that Austin was not aware of the 2013 payments for termination of the restricted stock. (Trial Tr. Vol. XVIII at 4258:25-4262:17) The Court concludes that the 2013 restricted-stock payments constitute behavior during the commission of a federal offense.

## II. STARKEY

The Court must decide whether Starkey was directly and proximately harmed by the 2013 restricted-stock payments. Ruzicka was convicted of several offenses that involved the fraudulent taking of money from Starkey. No party disputes that Starkey was a victim of Ruzicka's crimes. (Ruzicka Br. at 2 ("[T]he victim of Mr. Ruzicka's alleged crimes was Starkey, not Austin personally.").) The Court concludes that Starkey is a victim and will permit Starkey to file a motion under the CVRA.

The Court notes, however, that it is unnecessary for Starkey to file such a motion to obtain restitution, which will be part of the Court's considerations at sentencing under the

MVRA. Moreover, the Court cautions Starkey that it and Austin are separate entities and, therefore, Starkey cannot assert Austin's rights. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474-75 (2003). While Starkey has not expounded the merits of its position, Starkey states it seeks to file a motion "to ask the Court to amend and clarify the February 27 Order . . . so as to mitigate further damage and harm to Starkey and Starkey Hearing Foundation." (Austin Br. at 11.) Austin's initial letter to the Court stated that he seeks to file the motion pursuant to the provision providing for the victim's "right to be treated with fairness and with respect for the victim's dignity and privacy." (Austin Letter at 1); *see* 18 U.S.C. § 3771(a)(8). The February 27 Order found that the United States knowingly elicited false testimony about (1) whether Austin shredded the descending gross income reports and (2) whether, in a single day, Ruzicka drafted an amended employment contract in a single day. (*Napue* Order at 6-15.) It is unclear how Starkey's right to be treated with fairness was infringed by the Court's February 27 Order, notwithstanding Starkey's interest in rehabilitating Austin as "the public face of Starkey."[4] (Austin Br. at 11.) However, the Court will allow Starkey to file a motion explaining its position if it feels that such a motion remains necessary.

---

[4] A crime victim appearing as a witness in a criminal trial does not have the right to provide false testimony. The Court has an obligation to protect the constitutional rights of criminal defendants. This includes ensuring that a criminal conviction is not "obtained through use of false evidence." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

## III.    AUSTIN

The Court must decide whether Austin was directly and proximately harmed by the 2013 restricted-stock payments.  At the heart of this issue is whether a shareholder of a pass-through entity can be considered a victim simply by virtue of his or her ownership stake in the entity.  Because the Court will conclude that Austin is not a victim by virtue of his ownership stake in Starkey, the Court will deny Austin's request to file a motion.

A "basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."  *Dole Food*, 538 U.S. at 474.  "An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest."  *Id.*  Even in the case of pass-through entities, courts must respect the distinction between the business entity and its owner.  *See United States v. Acambaro Mexican Rest., Inc.*, 631 F.3d 880, 883 (8th Cir. 2011).  This separation serves to protect shareholders from the corporation's liabilities and, therefore, in only the rarest of cases should the Court disregard the distinction between corporation and shareholder.

These basic tenets of corporate law inform the Court's interpretation of the CVRA. The shareholder (i.e., the "person" contemplated by the CVRA) must show "direct[] and proximate[] harm[]" to his or her individual person as a result of the crime; it is not enough for the corporation to have been harmed.  18 U.S.C. § 3771(e)(2).  At least one district court has concluded that even a sole shareholder is not a victim under the CVRA by virtue of his or her participation in the proceedings as the shareholder's representative of the victim company.  *See United States v. Kasper*, 60 F. Supp. 3d 1177, 1179 (D.N.M. 2014).

However, there are a number of situations in which courts have found that shareholders are entitled to restitution as a result of criminal acts committed against the corporation. These cases are instructive as to what harm must be shown for a shareholder to be a victim. Shareholders may be victims when they suffer an economic loss that is causally linked to the defendant's fraud or when they rely on fraudulent representations to invest in the corporation. *See United States v. Reifler*, 446 F.3d 65, 125-28 (2d Cir. 2006); *United States v. Gardner*, No. 13-35, 2017 WL 684442, at *1-2 (D. Minn. Feb. 21, 2017). *But see United States v. Collardeau*, No. 03-800, 2005 WL 1106475, at *5-7 (D.N.J. Apr. 28, 2005) (insufficient causation). These cases stand for the proposition that shareholders who are directly victimized by a corporation they partially own may receive restitution. The facts of this case do not match: Austin does not allege that the value of his shares in Starkey depreciated or that he invested additional money in Starkey as a result of the scheme.

