# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

                          Plaintiff,

v.

JEROME C. RUZICKA and
W. JEFFREY TAYLOR,

                          Defendants.

Criminal No. 16-246 (JRT/SER)

**MEMORANDUM OPINION
AND ORDER DENYING
POST-TRIAL MOTIONS**

---

Erica H. MacDonald, United States Attorney, and Benjamin F. Langner, Lola Velazquez-Aguilu, and Surya Saxena, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

John C. Conard, **JOHN C. CONARD PLLC**, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415, for defendant Jerome C. Ruzicka.

Casey T. Rundquist and William J. Mauzy, **MAUZY LAW PA**, 800 Hennepin Avenue, Suite 800, Minneapolis, MN 55403, for defendant W. Jeffrey Taylor.

# TABLE OF CONTENTS

BACKGROUND .................................................................................................. 3
    I.    **Pre-trial Motions** ............................................................................ 5
    II.   *Napue* **Order** .................................................................................... 6
    III.  **Motions for Acquittal** ................................................................... 7
    IV.  **Verdicts** ........................................................................................... 7
    V.   **Post-Trial Motions** ......................................................................... 8
DISCUSSION ..................................................................................................... 8
    I.    **Standards of Review** ..................................................................... 8
    II.   **Motion for a New Trial – Constructive Amendment** ............ 9
    III.  **Motion for a New Trial –** *Napue* **Violations** ........................... 14
        A.   January 2018 Interview ...................................................... 16
        B.   July 2016 Interview ............................................................ 17
        C.   Austin's Signature ............................................................. 18
        D.   Starkey's Tax Returns ....................................................... 19
    IV.  **Motion for a New Trial – Miscarriage of Justice** ................... 21
        A.   Austin's Credibility ........................................................... 22
        B.   Archer Consulting .............................................................. 24
    V.   **Motion for a New Trial – Prosecutorial Misconduct** ............ 28
        A.   Austin's Credibility ........................................................... 29
        B.   Susan Mussell .................................................................... 32
        C.   Trustee Verification Forms ............................................... 34
        D.   Nelson's Conversations with Austin ............................... 35
        E.   Ownership of Northland Hearing ................................... 37
        F.   Korpela's Testimony on SoundPoint .............................. 39
        G.   Ruzicka's Ownership of Hearing Fusion ....................... 46
    VI.  **Motion for a New Trial – Misjoinder** ...................................... 47
        A.   Timeliness ........................................................................... 47
        B.   Exculpatory Testimony ..................................................... 48
        C.   Unrelated Acts .................................................................... 50
    VII.  **Motion for a New Trial –** *Brady* **Materials** ............................ 52
    VIII. **Motions for Acquittal** ................................................................. 55
        A.   Northland Hearing (Counts 2, 3, and 10) ...................... 55
        B.   Archer Consulting (Count 4) ........................................... 56
        C.   Archer Acoustics (Counts 7 and 19) .............................. 57
        D.   Tax Fraud (Count 25) ....................................................... 59
    IX.  *Franks* **Motion** ............................................................................ 60
ORDER ............................................................................................................ 63

Defendants Jerome C. Ruzicka and W. Jeffrey Taylor have brought numerous post-trial motions seeking relief from various criminal convictions. Both were alleged to have engaged in a conspiracy to defraud hearing-aid companies Starkey Laboratories, Inc. ("Starkey"), and Sonion A.S. A jury returned a guilty verdict for Ruzicka on four counts of mail fraud, three counts of wire fraud, and one count of making and subscribing a false tax return. A jury returned a guilty verdict for Taylor on one count of mail fraud and two counts of wire fraud. The Court will consider each of their motions in turn and, for the reasons explained herein, will deny all of them.

## BACKGROUND

For purposes of brevity, the Court will abstain from reciting the factual allegations contained in the Indictment. (3d Superseding Indictment ("Indictment"), Jan. 8, 2018, Docket No. 298.) The Court previously summarized the factual allegations in its order on the parties' motions in limine. *United States v. Ruzicka* (*MILs Order*), No. 16-246, 2018 WL 385422, at *1-2 (D. Minn. Jan. 11, 2018) (Docket No. 308).

Defendants Jerome C. Ruzicka, Lawrence W. Miller, W. Jeffrey Taylor, and Lawrence T. Hagen were indicted on some or all of 25 separate counts:

| | |
|---|---|
| Count 1: | Conspiracy to Commit Mail Fraud and Wire Fraud. (Indictment ¶¶ 17-56.) |
| Counts 2-3: | Mail Fraud stemming from the 2013 Northland Hearing restricted stock transaction. (*Id.* ¶ 58.) |
| Count 4: | Mail Fraud stemming from Archer Consulting. (*Id.*) |
| Count 5: | Mail Fraud stemming from transfer of the title to a Jaguar vehicle from Starkey to Ruzicka. (*Id.*) |

| | |
|---|---|
| Count 6: | Wire Fraud stemming from a transfer from Auric's bank account to Claris Investments' bank account. (*Id.* ¶ 60.) |
| Count 7: | Wire Fraud stemming from a transfer from ExSilent to Archer Acoustics. (*Id.*) |
| Counts 8, 13-14: | Wire Fraud stemming from a payment from Starkey to Archer Consulting. (*Id.*) |
| Count 10: | Wire Fraud stemming from the 2013 Northland Hearing restricted stock transaction. (*Id.*) |
| Counts 9, 11-12: | Wire Fraud stemming from employment bonus payments from Starkey to Miller. (*Id.*) |
| Counts 15, 17: | Wire Fraud stemming from payments from Archer Consulting to Ruzicka. (*Id.*) |
| Counts 16, 18: | Wire Fraud stemming from payments from Archer Consulting to Taylor. (*Id.*) |
| Count 19: | Wire Fraud stemming from a transfer from Sonion to Archer Acoustics. (*Id.*) |
| Counts 20, 23: | Transactions Involving Fraud Proceeds stemming from checks from Archer Consulting to a 401k account benefitting Ruzicka and Taylor. (*Id.* ¶ 62.) |
| Count 21: | Transactions Involving Fraud Proceeds stemming from a check from Archer Consulting to Taylor. (*Id.*) |
| Count 22: | Transactions Involving Fraud Proceeds stemming from a check from Archer Consulting to Ruzicka. (*Id.*) |
| Count 24: | Making and Subscribing a False Return stemming from Ruzicka's 2010 Individual Income Tax Return, related to proceeds from the sale of SoundPoint. (*Id.* ¶ 64.) |
| Count 25: | Making and Subscribing a False Return stemming from Ruzicka's 2014 Individual Income Tax Return, related to a purported loan from Starkey. (*Id.* ¶ 66.) |

The Court will briefly summarize its previous orders and other procedural history as relevant to the current order.

## I.    PRE-TRIAL MOTIONS

Before trial, Ruzicka brought a motion to sever on the grounds that Rule 14 required severance of the co-defendants because Ruzicka would be unable to compel their testimony and that Rule 8 required severance of improperly joined schemes, and a motion to dismiss on the ground that the conspiracy charge was duplicitous. (Ruzicka's Mot. to Sever, Mar. 31, 2017, Docket No. 131; Ruzicka's Mot. to Dismiss, Mar. 31, 2017, Docket No. 130.) Taylor moved to join both motions. (Taylor's Request to Join, Apr. 17, 2017, Docket No. 152.) The Magistrate Judge did not address Taylor's motion to join, but denied the motion to sever because Ruzicka had not established that joinder would result in irreconcilable defenses or inadmissible evidence and recommended denying the motion to dismiss because the Indictment charged a single conspiracy. (R. & R. at 3-4, May 22, 2017, Docket No. 168; Order at 8, May 19, 2017, Docket No. 162.) The Court adopted the recommendation. (Order, June 14, 2017, Docket No. 175.)

Also before trial, the United States moved to permit the introduction of evidence about SoundPoint Audiology and Hearing Services LLC ("SoundPoint"), Audiometrix LLC, and Hearing Fusion. (Gov.'s Mem. & Mots. in Limine ("Gov. MILs") at 20-21, Dec. 14, 2017, Docket No. 244.) The Court concluded that evidence related to SoundPoint was admissible because it was inextricably intertwined with the 2010 tax-fraud count against Ruzicka. *MILs Order*, 2018 WL 385422, at *3-4. The Court also concluded that evidence

related to Audiometrix and Hearing Fusion was admissible because it was sufficiently connected to the conspiracy count. *Id.*

## II.  *NAPUE* ORDER

On February 27, 2018, the Court concluded that the United States knew or should have known about two instances of false testimony by witness William Austin, the majority shareholder and CEO of Starkey:  (1) Austin never told FBI agents that he shreds documents and (2) Ruzicka drafted his own amended employment contract the same day that it was signed.  *United States v. Ruzicka* (*Napue Order*), No. 16-246, 2018 WL 1064215, at *2-7 (D. Minn. Feb. 27, 2018) (Docket No. 377).  The Court concluded that the United States' failure to correct these false statements would result in a constitutional violation.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).  To avoid the violation, the United States called back two FBI agents for further testimony.  In light of that additional testimony, the Court found that Austin had provided false testimony and struck his false statements.  (Mem. Op. & Order at 2, Mar. 5, 2018, Docket No. 391.)  On March 5, the Court issued a written order finding that the United States had remedied the *Napue* violation.  (*Id.*)

The Court subsequently instructed the jury:

> At the end of trial, the Court struck two portions of William Austin's testimony because the Court concluded that these statements were false:
>
> 1.  William Austin's testimony that he never shredded any descending gross income reports.

2. William Austin's testimony that he believed Defendant Ruzicka had drafted the amendment to his employment contract and that he had drafted that amendment the same day it was signed.

The Court has struck this testimony and, therefore, you may not consider it in your deliberations. However, you may consider the fact that the Court has struck portions of Austin's testimony in assessing his credibility.

(Jury Instrs. No. 41, Mar. 9, 2018, Docket No. 396.)

## III.    MOTIONS FOR ACQUITTAL

Before the close of trial, Ruzicka and Taylor moved for acquittal and a mistrial on various grounds, including misjoinder, and raised or renewed a number of oral motions. (Trial Tr. Vol. XXIV at 5996:9-23, July 13, 2018, Docket No. 516; Taylor's Mot. for Acquittal, Feb. 26, 2018, Docket No. 368; Taylor's Mot. for Decl. of Mistrial, Feb. 26, 2018, Docket No. 369; Ruzicka's Mot. for Acquittal, Feb. 26, 2018, Docket No. 370.) The Court denied these motions. (Minute Entry, Feb. 28, 2018, Docket No. 383; Minute Entry, Feb. 27, 2018, Docket No. 378.)

## IV.    VERDICTS

The jury returned not-guilty verdicts for Miller and Hagen on all counts. (Miller Verdict, Mar. 8, 2018, Docket No. 419; Hagen Verdict, Mar. 8, 2018, Docket No. 420.) The jury returned a guilty verdict for Ruzicka with respect to Counts 2-5, 7, 10, 19, and 25. (Ruzicka Verdict at 1-4, Mar. 8, 2018, Docket No. 417.) The jury returned a guilty verdict for Taylor with respect to Counts 4, 7, and 19. (Taylor Verdict at 1-3, Mar. 8, 2018, Docket No. 418.)

## V.     POST-TRIAL MOTIONS

Ruzicka and Taylor filed the post-trial motions that are now before the Court.  At the hearing on these motions, the Court granted Taylor's motion to join three of Ruzicka's motions.  (Minute Entry ("Hearing Minutes"), July 26, 2018, Docket No. 534.)

## DISCUSSION

## I.     STANDARDS OF REVIEW

Taylor and Ruzicka each brought motions for a new trial.  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The Court has broad discretion to grant a new trial under Rule 33, but it must exercise that discretion sparingly.  *United States v. McClellon*, 578 F.3d 846, 857 (8th Cir. 2009).  The Court should grant a motion for a new trial "where the evidence presented weighs heavily enough against the verdict that the court believes a 'miscarriage of justice may have occurred.'  Unlike a motion for acquittal, . . . a court considering a new trial motion is free to evaluate the evidence and credibility of the witnesses."  *United States v. Hilliard*, 392 F.3d 981, 987 (8th Cir. 2004) (citation omitted) (quoting *United States v. Huerta-Orozco*, 272 F.3d 561, 565 (8th Cir. 2001)).