Instead, Austin relies on his status as Starkey's majority shareholder to argue that he is a victim of the 2013 sale of restricted stock – in short, he argues that everything taken from Starkey was "effectively taken from Mr. Austin, as the principal owner of Starkey – a pass-through corporation." (Austin Br. at 6-7.) But Austin is not Starkey; Austin is not even Starkey's sole shareholder.[5] (*See* Chartwell Report 2013 at 5.) The harm to Starkey

---

[5] Austin submits that "[t]he Court previously acknowledged that Mr. Austin and Starkey were virtually indistinguishable" because it observed that "for all practical purposes, the Starkey Corporation was Mr. Austin at the time" he was defending himself in a civil suit brought by Ms. Dawson Austin. (Austin Br. at 4-5 n.2 (quoting Trial. Tr. Vol. X at 2119:14-21, May 13, 2018, Docket No. 503).) Setting aside the fact that the Court's evidentiary ruling is irrelevant here, the

is direct, while the harm to Austin – like the harm to each Starkey employee participating in the ESOP – is "ancillary." *In re McNulty*, 597 F.3d at 352. The distinction is important and must be rigorously enforced to ensure efficiency in judicial proceedings. If the Court concluded that shareholders are victims merely because they own shares in a victim corporation, then all shareholders would be entitled to "be reasonably heard at any public proceeding," "confer with the attorney for the Government in the case," and "full and timely restitution." 18 U.S.C. § 3771(a). The Court must avoid turning a criminal trial into a judge-led shareholder meeting.

This conclusion is reinforced by the two cases Austin submits in support of his motion because each highlights the requirement of a direct connection between fraud and victim. In *United States v. Warwick*, an employee submitted fraudulent timesheets to her employer, which in turn submitted them to the federal government. No. 11-167, 2011 WL 4527285, at *1 (D. Md. Sept. 26, 2011). The fact that the employer was part of the fraud

---

litigation between Austin and his ex-wife took place in the late 1990s, before Austin stepped away from day-to-day management of the company and before Starkey established its ESOP. (*See* Trial Tr. Vol. V at 1184:7-1186:7, July 13, 2018, Docket No. 502; Trial Tr. Vol. XIII at 3172:15-3173:25, July 13, 2018, Docket No. 507.)

Moreover, the Court cannot draw a line between the majority shareholder and minority shareholders for victim status. The plain language of the CVRA contemplates that **any** individual directly and proximately harmed by the defendant's conduct is a "crime victim." The CVRA does not distinguish between the severity of the harm suffered by victims. Accordingly, whether Austin is the majority shareholder and therefore suffered the most harm of the shareholders is irrelevant. If Austin is a victim by virtue of his stake in Starkey, then the ESOP is a victim and – presumably – all of Starkey's employee shareholders are victims. If all of these individuals are victims, the Court cannot practically accord them all the rights envisioned by the CVRA. 18 U.S.C. § 3771 (d)(2). However, because the Court concludes that neither Austin nor the ESOP is a victim, the Court need not establish procedures to address the potential grievances of the multitude of shareholders.

– and indeed had to reimburse the government – was sufficient to show direct harm to the employer. *Id.* at *2. In *Stewart*, a bank's vice president of mortgage lending conspired with a mortgage origination firm to overcharge borrowers by one percent; the two were charged with honest services fraud. 552 F.3d at 1287. The fact that the borrowers signed an agreement with the bank assuming the extra cost – even though the actual loss was absorbed by a developer, who paid all closing costs – was sufficient to show direct harm. *Id.* at 1288-89. Both cases stand for the proposition that a third party unwittingly forced to participate in the fraud may be a victim. Austin has not shown that he was duped into participating in the 2013 restricted-stock transaction.

Notably, Austin does not submit any authority showing that stock ownership suffices to show direct harm; as such, this Court will decline to be the first to do so.

Austin's other argument is that the booking of the 2013 restricted-stock transaction to Northland Hearing caused disadvantageous tax treatment of the sale that passed through to Austin's income tax returns. This is a novel argument. Northland Hearing operated at a loss while Starkey was profitable. The 2013 transaction would have been deductible for tax purposes. Booking it to Northland Hearing rather than Starkey was not advantageous because Northland Hearing did not have any taxable income to offset. (Trial Tr. Vol. XX at 4966:19-24, 4970:2-24, July 13, 2018, Docket No. 512.) As a result, Austin was unable to benefit from the deduction when Starkey's tax liability passed through to him.

Even setting aside the aforementioned problem with the ancillary nature of pass-through harm, Austin's argument is unpersuasive because he has not demonstrated that Starkey's inability to deduct the 2013 transaction was caused by Ruzicka's fraudulent

actions.  If Ruzicka had never caused the 2013 transaction, there would be no transaction

to book to Starkey.  There is no harm because Starkey and Austin had the same tax liability

with the fraud as they would have had without the fraud.  In effect, Austin argues that he

did not receive the maximum benefit of Ruzicka's fraudulent conduct.  It would be strange

to hold that an individual who is deprived of a possible benefit of a crime is a victim for

purposes of the CVRA.  The purported "harm" of not receiving a possible benefit of the

crime is ancillary to the crime itself.  *McNulty*, 597 F.3d at 352.

Accordingly, the Court concludes that Austin is not a victim for purposes of the

CVRA and will deny Austin's request to file a motion pursuant to the CVRA.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1. The Court **FINDS** that Austin is not a victim under the CVRA.

2. The Court **FINDS** that Starkey is a victim under the CVRA.  The Court **WILL**

    **PERMIT** Starkey to file a motion under the CVRA.


DATED:  August 1, 2018                    _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                  Chief Judge
                                                  United States District Court