Taylor and Ruzicka have also renewed their motions for acquittal.  Rule 29 permits the Court to enter a judgment of acquittal after a guilty verdict if the evidence is insufficient to sustain the conviction. Fed. R. Crim. P. 29(a).  The standard for determining whether evidence is insufficient is strict, requiring acquittal only where there is "no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a

reasonable doubt." *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999); *see also United States v. Herbst*, 666 F.3d 504, 510 (8th Cir. 2012) ("Reversal is warranted only if no reasonable jury could have found guilt beyond a reasonable doubt."). The Court "consider[s] the evidence in the light most favorable to the government, drawing all reasonable inferences and resolving all evidentiary conflicts in favor of the jury's verdict." *United States v. Aponte*, 619 F.3d 799, 804 (8th Cir. 2010).

Finally, Ruzicka has renewed his motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Such a hearing is required when "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in [a] warrant affidavit." *Id.* at 155-56. However, the rule applies only to the affiant, not a nongovernmental informant, and only if the material was necessary to the finding of probable cause. *Id.* at 171-72.

## II.    MOTION FOR A NEW TRIAL – CONSTRUCTIVE AMENDMENT

Ruzicka moves for a new trial on Counts 2, 3, and 10 because the United States constructively amended the Indictment, or, in the alternative, because the evidence proved a variance. (Ruzicka's Mot. for a New Trial ("Constructive Am. Mot."), Apr. 12, 2018, Docket No. 436.) The Court will deny the motion.

"A constructive amendment of an indictment is a direct violation of the Fifth Amendment and is reversible error per se." *United States v. Thomas*, 791 F.3d 889, 896 (8th Cir. 2015).

> A constructive amendment occurs when the essential elements
> of the offense as charged in the indictment are altered in such

> a manner – often through the evidence presented at trial or the jury instructions – that the jury is allowed to convict the defendant of an offense different from or in addition to the offenses charged in the indictment.

*Id.* (quoting *United States v. Whirlwind Soldier*, 499 F.3d 862, 870 (8th Cir. 2007)). The question is whether the evidence, arguments, or instructions at issue created a substantial likelihood that the defendant was convicted of an uncharged offense. *Id.* "The basic difference between a constructive amendment and a variance is this: a constructive amendment changes the charge, while the evidence remains the same; a variance changes the evidence, while the charge remains the same." *Id.* at 897 (quoting *United States v. Stuckey*, 220 F.3d 976, 981 (8th Cir. 2000)). Variances are subject to the harmless error rule and require reversal only if the defendant was actually prejudiced because he was not fully appraised of the charges he would face. *Id.*

The Court must first determine the scope of the conduct charged in the Indictment. Ruzicka maintains that the Indictment alleged only fraud by omission, and that the United States constructively amended the Indictment by presenting two uncharged theories of fraud: abuse of authority and affirmative concealment or misrepresentation. The Indictment generally alleged that Ruzicka conspired with the other Defendants to defraud Starkey "by means of materially false and fraudulent pretenses, representations, promises, and material omissions." (Indictment ¶ 18.) More specifically, it alleged that Ruzicka secretly created Northland Hearing Centers, Inc., ("Northland Hearing"); transferred assets from Northland US, LLC ("Northland US") to Northland Hearing; issued restricted stock in Northland Hearing to himself, Starkey Chief Financial Officer Scott Nelson, and

Northland Hearing President Jeffrey Longtain; and caused Starkey to pay the three stockholders for the termination of the restricted shares before they vested. (*See id.* ¶¶ 19, 35-43.) Even more specifically, it alleged that Ruzicka "caused Austin's signature to be forged on certain of the necessary transactional documents" related to the 2006 transaction and that Ruzicka and Nelson "caused the [2013] restricted stock payments to be booked to Northland Hearing, rather than Starkey, which had the effect of shielding the payments from Starkey employees and Austin."[1] (*Id.* ¶¶ 36, 41.) Accordingly, the Court finds that the United States adequately alleged theories of affirmative concealment and misrepresentation in the Indictment.[2]

Next, the Court must determine whether the prosecution improperly amended the Indictment or varied the Indictment during trial.

First, Ruzicka's argument that the United States evaded the force of the jury instructions by improperly advancing a theory of affirmative misrepresentation or

---

[1] Earlier versions of the Indictment stated that Ruzicka and Nelson "took various steps to conceal the Northland transactions from Austin, including lying to and misleading Starkey and Northland Hearing employees and others," citing the act of booking the 2013 payments to Northland Hearing rather than Starkey as one example; the operative Third Superseding Indictment, filed after Nelson reached a plea agreement with the United States, eliminated the explicit allegation of "steps to conceal" but retained the example. (*Compare* 3d Superseding Indictment ¶ 41, *with* 2d Superseding Indictment ¶ 41, Dec. 5, 2017, Docket No. 215, *and* Superseding Indictment ¶ 42, Jan. 25, 2017, Docket No. 60. *See also* Nelson Plea Agreement at 4, Dec. 19, 2017, Docket No. 266.)

[2] Ruzicka distinguishes the 2013 restricted-stock transaction from the 2006 transactions and insists that "nothing in the indictment suggests that the basis for the claim of fraud in the *issuance* of the stock is anything but fraud by omission." (Reply Supp. Constructive Am. Mot. at 6, June 13, 2018, Docket No. 487.) But the allegation that Ruzicka caused Nelson to forge Austin's signature on the asset-transfer documents was sufficient to put Ruzicka on notice that fraudulent concealment was alleged as to the entirety of the 2006 transaction.

concealment in rebuttal argument fails because the Indictment alleged both theories, and the Court's instructions to the jury contemplated the possibility of conviction based on them. The prosecution explained to the jury in its rebuttal that there were three ways to commit fraud – "if you lie," "if you conceal," and "by standing by silently and failing to disclose facts, but only if there was a duty to reveal those facts." (Trial Tr. Vol. XXVI at 6369:7-23, July 13, 2018, Docket No. 517.) The prosecution then explained, "We are not alleging a fraud by omission in this case, and so you do not need to determine if any of the defendants had a duty to disclose. We are alleging fraud by lies and concealment." (*Id.* at 6370:1-4.) These statements were consistent with the Court's jury instructions. True, at Defendants' request, the Court instructed the jury that a defendant can only be convicted of mail or wire fraud for omitting a material fact if there was a legal duty to disclose the information. (Jury Instrs. Nos. 26-27.) But the Court also instructed the jury that a defendant can be convicted of mail or wire fraud for employing material falsehoods or concealing material facts if the prosecution proved that he "either made an affirmative representation or took deceptive actions intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." (*Id.*) As such, the Court concludes that the United States did not contradict the Court's instructions to the jury.[3]

---

[3] Ruzicka's protestation that the United States waited until rebuttal argument to disclaim the theory of fraud by omission fails because the United States consistently disclaimed a theory of omission or failure to provide honest services in pre-trial litigation. *See, e.g.*, *MILs Order*, 2018 WL 385422, at *8. As such, Ruzicka cannot credibly claim that "he was not fully appraised of the charges he would face." *Stuckey*, 220 F.3d at 981.

Ruzicka's argument that the United States improperly prosecuted him for criminal abuse of authority by a corporate officer falls short for the opposite reason: the United States never advanced such a theory. Singling out several lines from the prosecution's closing argument, Ruzicka submits that references to his position of authority suggested to the jury that it could convict him based solely on misuse of his authority rather than based on the elements of fraud charged in the Indictment and instructed by the Court. The prosecution argued that "Ruzicka and his coconspirators" acted "to take advantage of [their] positions of authority, particularly Mr. Ruzicka's unique position of trust and autonomy within Starkey, to steal from Starkey" and stated that the "glue that binds" the alleged conspiracy "is the abuse of Mr. Ruzicka's position of power and prominence to pave the way for this fraud by exploiting Mr. Ruzicka's position, as well as the authority of each of the defendants and coconspirators." (Trial Tr. Vol. XXVI at 6161:14-21, 6163:3-10.) Comparable to the use of an otherwise-legal firearm in an assault, Ruzicka's authority was thus depicted as a mere implement for perpetrating fraud.[4]

Ruzicka argues that the jury may have nonetheless been confused, based on its request that the Court "explain Occupational fraud," (Redacted Jury Question No. 2, Mar. 9, 2018, Docket No. 411), and subsequent statement that "there is a lot of animosity" in the jury room, (Redacted Jury Question No. 4, Mar. 9, 2018, Docket No. 415). But the Court promptly and properly responded to the question by explaining that "occupational fraud"

---

[4] The United States' trial brief described Ruzicka as having "orchestrated a massive scheme designed to enrich himself and his accomplices by misusing his authority and autonomy as president of Starkey Laboratories," putting him on notice of this theory. (Gov. MILs at 1.)

is not a crime and pointing the jury to the instructions relevant to the fraud charges. (Resp. to Jury Question No. 2, Mar. 9, 2018, Docket No. 412.) Those instructions properly explained what the jury must find to reach a guilty verdict and included a paragraph stating that a duty to disclose imposed by an employment contract is not a relevant legal duty. (Jury Instrs. Nos. 26-27.) As such, the Court concludes that the jury did not convict Ruzicka based on an uncharged abuse-of-authority theory.

The Court thoroughly instructed the jury as to the elements of each charge contained in the Indictment, laboriously read the full Indictment to the jury, provided the jury with a copy of the Indictment, and asked the jury to determine Ruzicka's guilt only with respect to the charges as stated in the Indictment. The jury was fully qualified to weigh the credibility of the evidence put on by the United States to substantiate the Indictment's allegations of affirmative misrepresentation and concealment. The fact that it deliberated four days before convicting Ruzicka on some charges and acquitting him on others demonstrates that it acted with the requisite seriousness.

The Court concludes that neither a constructive amendment nor a variance occurred and will deny Ruzicka's motion for a new trial on this ground.

## III.    MOTION FOR A NEW TRIAL – *NAPUE* VIOLATIONS

Ruzicka moves for a new trial because the United States failed to correct four statements that it knew were false. (Ruzicka's Mot. for a New Trial – *Napue* Violations ("*Napue* Mot."), Apr. 12, 2018, Docket No. 437.) Additionally, Ruzicka requests an

evidentiary hearing to present evidence about Austin's knowledge of Starkey's taxes. (*Id.* at 23-24.) Taylor joins. (Hearing Minutes.) The Court will deny the motion.[5]

The prosecution's knowing use of false testimony to obtain a conviction is a violation of due process. *Napue*, 360 U.S. at 269. When false testimony arises during the course of trial, "[t]he duty to correct false testimony is on the prosecutor, and that duty arises when the false evidence appears." *See United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988) (alteration in original) (quoting *United States v. Bigeleisen*, 625 F.2d 203, 208 (8th Cir. 1980)). "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (alteration in original) (quoting *Napue*, 360 U.S. at 271). To prove a *Napue* violation, the defendant must show "(1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." *United States v. West*, 612 F.3d 993, 996 (8th Cir. 2010) (quoting *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007)).

---

[5] Ruzicka also argues in this motion that the prosecution committed misconduct by misrepresenting the Court's *Napue* Order. Ruzicka makes a similar argument in his Motion for a New Trial Due to Prosecutorial Misconduct. (Mot. for a New Trial – Prosecutorial Misconduct at 22-24, Apr. 12, 2018, Docket No. 438.) The Court will address this portion of Ruzicka's *Napue* Motion together with its discussion of his Misconduct Motion, *see infra* § V.A, and will deny the *Napue* Motion as to both Ruzicka and Taylor for the same reasons discussed there.

### A.    January 2018 Interview

The Court must consider (1) whether Austin's testimony that he did not tell the United States about Larry Hixson was false and (2) whether the United States knew that testimony was false.  If so, the Court must decide whether the Defendants were prejudiced by the false testimony.  The Court will conclude that the Defendants were not prejudiced by Austin's testimony.

At trial, Austin claimed that the United States did not ask him about Larry Hixson. (Trial Tr. Vol. XIII at 2962:11-25, July 13, 2018, Docket No. 507.)  According to FBI Special Agent Brian Kinney's notes from interviews conducted just two weeks earlier, "Bill Austin stated that he did negotiate a contract with Larry Hixson and believed Hixson understood the contract.  Austin stated that he was not aware that Hixson was ill and that Hixson is still alive."  (*Napue* Mot., Ex. 1, Apr. 12, 2018, Docket No. 437-1.)

The Court need not decide whether Austin's testimony was false because the Court concludes that the Defendants were not prejudiced by Austin's testimony.  *West*, 612 F.3d at 996.  This testimony is material to the extent that the question whether Austin provided false testimony about what he told the FBI during interviews goes to his credibility as a witness.  But IRS Special Agent Shannon Korpela testified during cross-examination that Austin's testimony was inaccurate in this regard and that this inaccurate statement was made while Austin was under oath.  (Trial Tr. Vol. XXI at 5290:11-5292:14-5293:3:14, July 13, 2018, Docket No. 513.)  Moreover, the Court instructed the jury that it had struck two other portions of Austin's testimony because it had concluded that they were false and that the jury could consider "the fact that the Court has struck portions of Austin's

testimony in assessing his credibility." (Jury Instrs. No. 41.) The Court also instructed the jury:

> If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such an individual concerning other matters. You may reject all of the testimony of that witness or you may give it such weight or credibility as you may think it deserves.

(Jury Instrs. No. 7.) The jury was therefore sufficiently instructed that Austin had provided false testimony and how to weigh the falsity of that testimony when assessing Austin's credibility.

Because the Court finds that the jury had sufficient information to weigh Austin's credibility, the Court concludes that the United States' failure to correct other misstatements by Austin did not result in prejudice.

## B.     July 2016 Interview

The Court must decide (1) whether Austin's testimony that he never used the phrase "church and state" with reference to separating his personal and business assets was false and (2) whether the United States knew that testimony was false. Because the FBI unfortunately declines to record interviews, there is no way to know whether this statement was in fact said by Austin; it could have been merely the author's editorialization of Austin's comments. And, as discussed above, even if the United States knew that this statement was false, the Court again concludes that there was no prejudice because the falsity of the statement is material only to Austin's credibility and the jury was sufficiently instructed that Austin had otherwise provided false testimony. *See West*, 612 F.3d at 996.

Because the Court finds that it is not clear that Austin's testimony was false, the Court concludes that the United States did not have an obligation under *Napue* to correct this testimony.[6]

## C.    Austin's Signature

The Court must decide (1) whether Austin's testimony that he signed "hundreds of written actions" was false and (2) whether the United States knew that testimony was false. Ruzicka argues that the United States must have known that the written actions at issue

---

[6] During the hearing on this motion, the prosecution stated that it would not matter whether FBI interviews were recorded because the recordings would be inadmissible hearsay. The Court disagrees. Recordings could be used to refresh witnesses' recollections or for impeachment without running afoul of the hearsay rule. *See* Fed. Rs. Evid. 613, 806. Recordings could also be used by the Court in deciding preliminary questions, such as in deciding whether a witness is qualified to testify. *See* Fed. R. Evid. 104. Indeed, the Court cannot imagine an instance in which an audio or video recording of an interview would be inadmissible hearsay but an FBI agent's written notes of that interview would not be.

The prosecution also claimed that recording interviews may have a "chilling" effect, leading witnesses to refuse to speak to investigators. Of course, this assumes that witnesses prefer their statements to be written down – possibly incorrectly – during or after the interview. Whether the interview is videotaped or summarized after the fact, there remains a recording of the interview; the FBI agent's summary is merely a less reliable recording than a video or audio recording. Moreover, research has demonstrated that fears that witnesses will "clam up" when recorded are "unfounded." *See generally* Thomas P. Sullivan, *Police Experiences with Recording Custodial Interrogations*, N.W. Univ. Ctr. on Wrongful Convictions 19-23 (2004), https://www.americanbar.org/content/dam/aba/migrated/2011_build/death_penalty_moratorium/custodialinterrogations.authcheckdam.pdf.

These arguments are further belied by the fact that in 2014 the Executive Office for United States Attorneys "establishe[d] a presumption in favor of electronically recording custodial interviews, with certain exceptions, and encourages agents and prosecutors to consider taping outside of custodial interrogations." Mem. from Monty Wilkinson, Director, Exec. Office for U.S. Attorneys, to All U.S. Attorneys, *New Department Policy Concerning Electronic Recording of Statements* (May 12, 2014). While the presumption itself only applies to custodial interviews, the memo envisions that U.S. Attorneys and the FBI will tape other interviews, including witness interviews. The Court sees no reason to defend an unsupportable policy of not recording interviews when the Department of Justice itself has counselled against such a policy.

were not signed by Austin because it had the relevant documents in its possession and the documents were signed by others, each using their version of Austin's signature. But mere possession of the documents would not inform the United States that these documents were not signed by Austin because, on their face, the documents purport to be signed by Austin. There is no evidence to suggest that the United States knew that these documents were not actually signed by Austin. "[N]o constitutional violation occurs when the government has no reason to believe that the testimony was false." *United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992). Because the Court finds that the United States did not know whether Austin's testimony was false, the Court concludes that the United States did not have an obligation under *Napue* to correct Austin's testimony that he signed "hundreds of written actions."

### D.     Starkey's Tax Returns

The Court must decide (1) whether Austin's testimony that he only recently learned that Starkey's tax return was separate from his individual return and that he did not participate in the preparation of Starkey's returns was false and (2) whether the United States knew that testimony was false. The Court will conclude that it is unclear that Austin's testimony was false and that the United States did not know it to be false.

Ruzicka makes three arguments about why the United States knew that Austin's statement about his and Starkey's tax returns were false. First, Ruzicka argues that "it is facially implausible for the CEO of a billion-dollar corporation *with its own dedicated tax department* to claim he is unaware that the corporation files a tax return." (*Napue* Mot. at

20.)  While it would surely be reckless for a CEO not to be aware of his business's tax obligations, particularly when the CEO holds a majority share of the company, it is not factually impossible for a CEO to be so ignorant of the business's operations.  It is entirely possible that Austin is in fact that reckless.  The Court cannot find that the United States knew that Austin provided false testimony about his knowledge of Starkey's tax filings simply because the Court would hope that no CEO would be so ignorant of his or her company's tax structure.

Second, Ruzicka argues that Nelson informed the United States that Austin was involved in Starkey's tax strategy.  However, "[m]erely inconsistent statements do not establish use of false testimony."  *West*, 612 F.3d at 996; *see Napue* Order, 2018 WL 1064215, at *2.  On this record, the Court concludes that it has no reason to believe that the United States knows which of these contradictory statements are false.

Third and finally, Ruzicka argues that Korpela knew that Austin knew that Starkey filed a separate tax return because she had reviewed the returns.  Schedule E of Austin's personal income tax returns reported his income from Starkey with information drawn from Schedule K-1 forms issued by Starkey.  (*See Napue* Mot., Ex. 3 at 15 ("2003 Return"), Apr. 12, 2018, Docket No. 437-3; *Napue* Mot., Ex. 4 at 19 ("2004 Return"), Apr. 12, 2018, Docket No. 437-4.)  There is no dispute that Starkey and Austin filed separate returns. However, Austin's statement relates to his personal knowledge of the filings.  Austin's personal returns were prepared by Ernst & Young LLP.  (2003 Return at 5; 2004 Return at 5.)  The copies obtained by Ruzicka show that Austin personally signed an extension for time to file, but not that he signed under penalty of perjury that he had examined the returns

for accuracy. And, while Austin presumably did sign that statement before submitting them, he could have simply perjured himself by doing so. As such, nothing in the record conclusively proves that Austin read and reviewed his tax returns, let alone that the United States knew him to be lying when he testified to the contrary.[7]

Because the Court finds that the United States did not know whether Austin's testimony about the tax returns was false, the Court concludes that the United States did not commit a *Napue* violation by failing to correct this testimony. Accordingly, the Court will deny Ruzicka's motion for an evidentiary hearing. *Cf. MILs Order*, 2018 WL 385422, at *9-10 (denying Ruzicka's renewed *Brady* motion for related discovery).

*     *     *

Having reviewed all of arguments, the Court will deny Ruzicka's motion for a new trial on this ground.

## IV.    MOTION FOR A NEW TRIAL – MISCARRIAGE OF JUSTICE

Ruzicka moves for a new trial because (1) Austin's testimony was so incredible that allowing Ruzicka's conviction to stand would result in a miscarriage of justice and (2) the jury reached inconsistent verdicts with respect to the Archer Consulting charges. (Ruzicka's Mot. for New Trial – Miscarriage of Justice ("Miscarriage of Justice Mot."), Apr. 12, 2018, Docket No. 442.) The Court will deny the motion.

---

[7] Moreover, as above, even if Ruzicka could make such a showing, it would not establish prejudice because it only goes to credibility – whether Austin knew Starkey filed a separate tax return informs, but does not decide, the question whether Austin knew what was in the returns.

## A.     Austin's Credibility

The Court must decide whether a new trial is warranted because the United States relied on Austin's testimony to convict Ruzicka of three counts of mail and wire fraud related to Northland Hearing – Counts 2, 3, and 10. The Court concludes that, even absent Austin's testimony, sufficient evidence supported the jury's verdict.

The Eighth Circuit's decision in *United States v. Hilliard* is instructive as to how district courts should evaluate motions for new trials in cases where, as here, the United States' principal witness has "serious credibility problems." 392 F.3d 981, 986-88 (8th Cir. 2004). In *Hilliard*, the defendant was convicted of aiding and abetting the illegal transfer of firearms. *Id.* at 982. The district court awarded the defendant a new trial after finding that the government's two principal witnesses were not credible:

> Chief Judge Bennett concluded that the trial evidence "weighs heavily enough against the verdict for the court to conclude that a miscarriage of justice may have occurred," remarking that it was "an extraordinarily close call." The court noted that the government's case-in-chief rested largely on the testimony of James and Baskerville, and that both witnesses had serious credibility problems, exemplified by their equivocal testimony and lapses in memory. He further observed that the testimony of the two witnesses was often contradictory. Recognizing that Hilliard was convicted of only one of the five charged counts even though the evidence for all five overlapped, the court opined that the weakness of the evidence may have been the reason for the inconsistent verdict.

*Id.* at 987 (citation omitted). The Eighth Circuit affirmed and elaborated on the district court's analysis, noting that "the district court did not take issue with the *extent* of the government's evidence; it found problems with the *quality* of the evidence." *Id.* The Eighth Circuit stated that the evidence was "strong enough to withstand a motion for

judgment of acquittal, where the district court does not weigh evidence or consider the credibility of witnesses," but "in a new trial motion, the district court is to 'weigh the evidence and evaluate for itself the credibility of the witnesses.'" *Id.* (quoting *Huerta-Orozco*, 272 F.3d at 565). A motion for a new trial "may even be granted where there is 'substantial evidence to sustain the verdict.'" *Id.* at 987-88 (quoting *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002)). The Eighth Circuit concluded, "It was the district court's prerogative to find the testimony of Baskerville and James so unreliable that a conviction based on that testimony could not stand and, after independently reviewing that testimony, we find no error in the district court's conclusion." *Id.* at 988.

The Court finds Austin's testimony not credible. During trial, the Court had the opportunity to observe Austin's demeanor and testimony. Austin's testimony on direct examination was internally inconsistent, and the Defendants' thorough cross-examination revealed additional flaws in his recollection. His testimony was repeatedly contradicted by numerous witnesses and documents. Indeed, the Court has already concluded that Austin provided false testimony on at least two occasions. *Napue* Order, 2018 WL 1064215, at *2-6. The Court concludes that Austin's testimony is so unreliable that Ruzicka's convictions on the Northland charges stemming from the Northland transactions cannot stand if sufficient other evidence does not support the convictions. *Hilliard*, 392 F.3d at 988.

However, the Court concludes that sufficient other evidence supports the jury's verdict in this regard. Ruzicka focuses on evidence showing that Austin must have known about the 2006 stock issuance to Ruzicka, Nelson, and Longtain. (Miscarriage of Justice

Mot. at 4-5.)  The evidence – notably Nelson's testimony – establishes that Austin did know about the 2006 transaction.  (Trial Tr. Vol. XVIII at 4406:24-4408:24, July 17, 2018, Docket No. 525); *see United States v. Ruzicka* (*Victim Order*), No. 16-246, 2018 WL 3647226, at *5-7 (D. Minn. Aug. 1, 2018).  But Ruzicka's three convictions related to Northland all involve allegations related to the subsequent 2013 payments for termination of the restricted stock.  (*See* Indictment ¶¶ 38-43; Ruzicka Verdict at 1-2.)  The jury could have found that Austin knew about the 2006 issuance of the stock but still have convicted Ruzicka based on a finding that he fraudulently concealed the 2013 termination payments. Nelson testified that Austin did not know about the 2013 payments and that Ruzicka and Nelson intentionally booked the transaction to Northland Hearing rather than Starkey to hide the transaction from Austin.  (Trial Tr. Vol. XVIII at 4258:25-4262:17, 4276:25-4280:4.)  The Court finds Nelson's testimony credible.

As such, the Court concludes that sufficient evidence supported the jury's guilty verdict for wire and mail fraud stemming from the Northland Hearing transactions even absent Austin's testimony and will deny Ruzicka's motion as to Counts 2, 3, and 10.

### B.    Archer Consulting

The Court must decide whether a new trial is warranted because the jury found Ruzicka guilty of just one of a dozen counts related to Archer Consulting (Count 4). Because an inconsistent verdict alone cannot justify a new trial, the Court must consider whether sufficient evidence supported the verdict.  The Court will conclude that it does.

Admittedly, the jury's verdict as to Count 4 is striking in its inconsistency. Setting aside the conspiracy count, the United States brought 12 separate counts related to Archer Consulting against both Ruzicka and Taylor. (Indictment ¶¶ 58, 60, 62.) The jury acquitted the two on 11 of the 12 – including three related to the initial funds transfers from Starkey to Archer Consulting. (Ruzicka Verdict; Taylor Verdict.) Moreover, the conduct for which the jury convicted the Defendants on Count 4 (mail fraud based on mailing check #1113 from Archer Consulting to Paychex Retirement Services) is effectively indistinguishable from that for which the jury acquitted the Defendants on Count 23 (a transaction involving fraud proceeds based on Paychex cashing the check six days later). (*See* Trial Tr. Vol. XXI at 5191:1-5193:10, 5205:3-5206:18; Gov. Ex. 339.) These contradictions are difficult to logically reconcile.

But logic is of no moment here, because any attempt to parse the verdict "would be based on either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *United States v. Opare-Addo*, 486 F.3d 414, 417 (8th Cir. 2007) (quoting *United States v. Powell*, 469 U.S. 57, 66 (1984)). "Inconsistent verdicts may result from an inclination to be merciful or confusion on the part of the jury." *Id.* at 416-17 (citing *Powell*, 469 U.S. at 65). For this reason, when considering "what are characterized as inconsistent verdicts," the Court must ask only "whether the government presented sufficient evidence to support the conviction." *Id.* at 416 (citing *Nesbitt v. Hopkins*, 86 F.3d 118, 121 (8th Cir. 1996)).

In his renewed motion for acquittal, Ruzicka argues that there is not sufficient evidence to support his conviction on Count 4 because the mailing at issue took place after

the alleged fraud was complete – which, according to Ruzicka, was as soon as the money from Starkey hit Archer Consulting's bank account.[8]  (*See* Ruzicka's Renewed Mot. for J. of Acquittal at 2-5, Apr. 12, 2018, Docket No. 444.)  The United States contends that the mailing was not after-the-fact because – even if Ruzicka and Taylor controlled the Archer Consulting account – the scheme to defraud Starkey and Sonion was not complete until the funds passed through to Ruzicka and Taylor personally.[9]

No one disputes that getting money from Starkey was part of the fraudulent scheme alleged:  the three counts based on the transfers from Starkey to Archer Consulting, Counts 8, 13, and 14, were each for wire fraud.  (Indictment ¶ 60.)  But the full nature of the scheme is difficult to discern from the other charges brought against the Defendants.  Counts 20 through 23 allege that transfers from Archer Consulting to Paychex and to the Defendants were transactions involving fraud proceeds.  (*Id.* ¶ 62.)  Yet Count 4 alleges that a transfer from Archer Consulting to Paychex – effectively the same transaction charged in Count 23 – was mail fraud.  (*Id.* ¶ 58.)  And Counts 15 through 18 allege that transfers from Archer Consulting and from Paychex to the Defendants were wire fraud.  (*Id.* ¶ 60.)

---

[8] Ruzicka does not contest that there was substantial evidence of the mailing.

[9] For the first time, the United States also contends that the mailing was part of the scheme because it reduced the Defendants' tax liability and cloaked the scheme with an aura of legitimacy. *See United States v. Jinian*, 725 F.3d 954, 963-64 (9th Cir. 2013); *United States v. Lack*, 129 F.3d 403, 408-09 (7th Cir. 1997).  Ruzicka justifiably complains that these theories were not alleged in – or even suggested by – the Indictment.  To avoid the risk of a variance, the Court does not consider this argument.

At the hearing on these motions, the United States acknowledged these apparent contradictions and admitted that there "isn't a particular reason" for why the charges were brought in this haphazard fashion. Instead, the United States points to case law showing that mailings of fraud proceeds that further a fraudulent scheme may be charged as either mail fraud or a transaction involving fraud proceeds. *United States v. Seward*, 272 F.3d 831, 837 (7th Cir. 2001); *United States v. Morelli*, 169 F.3d 798, 806 n.9 (3d Cir. 1999) ("A [mail]ing could constitute [mail] fraud even though it involved money that had already been obtained as a result of fraud."). But the fact that the United States was free to select from two charges offers no insight into why it selected the charges it did.[10]

Even if the charging scheme is as perplexing as the jury's verdict, however, the narrative portion of the Indictment alleges that the fraudulent scheme was completed when Ruzicka and Taylor got paid. Specifically, the Indictment alleges that "Ruzicka was making secret payments to himself and Taylor via fraudulent commissions paid to a sham vendor." (Indictment ¶ 22.) "Via" means "by way of" or "through the medium or agency of." *Merriam-Webster's Collegiate Dictionary* 1310 (10th ed. 2001). This allegation therefore shows that the payments from Starkey to Archer Consulting were merely means to an end. The Indictment also alleges that the two men "split the proceeds" after Starkey paid fraudulent invoices. (*Id.* ¶ 25.) This reaffirms that dividing the spoils – including by transferring funds from Archer Consulting to Paychex – was more than mere "post-fraud

---

[10] Moreover, these cases make clear that the United States may charge any given transaction either way, but not necessarily that it may charge a particular transaction as both.

accounting" to which Ruzicka and Taylor were "indifferent." *Schmuck v. United States*, 489 U.S. 705, 714 (1989). Thus, even if the transfer was not an "essential element" of the scheme, it was incident to one. *Id.* at 710-11.

As such, the Court concludes that sufficient evidence supported the jury's guilty verdict for mail fraud stemming from the Archer Consulting mailing and will deny Ruzicka's motion as to Count 4.

\* \* \*

Accordingly, the Court will deny Ruzicka's motion for a new trial on this ground.

## V. MOTION FOR A NEW TRIAL – PROSECUTORIAL MISCONDUCT

Ruzicka moves for a new trial because of prosecutorial misconduct, arguing that prosecutors for the United States presented false and misleading questioning, argument, and testimony throughout the trial and particularly in rebuttal argument. (Ruzicka's Mot. for a New Trial – Misconduct ("Misconduct Mot."), Apr. 12, 2018, Docket No. 438.) The Court will deny the motion.

Ruzicka "must first show that the comments were improper and then that they prejudiced [Ruzicka's] rights in obtaining a fair trial. A prosecutor's comments are improper if they 'are likely to inflame bias in the jury and to result in a verdict based on something other than the evidence.'" *United States v. Crawford*, 523 F.3d 858, 861 (8th Cir. 2008) (citation omitted) (quoting *United States v. Mullins*, 446 F.3d 750, 759 (8th Cir. 2008)). Prosecutors "may not suggest that evidence which was not presented at trial provides additional grounds for finding [the] defendant guilty." *United States v. Segal*, 649

F.2d 599, 604 (8th Cir. 1981) (alteration in original) (quoting *United States v. Garza*, 608

F.2d 659, 662-63 (5th Cir. 1979)).  But "[s]o long as prosecutors do not stray from the

evidence and the reasonable inferences that may be drawn from it, they, no less than

defense counsel, are free to use colorful and forceful language in their arguments to the

jury." *United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir. 1997).  If the comments

are improper, the Court next examines "(1) the cumulative effect of the misconduct, (2) the

strength of the properly admitted evidence of the defendant's guilt, and (3) any curative

actions taken by the trial court." *Crawford*, 523 F.3d at 861 (quoting *United States v. Yu*,

484 F.3d 979, 986 (8th Cir. 2007)).

### A.     Austin's Credibility

The Court must decide whether the prosecution misled the jury in its rebuttal

argument by (1) misrepresenting the Court's *Napue* Order or Jury Instructions and

(2) improperly vouching for Austin's credibility.  The Court will conclude that the

prosecution's statements were not improper and did not prejudice Ruzicka.

Prior to closing statements, the Court clarified the extent to which the parties could

argue about the falsity of Austin's testimony.  At the charge conference, the Court stated,

"I find it very difficult to figure out what's knowingly and what's not knowingly about

[Austin's] testimony. . . . You can argue what you wish relative to this in your closing

arguments."  (Trial Tr. Vol. XXV at 6062:18-21, July 17, 2018, Docket No. 527.)  The

Court added:  "I think that the testimony itself has been stricken from the record, so I don't

think that you can talk about the substance of the testimony, but I do think that it's fair

game to argue that it bears on his credibility or not that these statements – the Court has found these statements to be false." (*Id.* at 6063:18-23.)

Ruzicka identifies two allegedly misleading statements made by the prosecution during its rebuttal. First, Ruzicka alleges that the prosecution misled the jury by stating that there was no judicial finding that Austin provided false testimony:

> Now the defense attorneys have repeatedly told you that there is a judicial finding that Mr. Austin lied. I want you to look at this instruction. There is one word you don't see there, right? You don't see the word "lied." You don't see the word "knowingly" false.

(Trial Tr. Vol. XXVI at 6366:17-21.) The prosecution's statement referenced Instruction 41, which stated that "the Court struck two portions of William Austin's testimony because the Court concluded that these statements were false." (Jury Instrs. No. 41.) Moreover, the Court expressly allowed the prosecution to argue whether Austin provided false testimony intentionally. (Trial Tr. Vol. XXV at 6062:18-21.) The Court concludes that the prosecution's representation of Instruction 41 was not improper.

Second, Ruzicka alleges that the prosecution improperly vouched for Austin's credibility by stating:

> There are two things that the Court did determine were false, and you will look at those two things and those facts, and you have to ask yourselves[,] how do they chalk up in terms of the four days of testimony that you heard from Bill Austin[?] He testified for four days, and there are two things that are the subject of this instruction[.]

(Trial Tr. Vol. XXVI at 6366:22-6367:3.) Again, there was nothing improper about this statement. As reflected in the Court's *Napue* Order and in Instruction 41, the prosecution

was correct that the Court found only two of Austin's statements to be false. "Improper vouching occurs when a prosecutor refers to facts outside the record, implies that the witness's testimony is supported by facts not available to the jury, gives an implied guarantee of truthfulness, or expresses a personal opinion regarding witness credibility." *United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004). The prosecution did none of these things in its rebuttal. It merely asked the jury to weigh the Court's finding that Austin made two false statements in light of his four days of testimony. Accordingly, the Court concludes the prosecution did not improperly vouch for Austin's credibility.

Even if the statements were improper, the Court concludes that its instructions to the jury cured any resulting prejudice. *See Crawford*, 523 F.3d at 861. Following closing arguments, the Court instructed the jury to follow the Court's instructions:

> The lawyers have quite properly referred to some of the applicable rules of law in their closing arguments to you. However, if any difference appears to you between the law as stated by counsel and the law as stated by the Court in these instructions, you, of course, must follow the instructions given to you by the Court.

(Jury Instrs. No. 2.) The Court thoroughly instructed the jury on how it may weigh witness credibility, including a statement on how the jury may consider false testimony:

> If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such an individual concerning other matters. You may reject all of the testimony of that witness or you may give it such weight and credibility as you may think it deserves.

(Jury Instr. No. 7; *see also* Jury Instr. No. 6.) The Court then instructed the jury on the falsity of two statements made by Austin and the fact that the jury could not consider the

substance of those statements. (Jury Instrs. No. 41.) Accordingly, even if the prosecution's statements were improper, the Court finds that any potential prejudice was remedied by the Court's instructions.

### B. Susan Mussell

The Court must decide whether the prosecution improperly stated in its rebuttal argument that Susan Mussell, Starkey's former general counsel, was the subject of an internal investigation and the federal investigation. The Court will conclude that the prosecution's statements about Susan Mussell were not improper.

Mussel drafted a memorandum on September 22, 2015, stating that the 2013 Northland transaction was disclosed in Starkey company records. (Misconduct Mot., Ex. 1 at 2-3, Apr. 12, 2018, Docket No. 438-1.) The United States attacked Mussel's credibility in its rebuttal argument by stating:

> Now Mr. Conard has brought up the memo drafted by Susan Mussell several times, and you have this in evidence. It's drafted after Mr. Ruzicka was terminated, and as you have heard from the agents, Susan Mussell was both the subject of the internal investigation, and she was a target of the federal investigation as well.

(Trial Tr. Vol. XXVI at 6372:23-6373:3.)

Ruzicka argues that no evidence was presented to substantiate argument that Mussell was the target of either Starkey's investigation or the federal investigation. Kinney testified that the United States received "volumes of documentation regarding what [Starkey's] allegations were of." (Trial Tr. Vol. IV at 853:23-24, July 13, 2018, Docket No. 500.) When asked "who was alleged by Starkey to have committed some

wrongdoing," Kinney responded by identifying subjects of the federal investigation, including "possibly Susan Mussell." (*Id.* at 859:13-22)  Kinney explained that "[t]he subject is the person who is alleged that has done the wrongdoing."  (*Id.* at 852:23-24.) Kinney's testimony makes clear that (1) Starkey alleged that Mussell had "committed some wrongdoing" and (2) Mussell was a possible subject of the federal investigation. Accordingly, the prosecution's comments were supported by Kinney's testimony.

Ruzicka argues that the United States "grasps at straws" to justify the statements. (Reply Supp. Misconduct Mot. at 3, June 13, 2018, Docket No. 483.)  First, Ruzicka argues that the United States used the phrase "the agents" in closing argument even though Kinney alone testified about Mussell as a subject of the investigation.  True, but such a slip of the tongue is not enough to render the comments improper in this case.  Second, Ruzicka argues that Kinney identified Mussell as a "subject" of the investigation rather than a "target."  In the criminal-investigation context, "target" and "subject" are not synonymous terms.  However, the Court did not instruct the jury on the distinction between a "target" and a "subject," and Kinney did not testify about it.  In common parlance, "target" and "subject" have similar meanings.  The Court has no reason to believe that the jury knew of the jargonistic distinction in how the terms are used by law-enforcement agencies and, even if it did, the Court would not conclude that calling Mussell a "target" rather than a "subject" "inflame[d] bias in the jury." *Crawford*, 523 F.3d at 861.  Both of Ruzicka's arguments are semantic and unpersuasive.

Accordingly, the Court concludes that the comments about Mussell were not improper.

## C. Trustee Verification Forms

The Court must decide whether the United States made improper statements about signatures on Employee Stock Ownership Plan ("ESOP") valuation reports. The Court will conclude that the prosecution's statements about who signed the ESOP reports were not prejudicial.

In its rebuttal argument, the prosecution stated:

> So, for example, remember all of the questions about these trustee certifications relating to the ESOP.
>
> Every year Scott Nelson certified that he had reviewed the valuations with the trustee, and the questioning was designed to suggest that because of these certifications Mr. Austin must have known about the Northland stock transaction.
>
> When Scott Nelson ultimately testified, though, he acknowledged the fact that there were two trustees for the ESOP, Jerry Ruzicka and Bill Austin, and he acknowledged that when he signed that record, he was affirming the fact that he had reviewed the valuation with Jerry Ruzicka.

(Trial Tr. Vol. XXVI at 6374:13-6375:1.)

Ruzicka argues that these statements were misleading because Nelson only signed the valuations in 2004 and 2005, and later valuations were signed by Mussell. Ruzicka argues that the importance of the signatures is to suggest that Austin was provided the valuation report every year. Ruzicka is correct that Mussell signed the ESOP valuations after 2005. (*Compare* Misconduct Mot., Exs. 3-4, Apr. 12, 2018, Docket Nos. 438-3, 438-4, *with* Exs. 5-6, Apr. 12, 2018, Docket Nos. 438-5, 438-6, *and* Ex. 7, Apr. 12, 2018, Docket No. 440.) However, whether Mussell or Nelson signed the certification does not inform whether the signatory actually reviewed the valuation with Austin. In fact, Nelson

testified that he "generally" provided the verification to Ruzicka and "[did]n't recall giving one to Bill." (Trial Tr. XVIII at 4208:3-14.) Nelson elaborated that Austin "would ask [him] occasionally what the share value was, but not a copy of the document." (*Id.* at 4208:17-18.) Whether Austin was knowledgeable about the contents of the valuation documents was a fact determination left to the jury. Accordingly, the Court concludes that Nelson's signature – or Mussell's – on the certifications is at best weak evidence that Austin was informed of the contents of the valuation, and concludes that any misstatement about who signed the documents was not prejudicial.

Moreover, the Court took curative action to correct any misstatements. The Court instructed the jury, "If any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or counsel." (Jury Instrs. No. 5.) The certifications were in evidence and could be evaluated by the jury, who would have seen the discrepancy between the prosecution's closing argument and the evidence.

Accordingly, the Court concludes that Ruzicka was not prejudiced by the prosecution's statement that Nelson signed the ESOP forms "every year."

### D. Nelson's Conversations with Austin

The Court must decide whether the prosecution made improper statements about a conversation Nelson had with Austin about Northland Hearing. The Court will conclude that the prosecution's characterization of Nelson's testimony was not prejudicial.

Nelson's testimony during cross-examination was that he spoke with Austin in or around 2006 about both the transfer of assets from Northland US to Northland Hearing and the issuance of restricted stock to Ruzicka, Nelson, and Longtain. (Trial Tr. Vol. XVIII at 4406:14-4408:24.) On redirect, Nelson testified that he only had one meeting with Austin about Northland Hearing, that it was at Starkey headquarters, that it was in 2006, and that the two discussed the asset transfer but not the restricted stock. (Trial Tr. Vol. XIX at 4666:23-4670:17, July 17, 2018, Docket No. 526.) Nelson further testified that, in 2015, he had a conversation with Austin at the Beach Road House. (*Id.* at 4677:3-4678:6.) At closing, the prosecution stated:

> Now, I mentioned to you a moment ago about the fact that Mr. Conard during his closing argument showed you some of the transcripts, some of the things that people said during their testimony but not all, including some portions of the testimony of Scott Nelson, and you'll recall that Mr. Conard showed you some language where Scott Nelson was talking about a conversation with Bill Austin about restricted stock.

> What you need to be clear about is the fact that when Mr. Conard asked this question, he asked about the conversation at the Beach Road house, and as Mr. Nelson clarified on redirect examination, the conversation at the Beach Road house happened in September of 2015.

> The only other conversation that Scott Nelson acknowledged ever having with Bill Austin about the ownership of Northland was the conversation wherein Scott Nelson said he talked to Bill Austin about moving Northland LLC into Starkey, moving the assets that Bill Austin owned into another company that Bill Austin owned.

(Trial Tr. Vol. XXVI at 6370:14-6371:7.) In support of this statement, the prosecution showed a portion of the cross-examination transcript showing that Nelson had a

conversation with Austin at the Beach Road House, but omitted several lines of transcript where Nelson stated that the conversation occurred in 2006.

The Court need not decide whether this omission was improper because the Court concludes that it was not prejudicial. Whether Austin knew about the 2006 issuance of the restricted stock is essential only to the conspiracy count. As discussed above, the jury could find Ruzicka guilty on the Northland counts even if Austin knew about the issuance of the restricted stock so long as the jury concluded that Austin did not know about the 2013 payments for termination of the restricted stock. Nelson testified that Austin did not know about the latter transaction. (Trial Tr. Vol. XVIII at 4258:25-4262:17.) This evidence adequately supports the verdict even if the jury believed Nelson's initial testimony that Austin knew about the issuance rather than his subsequent recantation. And, as discussed above, the Court gave an instruction regarding conflicts between the parties' arguments and the jury's recollection of the evidence. (Jury Instrs. No. 5.)

Accordingly, the Court concludes that Ruzicka was not prejudiced by the omission of portions of Nelson's testimony during rebuttal argument.

### E.    Ownership of Northland Hearing

The Court must decide whether the prosecution improperly used leading questions to elicit false testimony from Longtain and FBI Special Agent Matthew Snell that Ruzicka's ownership interest in Northland Hearing was not publicly disclosed. This testimony relates to forms filed with the Arizona and Connecticut Secretaries of State disclosing certain information about Northland Hearing. The Court will conclude that the

prosecution did not commit misconduct by asking Longtain and Snell about their knowledge of the disclosure forms.

On cross-examination, Longtain was questioned about whether the forms showed that Ruzicka, Nelson, and Longtain were officers of Northland Hearing. (Trial Tr. Vol. VIII at 1688:20-1690:3, July 17, 2018, Docket No. 524.) Next, when asked if, "where ownership is required to be listed, you three are listed as owners," Longtain responded, "I believe so." (*Id.* at 1689:21-1690:3.) On redirect, the prosecution demonstrated to Longtain that the forms disclosed that Ruzicka, Nelson, and Longtain were officers of Northland Hearing but did not disclose whether they were owners of the company. (*Id.* at 1732:16-1734:10.) These questions merely clarified that the document did not disclose whether Ruzicka, Nelson, and Longtain were owners. The Court concludes that this questioning of Longtain was not improper.

On cross-examination, Snell was asked whether Arizona requires public filing of an annual report. (Trial Tr. Vol. XVII at 3956:1-4, July 13, 2018 Docket No. 511.) Snell responded, "I don't know . . . whether it's a public filing." (*Id.*) On redirect, Snell was asked whether he knew if the document was publicly available. Snell stated, "As I discussed speaking with Mr. Conard, I don't know. He explained that it was available upon request for a certified copy, but whether it was publicly available and viewable on the website, I do not know." (*Id.* at 4108:23-4109:1.) Ruzicka claims that Snell must have known that the record was publicly available due to his wealth of experience in white-collar investigations. However, this wealth of experience does not mean that Snell or the prosecution is well-acquainted with the disclosure laws of Arizona. Ruzicka opened this

door when he asked Snell during cross-examination about his knowledge of whether the document was publicly available. The prosecution was entitled to follow up with Snell to clarify his knowledge, and he provided the same answer both times. The Court concludes that the questioning of Snell was not improper.

### F. Korpela's Testimony on SoundPoint

The Court must decide whether the prosecution improperly elicited false testimony from Korpela that Ruzicka directed the purchase of SoundPoint's accounts receivable balance at an inflated price for personal gain. The Court will conclude that the testimony elicited was improper but that it did not prejudice Ruzicka.

A prosecutor must have a "good faith belief that the incidents to which the questions alluded actually occurred." *See United States v. Monteleone*, 77 F.3d 1086, 1090 (8th Cir. 1996) (quoting *Mullins v. United States*, 487 F.2d 581, 585 n.1 (8th Cir. 1973)) (considering character evidence).

Korpela's testimony is worth quoting at length:

> Q. And so is the fact that they had accounts receivables a reference to the fact that there was money owed to [SoundPoint] from their customers?
>
> A. Yes.
>
> Q. Is that something that companies sometimes sell when they're being acquired?
>
> A. Yes.
>
> . . .

Q.      Was $500,000 below the price that All American paid for the accounts receivable?

A.      Yes, they paid [$]850,000.

(Trial Tr. Vol. XXI at 5144:8-14, 5145:1-3.)

At defense counsel's request, a sidebar followed:

[C]:    It may have been unintentional.  I think she just said they paid $850,000 for the accounts receivable.  That was the cash disbursement for the business as a whole.  Absolutely inaccurate, and they're talking about deal documents, which she has no problems interpreting, and we're building up to some kind of an opinion, I think.

[VA]:   If Mr. Conard, if he disagrees with her testimony, he can cross-examine her on all of those points.

[C]:     You have to have a good faith basis.

[VA]:   Yes, and I don't think you have established that she doesn't.  She has reviewed the documents.  She is the agent who is going to be testifying about the proceeds of the sale.

[C]:    The proceeds were 850.  She said that they paid that for the accounts receivable.  Obviously the proceeds involve a whole lot more than the accounts receivable, and they created a false impression of an inflated payment of a subcomponent of a deal.

[Ct.]:  I think you have to point out that she is wrong in your view on cross-examination, unless she is just blatantly wrong about this.

[VA]:   I don't believe she is incorrect.

(*Id.* at 5145:17-5146:16.)

She was.  The Purchase Agreement between SoundPoint and its members ("the 'Sellers'") and Northland Hearing (the "'Buyer'") states that "Sellers desire to sell, and Buyer desires to purchase, one hundred percent (**100%**) of the issued and outstanding units

(the "**Units**") of SoundPoint for consideration and on the terms set forth in this Agreement." (Misconduct Mot., Ex. 10 at 6, Apr. 12, 2018, Docket No. 438-10 (emphasis in original).) The agreement states that the purchase price for the Units would be $850,000. (*Id.* at 11.) And the agreement defines "Units" as "100% of the issued and outstanding Units of the Company, divided between the Members identified in Schedule 3.3." (*Id.*) More generally, "unit" is defined as "[t]he number of shares, often 100, that a given stock is normally traded in." *Black's Law Dictionary* 1568 (8th ed. 2004). No reasonable person skilled in law, business, or accounting could conflate "one hundred percent (100%) of the issued and outstanding units" for "the accounts receivable." The United States certainly did not when it explained in its Motions in Limine that "Ruzicka arranged for Starkey to **purchase the company** on terms favorable to SoundPoint, agreeing to pay SoundPoint $850,000 over and above the forgiveness of SoundPoint's extensive debt to Starkey." (Gov. MILS at 15-16 (emphasis added).)

There are no alternative interpretations of the facts with respect to the meaning of the Purchase Agreement or the United States' understanding of the Purchase Agreement. The prosecution should have known that Korpela's testimony was "blatantly wrong." Instead, the prosecution averred that the matter could be clarified on cross-examination. Admittedly, this mess probably would have been cleaned up if Korpela had not evaded questioning at that time. But instead, she eschewed from answering even basic questions:

> Q.   Do you recognize this as the purchase agreement for SoundPoint?
>
> A.   I do.

Q.      And if we look at the actual purchase agreement, what we are going to find is that it is a purchase of units; is that right?

A.      That is correct.

Q.      And units is the fancy word we use for shares if the entity is an LLC, right?

A.      I don't know that.

Q.      You don't know what units are?

A.      No.

Q.      What do you call shares in a LLC that's a partnership?

A.      I would call it a share.

Q.      Okay.  So you're testifying about the nature of this transaction.  Do you or do you not know the definition of units in the sale of an LLC partnership?

A.      It's defined right above there.

Q.      Do you know what – would you agree with me that it means the shares?

A.      I don't know.

Q.      Okay.  The other thing that is interesting about this is that in exchange for those units is the purchase price of $850,000?

A.      I believe that's tied to the accounts receivable.

Q.      Well, except that it's not anywhere in this document, is it?

A.      I don't know if it's in this one or not.  I have seen it –

Q.      Well, because – thank you.  Because there was an indication that the AR was [$]500,000 and that the price

was [$]850,000, and that seemed like a gap. Here, we have a purchase price of $850,000; is that right?

A.   Yes.

Q.   Okay. And if we want to know what they're buying, what the seller has to deliver in exchange for that are the units, right?

A.   That is what is written here, but I don't believe it's a correct representation.

Q.   You don't believe that this is the purchase agreement?

A.   I believe it's the purchase agreement, but it's one –

Q.   Is this the executed purchase agreement?

A.   I believe so.

Q.   For the deal?

A.   Yes.

Q.   There is no question that this is authentic because it's your document?

A.   I would agree with that.

Q.   Okay. You would agree that in this deal all the liabilities go with the shares. They are not excluded. There is no exclusion of liabilities?

A.   I don't know.

Q.   You don't know one way or the other?

A.   No.

Q.   You would agree with me that that's important because this deal closes on November 1, right?

A.   I don't know.

Q.      The final K-1 Mr. Ruzicka gave his tax preparer closed out his interest October 31st?

A.      Yes.

Q.      Everything goes to Northland on November 1?

A.      Around that date, yes.

Q.      And then whatever they do with that retail credit account happens somewhere around November 23rd?

A.      I don't know that.

Q.      Well, it happens long after Mr. Ruzicka's interest has been extinguished; is that true?

A.      I don't know that, either.

Q.      Have you checked?

A.      No.

Q.      So you don't know the nature of the debt treatment?

A.      The nature of it where?

Q.      Well, do you know when it was transferred and when it was extinguished and under what circumstances?

A.      Once it got to Starkey?

Q.      Right.

A.      No.

(Trial Tr. Vol. XXII at 5414:6-5417:7, July 13, 2018, Docket No. 514.)

Korpela – an IRS agent testifying for purposes of a tax-fraud count – failed to demonstrate basic knowledge about the terms of the SoundPoint Purchase Agreement.  As

such, the Court concludes that there was no good-faith basis for Korpela's testimony that

the $850,000 purchase price pertained only to SoundPoint's accounts receivable.

This was not the only time that Korpela claimed to not know critical details about

the case, and the prosecution failed to correct or clarify her testimony:

> Q.    Is SoundPoint or the – after SoundPoint, the 100 grand
>        a year for three years, charged in the indictment. Yes or
>        no?
>
> A.    The sale of SoundPoint is, yes.  The consulting
>        agreement is not.
>
> Q.    Well, show me in the indictment where it mentions the
>        word "SoundPoint"?
>
> A.    I don't have the indictment.  I couldn't show you.
>
> Q.    Is it possible you're mistaken, there is no mention of the
>        word "SoundPoint" in the entire indictment?
>
> A.    I don't know.
>
> Q.    All right.  But as you sit here today, you think that
>        SoundPoint is mentioned in the indictment.  Is that what
>        you're saying?
>
> A.    I think it's charged as part of the overall conspiracy, yes.

(*Id.* at 5349:1-16.)

It was not.  The United States was and is well aware that the word "SoundPoint"

does not appear in the Indictment.  It previously argued to the Court that evidence of

SoundPoint should be admissible because it is relevant to Ruzicka allegedly making and

subscribing a false return for 2010.  (*See* Gov. MILs at 15-16, 20-21.)  The Court permitted

this evidence solely because the sale of SoundPoint was "intertwined with the charge of

filing a false tax return." *MILs Order*, 2018 WL 385422, at *3-4 (distinguishing evidence of Audometrix and Hearing Fusion, which was admissible because it was sufficiently connected to the conspiracy charge). Left uncorrected by the prosecution, Korpela's erroneous testimony arguably expanded the conspiracy count to include allegations that the SoundPoint purchase was fraudulent. Indeed, in its briefing on this motion, the United States says that the SoundPoint evidence "demonstrates that Ruzicka was attempting to enrich himself at Starkey's expense" and implies that the jury could properly consider whether Ruzicka defrauded Starkey in part by causing it to overpay for SoundPoint. (Gov. Opp. to Misconduct Mot. at 14-16, May 30, 2018, Docket No. 473.) This position suggests that the evidence may have been introduced for an improper purpose and risked creating a constructive amendment or variance.

All of that said, the Court laboriously read the full Indictment to the jury and instructed the jury not to consider allegations not contained in the Indictment. And, crucially, the prosecution's questioning of Korpela and Korpela's testimony were relevant only to the conspiracy and the 2010 tax-fraud counts. The jury acquitted all four defendants on the conspiracy count and acquitted Ruzicka on the SoundPoint-related tax count. Accordingly, the Court concludes that Ruzicka was not prejudiced by the prosecution's questioning of Korpela or by Korpela's testimony.

### G.    Ruzicka's Ownership of Hearing Fusion

The Court must decide whether the United States improperly claimed that Ruzicka was an owner of – rather than merely a consultant for – Hearing Fusion. The Court need

not decide whether this claim was improper because the Court concludes that it was not prejudicial. Hearing Fusion was only relevant to the conspiracy count. *MILs Order*, 2018 WL 385422, at *3-4. Because the jury returned a verdict of not guilty on the conspiracy count, the Court concludes that any improper statements about the nature of Ruzicka's association with Hearing Fusion were not prejudicial.

\*       \*       \*

Accordingly, the Court will deny Ruzicka's motion for a new trial on this ground.

## VI.    MOTION FOR A NEW TRIAL – MISJOINDER

Ruzicka and Taylor each move for a new trial because of improper joinder of the four defendants. (Taylor's Mot. for a New Trial – Misjoinder ("Taylor's Misjoinder Mot."), Apr. 12, 2018, Docket No. 446; Ruzicka's Mot. for a New Trial – Misjoinder ("Ruzicka's Misjoinder Mot.")), Apr. 12, 2018, Docket No. 439). Taylor joins Ruzicka's motion in relevant part. (Hearing Minutes.) The Court will deny both motions.

### A.    Timeliness

The Court must first decide whether Ruzicka and Taylor's motions are timely. They are. Motions for improper joinder must be raised in a pre-trial motion when, as here, the basis for the motion is reasonably available and the motion can be determined without a trial on the merits. Fed. R. Crim. P. 12(b)(3)(B)(iv). If such a motion was not raised by a defendant before trial, a later motion must be denied as untimely absent a showing of good cause. Fed. R. Crim. P. 12(c)(3).

Ruzicka timely brought pre-trial motions on these grounds, (Ruzicka's Mot. to Sever; Ruzicka's Mot. to Dismiss), and Taylor moved to join them, (Taylor's Request to Join). At the close of trial, Ruzicka and Taylor renewed their motions. (*See* Trial Tr. Vol. XXIV at 5996:9-23.) Because the motions now before the Court simply raise more nuanced versions of the same arguments Ruzicka and Taylor timely brought both before trial and at the close of the United States' evidence, they are themselves timely. *See United States v. Brown*, 921 F.2d 785, 793 (8th Cir. 1990).

### B. Exculpatory Testimony

The Court must decide whether joinder deprived Ruzicka and Taylor of the opportunity to present exculpatory testimony from co-defendants Hagen and Miller. The Court will conclude that Ruzicka and Taylor were not prejudiced by the absence of their co-defendants' testimonies.

Severance is required when joinder is prejudicial to a defendant's right to a fair trial. Fed. R. Crim. P. 14(a). To demonstrate "real prejudice," a defendant must show "something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004) (quoting *United States v. Oakie*, 12 F.3d 1436, 1441 (8th Cir. 1993)). To show that a defendant's inability to call a co-defendant as a witness caused real prejudice, the defendant "must show that it is likely his co-defendant actually would have testified and that this testimony would have been exculpatory." *Id.* Indeed, the testimony must be "substantially exculpatory" – that is, it must "do more than merely tend to contradict a few details of the

government's case." *Id.* (quoting *Oakie*, 12 F.3d at 1441); *see also United States v. Starr*, 584 F.2d 235, 238-39 (8th Cir. 1978) (relevant testimony would have "exonerated" or "absolved" defendant).

Ruzicka submits an affidavit from Hagen stating that he would have been willing and able to testify in Ruzicka's defense. (Ruzicka's Misjoinder Mot., Ex. 1, Apr. 12, 2018, Docket No. 439-1.) Hagen states that he would have testified that (1) Austin knew about Ruzicka's involvement with SoundPoint and that Ruzicka protected Starkey's interest when dealing with Soundpoint; (2) Ruzicka and Taylor's involvement with Archer Acoustics was well-known in the industry and was known by Sonion; and (3) Bill Austin told Hagen that he could have ownership of his company cars after it was fully depreciated. (*Id.*) This evidence is identical to other testimony presented by the defense at trial and, at most, would have bolstered the credibility of that evidence by corroborating it. As such, even though this testimony does contradict certain key details of the United States' case and thereby may have given Ruzicka and Taylor a better chance of acquittal, it is not "substantially exculpatory." *Mickelson*, 378 F.3d at 818.

Although Ruzicka lacks a comparable affidavit from Miller proving that he would have testified, the Court credits Ruzicka's representation that Miller stated that he would have done so based on the full record, including the co-defendants' close association at trial and Ruzicka's representations at the hearing on this motion as to the reason why Miller did not provide an affidavit. According to Ruzicka, Miller would have testified that (1) Ruzicka, not Austin, made all compensation decisions; (2) the 2006 issuance of the Northland restricted stock was never hidden or concealed, Austin reviewed ESOP

documents related to the stock, and Austin knew about the stock; and (3) Austin was regularly involved in tax decisions.  Again, though this testimony would have bolstered the credibility of other defense evidence that contradicted certain details of the United States' case, it is not "substantially exculpatory" – particularly because, as above, the jury could have convicted Ruzicka on the Northland counts based solely on its belief that he fraudulently concealed the 2013 termination payments.

The Court finds that Ruzicka and Taylor have not demonstrated prejudice to warrant severance and accordingly will deny Ruzicka's motion for a new trial on the ground of improper joinder.

### C.     Unrelated Acts

The Court must decide whether joinder deprived Taylor a fair trial because it led to the presentation of extensive evidence of acts unrelated to the charges against him.  The Court will conclude that it did not.

Taylor effectively renews his previous argument that the Indictment did not allege and the United States did not prove the existence of a unitary conspiracy.  (*See* Trial Tr. Vol. XXIII at 5511:6-5512:23, July 13, 2018, Docket No. 515.)  Before denying related motions at the end of trial, the Court found that the United States had established the existence of a single hub-and-spoke conspiracy by a preponderance of the evidence.  (*Id.*) However, the Court instructed the jury that it must decide whether the United States had proved beyond a reasonable doubt that the Defendants were part of that single conspiracy. (Jury Instrs. No. 24.)  The jury decided that the United States had not and acquitted all four

Defendants on the conspiracy charge.  (Ruzicka Verdict at 1; Taylor Verdict at 1; Miller Verdict at 1; Hagen Verdict at 1.)

As above, severance is required when joinder is prejudicial to a defendant's right to a fair trial.  Fed. R. Crim. P. 14(a).  Real prejudice exists when "the jury [is] unable to compartmentalize the evidence as it relates to the separate defendants."  *Mickelson*, 378 F.3d at 818.  But "[s]everance is not required merely because evidence that is admissible only against some defendants may be damaging to others."  *Id.* (quoting *United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir. 1995)).  "Rarely, if ever, will it be improper for co-conspirators to be tried together."  *United States v. Drew*, 894 F.2d 965, 968 (8th Cir. 1990).  "And where the jury has acquitted one defendant while finding a co-defendant guilty of the same charge, we have held that the jury properly compartmentalized the evidence."  *United States v. Washington*, 318 F.3d 845, 858 (8th Cir. 2003).

The Court will decline to revisit its conclusion that the United States charged a unitary conspiracy and proved its existence by a preponderance of the evidence.  Taylor now argues that the jury's acquittals on the conspiracy charge prove that joinder was improper in the first instance.  But the Supreme Court has declined to "fashion a hard-and-fast formula that, when a conspiracy count fails, joinder is error as a matter of law," instead emphasizing the duty of the trial judge to grant a severance if prejudice appears.  *Schaffer v. United States*, 362 U.S. 511, 516 (1960).  Here, the conspiracy count did not "fail" until the verdicts were read, and up to that point the Court upheld its duty to watch for and avoid prejudice through resolving objections and giving careful instructions to the jury.  Far from showing that joinder was improper in the first instance, the jury's acquittals show that it

understood and complied with the Court's instructions. Similarly, the jury's acquittals of Hagen on Counts 7 and 19 – counts on which it convicted both Ruzicka and Taylor – demonstrates that it did properly compartmentalize the evidence.

To determine after the fact whether joinder caused prejudice, a court considers whether there was "(1) [a] failure to give limiting instructions; (2) evidence of guilt that is not overwhelming; (3) admission of evidence that would be inadmissible in a trial of only properly joined defendants and counts; (4) evidence on the improperly joined charges that is indistinct and not easily segregated; [or] (5) en masse trial of numerous defendants." *United States v. Sazenski*, 833 F.2d 741, 745-46 (8th Cir. 1987). Conceding that the Court's instructions caused him no prejudice, Taylor argues that the other four factors weigh in his favor. The Court disagrees. Joining four defendants is not a trial en masse. And, setting aside whether evidence of Taylor's guilt was overwhelming, much of the evidence Taylor says was unrelated would nonetheless have been admissible in a severed trial – and virtually all of it was, as above, compartmentalized by the jury.

The Court finds that Taylor has not demonstrated prejudice warranting severance and accordingly will deny his motion for a new trial on the ground of improper joinder.

## VII.   MOTION FOR A NEW TRIAL – *BRADY* MATERIALS

Ruzicka moves for a new trial because the United States allegedly withheld certain *Brady* materials. (Mot. for New Trial – *Brady* Materials ("Brady Mot."), June 13, 2018, Docket No. 489.) The Court will deny the motion because it will conclude that Ruzicka was aware of all the material facts relating to the materials.

Ruzicka alleges that he was contacted by the FBI after trial, on June 5, 2018, to discuss an investigation into stolen art and artifacts. Specifically, the FBI asked Ruzicka about an 1865 letter from General Ulysses S. Grant that was given to him by Starkey. (*Id.* at 3.) According to Ruzicka, the FBI indicated that the Grant letter was a gift from Starkey. (*Id.*) Ruzicka alleges that the Grant letter was a "form of non-traditional compensation which was commonplace at Starkey," and a statement about the letter by Starkey president Brandon Sawalich could have been introduced to impeach Austin's claims that Starkey did not provide non-traditional compensation. (*Id.* at 4-6.)

Under *Brady*, "prosecutors have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence." *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016). Evidence is "material" only if there is a "reasonable probability" that its disclosure would result in a different outcome of the proceeding. *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The Court finds that Sawalich's purported statement about the Grant letter is *Brady* material because it is impeachment evidence. However, the Eighth Circuit has held that the United States does not suppress *Brady* material when the defendant otherwise has access to the source of the material or the material is cumulative of other evidence already available to the defendant. *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001). Ruzicka has knowledge about the circumstances under which Starkey gave him the letter.

The Court concludes that that Sawalich's statement is cumulative with Ruzicka's own knowledge of the letter and, therefore, the non-disclosure of Sawalich's statement did not violate *Brady*.  Ruzicka argues that he could not admit evidence of his own knowledge without forfeiting his Fifth Amendment privilege against self-incrimination.  Yet *Brady* does not concern the ability of the defendant to **admit** exculpatory evidence; it only requires the **disclosure** of exculpatory evidence.

Moreover, the Court concludes that disclosure of the evidence would not have resulted in a different verdict.  Ruzicka and Miller questioned Austin extensively about Starkey's award of bonuses, loans, and other non-traditional forms of compensation, including Ruzicka's house.  (Trial Tr. Vol. XIII at 3086:25-3112:14; Trial Tr. Vol. XIV at 3194:14-3208:3, July 13, 2018, Docket No. 508.)  Ruzicka impeached Austin with various agreements he made with employees.  (Trial Tr. Vol. XIII at 3088:10-20, 3092:20-3094:16.)  The jury was provided with ample impeachment evidence about non-traditional forms of compensation provided to Starkey employees, including Ruzicka.  And Austin's credibility more generally was repeatedly called into question.  The Court concludes that Sawalich's statement about the Grant letter was cumulative of this evidence and does not create a "reasonable probability" of a different result such that confidence in the verdicts is undermined.

Accordingly, the Court will deny Ruzicka's motion for a new trial on this ground.

# VIII. MOTIONS FOR ACQUITTAL

Ruzicka and Taylor both renew their motions for acquittal. Specifically, Ruzicka moves for acquittal on Counts 2, 3, and 10 (related to Northland Hearing), Count 4 (related to Archer Consulting), Counts 7 and 19 (related to Archer Acoustics), and Count 25 (related to his 2014 tax return). (Ruzicka's Renewed Mot. for J. of Acquittal.) Taylor moves for acquittal on Counts 4, 7, and 19. (Taylor's Mot. for J. of Acquittal, Apr. 12, 2018, Docket No. 445.) The Court will deny both motions.

## A. Northland Hearing (Counts 2, 3, and 10)

Ruzicka argues that there was insufficient evidence to sustain his conviction on Counts 2, 3, and 10. The Court will deny the motion because (1) sufficient evidence shows that the charged mailings were drawn from Starkey's accounts payable department to support Counts 2 and 3 and (2) sufficient evidence shows that Ruzicka concealed the 2013 termination payment to support Count 10.

First, Ruzicka argues that the charged mailings in Counts 2 and 3 were fund transfers from Ruzicka's investment account to a life-insurance account and, therefore, the fraudulent scheme alleged was complete before the charged mailings took place.

> Crucial to a conviction for mail fraud is a showing the mailings are "incident to an essential part of the scheme," although it is "not necessary that the scheme contemplate the use of the mails as an essential element." Thus, as a general proposition, use of the mails after a scheme reaches fruition will not constitute grounds for a conviction.

*United States v. Taylor*, 789 F.2d 618, 620 (8th Cir. 1986) (citations omitted) (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)). The United States contends that these

mailings – although mailed from an Edward Jones office – were in fact mailings of checks from Starkey's accounts payable department. Although the Indictment describes the checks as "sent from Edward Jones to Lincoln Financial Group," Nelson's testimony and the checks themselves substantiate the United States' contention and, in turn, the verdict. (*See* Trial Tr. Vol. XVIII at 4262:18-4270:19; Gov. Exs. 690, 629, 698, 699.)

Second, Ruzicka argues that there was insufficient evidence that he concealed the 2006 issuance of Northland Hearing restricted stock to sustain Counts 2, 3, and 10. But, as above, concealment of the 2013 termination payments alone is sufficient to sustain Ruzicka's conviction on the Northland counts. *See supra* § IV.A. And Nelson testified that he followed Ruzicka's direction to conceal those payments. (Trial Tr. Vol. XVIII at 4278:7-4280:25.)

Accordingly, the Court will deny Ruzicka's motion for acquittal on Counts 2, 3, and 10.

### B.    Archer Consulting (Count 4)

#### 1.    Ruzicka

As discussed above, Ruzicka argues that there was insufficient evidence to sustain a conviction on Count 4 because the mailing at issue took place after the alleged fraud was complete. The Court already determined that there was sufficient evidence to sustain the verdict in the course of considering Ruzicka's motion for a new trial on Count 4. *See supra* § IV.B; *cf. infra* § VIII.B.2. Accordingly, the Court will deny Ruzicka's motion for acquittal on Count 4.

### 2. Taylor

Taylor renews his argument that there was insufficient evidence that he acted to conceal Ruzicka's interest in Archer Consulting to sustain his conviction on Count 4. Taylor argues that Ruzicka had authority to hire him as a consultant, that the payments to Archer Consulting were on Starkey's books, that he took no affirmative acts to conceal the existence of Archer Consulting, and that Taylor gave services of value to Starkey through Archer Consulting. Taylor brought a Rule 29 motion on the same grounds at the close of trial. The Court will decline to revisit its finding that the United States had produced sufficient evidence that Taylor participated in and knew of Ruzicka's efforts to conceal Ruzicka's role in Archer Consulting from Starkey. This remains a jury question. And, taking the evidence in the light most favorable to the United States, a reasonable jury could conclude that emails where Ruzicka referred to Archer Consulting in the third person were evidence of fraudulent concealment of Ruzicka's ownership in the company; similarly, a reasonable jury could infer from Snell's testimony about the nature of the invoices that Taylor had not done legitimate consulting work. (*See, e.g.*, Trial Tr. Vol. XV at 3547:14-3554:16, July 13, 2018, Docket No. 509.) Accordingly, the Court will deny Taylor's motion for acquittal on Count 4.

### C. Archer Acoustics (Counts 7 and 19)

#### 1. Ruzicka

Ruzicka renews his argument that there was insufficient evidence that he acted to conceal his involvement with Archer Acoustics from Sonion to sustain his conviction on

Counts 7 and 19.  But the United States alleged that Ruzicka and Taylor worked together to misrepresent Starkey as affiliated with Archer Acoustics and to conceal Taylor's involvement in Archer Acoustics from Sonion.  (Indictment ¶¶ 31-32.)  Ruzicka argues that he had no affirmative duty to disclose Taylor's involvement to Sonion, which, though true, ignores the fact that the United States presented evidence at trial showing that both men took steps to conceal Taylor's involvement from Sonion.  Crucially, Ruzicka agreed to open a post office box for Archer Acoustics near Starkey headquarters so that Taylor did not have to open one near the headquarters of Sonion U.S.  (Trial Tr. Vol. XVI at 3754:22-3758:15, July 13, 2018, Docket No. 510.)  Taken in the light most favorable to the United States, this and other related evidence is sufficient for a reasonable jury to conclude that Ruzicka assisted Taylor in concealing his involvement from Sonion.  *Rosemond v. United States*, 134 S. Ct. 1240, 1247 (2014).  Accordingly, the Court will deny Ruzicka's motion for acquittal on Counts 7 and 19.

### 2.    Taylor

Taylor renews his argument that there was insufficient evidence of fraudulent intent or material harm to sustain a conviction on Counts 7 and 19 because Sonion benefitted from his activities with Archer Acoustics.  Specifically, Taylor contends that Archer Acoustics helped Sonion sell additional units at a discounted lower price point that Sonion willingly gave Starkey, thereby taking business from its competitor.  As such, Taylor says, it makes no difference whether he took a "cut" for himself by selling the units at a slightly higher price.  But even if Taylor did bring additional business to Sonion, his "cut"

represented profits that Sonion could have earned had Taylor brought in the business as President of Sonion U.S. instead of as co-owner of Archer Acoustics. And, because the new customers were purchasing at the discounted Starkey rate, the total profit may have been lower than it could have been had Taylor brought in those customers by negotiating deals on behalf of Sonion. The evidence of Taylor's acts of concealment, *see supra* § VIII.C.1, construed in the light most favorable to the United States, is sufficient for a reasonable jury to find that Taylor fraudulently skimmed proceeds from Sonion to Archer Acoustics. The Court will thus deny Taylor's motion for acquittal on Counts 7 and 19.

### D.     Tax Fraud (Count 25)

Ruzicka renews his argument that there was insufficient evidence of intent to commit tax fraud to sustain a conviction on Count 25 because he believed the $200,000 he received from Starkey was a loan, not income. The United States contends that the payment was designed to cover tax liability created by the 2013 termination payments. Longtain and Nelson received similar payments; Longtain testified that he believed the money was taxable income because he understood that repayment was not expected and Nelson acknowledged that there was "some chance" he would not have to repay the "loan." (Trial Tr. Vol. VIII at 1652:9-1654:16; Trial Tr. Vol. XVIII at 4290:10-19.) Moreover, Nelson testified that he drafted promissory notes for himself and Longtain but not for Ruzicka, (Trial Tr. Vol. XVIII at 4289:21-23, 4291:6-12, 4293:1-15), and that the payment to Ruzicka was mischaracterized as an insurance expense rather than a loan, (*id.* at 4283:19-4284:12). True, Nelson also testified that both he and Ruzicka believed that the payment

to Ruzicka was a loan and that Ruzicka would not have to pay taxes on the purported loan until it was formally forgiven. (Trial Tr. Vol. XIX at 4733:14-4734:17.) But when the totality of this evidence is taken in the light most favorable to the United States, it is sufficient to sustain a jury's conclusion that Starkey had no expectation of repayment and that Ruzicka therefore knew that the payment was not a loan. Accordingly, the Court will deny Ruzicka's motion for acquittal on Count 25.

## IX. *FRANKS* MOTION

Finally, Ruzicka renews his motion for a *Franks* hearing, arguing that *Jenks* material and Kinney's trial testimony justify the suppression of evidence used at trial.[11] (Ruzicka's Renewed *Franks* Mot. ("*Franks* Mot."), Apr. 12, 2018, Docket No. 443.) Taylor joins. (Hearing Minutes.) The Court will deny the motion.

Ruzicka submits that Kinney knew that Austin's October 2015 statements that no one else had authority to sign Austin's name were false because (1) a different witness told a different investigator in March 2016 that Austin generally had others sign documents on his behalf, (2) Austin told Kinney in June 2016 that his stepson had signed his name without

---

[11] Before trial, the Court adopted the Magistrate Judge's conclusion that Kinney did not have an intent to mislead when he submitted a series of search warrant applications. (Order, June 14, 2017, Docket No. 175; R. & R. at 11-13.) The United States argues that Ruzicka has waived the right to bring this renewed motion because these statements were drawn from memoranda available to Ruzicka before trial. *See United States v. Frazier*, 280 F.3d 835, 844-45 (8th Cir. 2002). But Ruzicka raised the issue of signature authority in his initial motion, (Mot. to Suppress, Mar. 31, 2017, Docket No. 133), and now argues – if only at a high level of generality – that Kinney's trial testimony provided newly disclosed evidence meriting reconsideration.

authority, and (3) Austin told different investigators on July 22, 2016, that he did not know about the process through which others were signing documents on his behalf until Starkey's investigation began.[12]  But the March 2016 statements cannot support a finding that Kinney had the intent to mislead because they were made by a different witness to a different investigator; as such, this contradiction alone cannot prove that Kinney knew that Austin had been untruthful.  Furthermore, Austin's June and July 2016 statements show that investigators eventually followed up with Austin about the matter; as such, it cannot be said that Kinney acted with reckless disregard for the truth.  Therefore, these subsequent statements only put at issue the July 22, 2016, warrant for Taylor's "Geronimo Rose" email account.  Austin's June and July 2016 statements did not directly contradict his October 2015 statements:  the fact that Austin knew others had signed his name does not necessarily mean that Austin authorized them to do so.  Whie the thoroughness of the FBI's investigation left much to be desired, the Court is not persuaded that Kinney acted with reckless disregard for the truth by failing to clarify Austin's confused or misleading statements.  The bar is no higher than that.

---

[12] Ruzicka does not argue that a *Franks* hearing is required simply because Austin knew his own statements to be false, and he would be unsuccessful in doing so.  "To obtain a *Franks* hearing based simply on purported falsehoods of a confidential informant, the defendant must show that the confidential informant was in fact acting as a government agent.  The most important factors in determining whether a private citizen was acting as an agent of the government are whether the government acquiesced in the citizen's improper conduct, and whether the citizen was acting to assist law enforcement or to further his own ends."  *United States v. Hollis*, 245 F.3d 671, 673-74 (8th Cir. 2001) (citation omitted).  Ruzicka has persuasively argued throughout this case that Austin acted to further his own ends, not those of the United States; as such, if anything, the agency relationship was the other way around.

Ruzicka also submits that Kinney purposefully omitted from his search-warrant applications the existence of a 2005 document naming Ruzicka chief manager of Northland US, which Ruzicka says contradicted Austin's assertions about delegating signing authority. The document gave Ruzicka authority to execute any document that "purchases or sells any real or tangible property on behalf of the Company in the States of Oregon and Washington." (*Franks* Mot., Ex. 6 at 2, Apr. 12, 2018, Docket No. 443-6.) Given that Austin wholly owned Northland US, this document does at least implicitly contradict Austin's claims that he "has never given signature authority to Jerry Ruzicka on his (Austin's) behalf" and that "he never gave Jerry Ruzicka authority to sign his (Austin's) name." (*Franks* Mot., Ex. 1 at 3-4, Apr. 12, 2018, Docket No. 443-1.) But the Court has no reason to believe that the omission of this document was intentional. First, the document delegates signing authority only implicitly. Second, the document delegates only limited signature authority. Finally, Ruzicka has provided no evidence as to when the United States gained access to the document. As such, it cannot be said that omission of the document undermined a finding of probable cause. *United States v. Ellison*, 793 F.2d 942, 947 (8th Cir. 1986).[13]

Accordingly, the Court will deny Ruzicka's renewed *Franks* motion.

---

[13] The same is true generally. "Probable cause to issue a search warrant exists if, in light of the totality of the circumstances, there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Shockley*, 816 F.3d 1058, 1061 (8th Cir. 2016) (quoting *United States v. Donnell*, 726 F.3d 1054, 1056 (8th Cir. 2013)). Austin's apparent falsehoods notwithstanding, each of the warrants was supported by enough other uncontroverted material to justify a finding of probable cause.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Ruzicka's Motion for a New Trial (Constructive Amendment) [Docket No. 436] is **DENIED**.

2.      Defendant Ruzicka's Motion for a New Trial (*Napue*) [Docket No. 437] is **DENIED**.

3.      Defendant Ruzicka's Motion for a New Trial (Prosecutorial Misconduct) [Docket No. 438] is **DENIED**.

4.      Defendant Ruzicka's Motion for a New Trial (Improper Joinder) [Docket No. 439] is **DENIED**.

5.      Defendant Ruzicka's Motion for a New Trial (Miscarriage of Justice) [Docket Nos. 441 and 442] is **DENIED**.

6.      Defendant Ruzicka's Renewed Motion for a *Franks* Hearing [Docket No. 443] is **DENIED**.

7.      Defendant Ruzicka's Renewed Motion for Acquittal [Docket No. 444] is **DENIED**.

8.      Defendant Taylor's Motion for Acquittal [Docket No. 445] is **DENIED**.

9.      Defendant Taylor's Motion for a New Trial (Improper Joinder) [Docket No. 446] is **DENIED**.

10.     Defendant Ruzicka's Motion for New Trial (*Brady* Materials) [Docket No.

489] is **DENIED**.


DATED:  September 7, 2018                              s/John R. Tunheim
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                                              Chief Judge
                                                  United States District Court